# EXHIBIT 3

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

In re:

Lightning Technologies, Inc.,                     Case No. 21-41019
                                                  Chapter 7
                                                  Honorable Thomas J. Tucker

      Debtor.
_____/

## <u>EXHIBIT – FINAL VERSION</u>

## <u>AMENDED ASSET PURCHASE AGREEMENT</u>

      Fred J. Dery, Chapter 7 Trustee, through his counsel, The Taunt Law Firm, files this Final Version of the Amended Asset Purchase Agreement between the Trustee and Palltronics, Inc. including all schedules and amendments thereto.

      **THE TAUNT LAW FIRM**

By:   <u>/s/ Erika D. Hart (P67457)</u>
Dated: May 25, 2021      Erika D. Hart (P67457)
      Dean R. Nelson, Jr. (P70818)
      Attorneys for Trustee
      700 E. Maple Rd., 2nd Floor
      Birmingham, MI 48009
      (248) 644-7800
      ehart@tauntlaw.com
      dnelson@tauntlaw.com

*Execution Version*

## AMENDED 363 SALE ASSET PURCHASE AGREEMENT

This AMENDED 363 SALE ASSET PURCHASE AGREEMENT (the "Agreement") is entered into as of March 16, 2021 but effective as of March 4, 2021, between **Palltronics, Inc**., a Michigan corporation ("Buyer"), and **Fred J. Dery, in his capacity as Chapter 7 Trustee for the bankruptcy estate of Lightning Technologies Inc., Case No. 21-41019-tjt** ("Trustee" or "Seller", and collectively with Buyer, the "Parties" and each a "Party"). The date on which this Agreement is accepted by the Seller, as evidenced by his signature below, is the "Acceptance Date".

## RECITALS

WHEREAS, on February 5, 2021, an involuntary petition under Chapter 7 of the United States Bankruptcy Code, 11 USC §§101 *et. seq.,* as amended (the "Bankruptcy Code") was filed against Lightning Technologies, Inc. ("Debtor"), thereby commencing Case No. 21-41019-tjt (the "Bankruptcy Case") in the United States Bankruptcy Court for the Eastern District of Michigan ("Bankruptcy Court"); and

WHEREAS, Debtor consented to the involuntary petition and the Bankruptcy Court entered its Order for Relief on February 8, 2021 [Docket No. 5]; and

WHEREAS, Fred J. Dery was appointed as and is the duly acting Chapter 7 trustee for the bankruptcy estate in the Bankruptcy Case; and

WHEREAS, Debtor had been in the business of designing, manufacturing, and selling pallets, including pallets featuring specific proprietary coatings, pooling, and logistics (the "Business"); and

WHEREAS, the Seller desires to sell, convey, transfer, assign and deliver to the Buyer, and the Buyer desires to purchase and acquire from the Seller, all of the Assets free and clear of all liens, claims, encumbrances and other interests, including all Assumed Contracts (defined in Section 2.1.3 below), all on the terms and subject to the conditions provided herein, pursuant to Sections 105, 363 and 365 of the Bankruptcy Code; and

WHEREAS, the Assets shall be purchased by the Buyer pursuant to this Agreement and the Sale Order (as defined in Section 8.4) authorizing and approving this Agreement and the sale described herein, free and clear of all liens, claims, encumbrances and other interests, pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, and Bankruptcy Rules 6004 and 6006, which Sale Order will include, but not be limited to, the authorization and approval of the assumption by the Seller and assignment to the Buyer of the Assumed Contracts designated by the Buyer to be assumed and assigned, in accordance with Section 365 of the Bankruptcy Code, and the Sale Procedures Order and Sale Procedures (each as defined in Section 6 below), all in the manner and subject to the terms and conditions set forth in this Agreement and the Sale Order and in accordance with other applicable provisions of the Bankruptcy Code and the Bankruptcy Rules and the local rules for the Bankruptcy Court (the "Sale").

*Execution Version*

# AGREEMENT

NOW, THEREFORE, in consideration of the premises and mutual representations, warranties and covenants herein contained and other good and valuable consideration, the receipt, adequacy and legal sufficiency of which are hereby acknowledged, and intending to be legally bound, the Parties hereto agree as follows:

**1. Incorporation of Recitals.**

**1.1.** The Recitals set forth above are true and correct and are incorporated into and form an integral part of this Agreement.

**2. Purchase and Sale of Assets.**

**2.1.** Assets.  Upon the terms and subject to the conditions set forth in this Agreement and the Sale Order, and pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, at the Closing and effective on the Closing Date, the Seller shall sell, convey, transfer, assign and deliver to the Buyer, and the Buyer shall purchase, receive and accept from the Seller, free and clear of all liens, claims, encumbrances and other interests, all of the Assets.  "Assets" shall mean all of the Debtor's and its bankruptcy estate's right, title, and interest in and to the assets, properties, and other rights used, useful or capable of being used in connection with the Business (exclusive only of the Excluded Assets (as defined in Section 2.4 below).  The Assets shall include, but shall not be limited to, all of the Debtor's and its bankruptcy estate's right, title and interest in and to the Assets described in the following clauses of this Section 2.1 (but shall specifically exclude the Excluded Assets only):

**2.1.1.** the Debtor's Accounts, Chattel Paper, Deposit Accounts, Documents, Fixtures, General Intangibles, the Assumed Contracts (as defined in Section 2.1.3 below; and including any agreements and any related Contract Rights), Goods, Instruments, Investment Property, and Money (each capitalized term used, but not defined, in this Section 2.1.1 has its meaning as defined in the Article 9 of the Michigan Uniform Commercial Code), including, in each case, that which is specifically set forth on Schedule 2.1.1 hereto;

**2.1.2.** (a) the Equipment of the Debtor, including that which is specifically set forth on Schedule 2.1.2(a) hereto and (a) the motor vehicles and corresponding vehicle title and Michigan registration set forth on Schedule 2.1.2(b) hereto;

**2.1.3.** all of the Debtor's right in, to and under any written contract, obligation, understanding, commitment, lease, license, purchase order, bid or other agreement, together with all amendments and other modifications of any of the foregoing, that are not executory contracts or unexpired leases under Section 365 of the Bankruptcy Code ("Contracts") and all executory contracts and unexpired leases under Section 365 of the Bankruptcy Code that are designated in writing by the Buyer at any time prior to and as of the Closing Date to be assumed by Seller and assigned to Buyer under the terms of this Agreement, the Sale Procedures Order or the Sale Order ("Assumed Contracts"), including those Contracts and Assumed Contracts that are specifically set forth on Schedule 2.1.3 hereto;

**2.1.4.** the Intellectual Property (as defined and identified on Schedule 2.1.4 hereto);

**2.1.5.** all Inventory, all Goods held by Debtor for sale or lease or to be furnished under contract or service, including any finished goods, raw materials, work in progress, and materials used or consumed in the Business, including that which is specifically set forth on <u>Schedule 2.1.5</u> hereto (collectively "Inventory");

**2.1.6.** all equity owned by the Debtor or any other subsidiary of the Debtor including that which is specifically set forth on <u>Schedule 2.1.6</u> hereto;

**2.1.7.** all causes of action, lawsuits, judgments, claims and demands of any nature to the extent reasonably necessary to enforce Buyer's rights, title and interest in the Assets;

**2.1.8.** any other property or assets of the Debtor or its bankruptcy estate in existence at the time of the Closing that are not Excluded Assets (as defined in Section 2.4 below);

**2.1.9.** any rights, title and interest of Seller, including the right to enforce, under any nondisclosure agreement, confidentiality agreement or similar document or agreement running in favor, or for the benefit, of Seller, including, but not limited to, any such document or agreement executed and delivered to Seller in connection with the Sale under the Sale Procedures (defined in Section 6.1 below); and

**2.1.10.** except for the Purchase Price paid by Buyer, all proceeds and products of any of the foregoing.

For purposes of this Agreement, the Assets identified on the Schedules referred to in this Section 2.1 are defined in this Agreement as the "Scheduled Assets". Buyer shall have the right to amend the Schedules at any time prior to Closing Date to add or delete Assets from the Schedules or to modify their scope or descriptions, in each case, without increasing or reducing the Purchase Price (defined in Section 3.1).

**2.2.** <u>Right to Disclaim Assets</u>. Notwithstanding Section 2.1, Buyer shall have the right to disclaim any Asset, and thereby to treat such disclaimed Asset as an Excluded Asset, at any time prior to Closing by notifying Seller in writing of its election to disclaim such Asset.

**2.3.** <u>No Assumption of Liability</u>. The transfer of the Assets pursuant to this Agreement does not include the assumption of any liability or other obligation related to the Assets, whether express or implied, unless Buyer expressly assumes such liability or other obligation in this Agreement.

**2.4.** <u>Excluded Assets</u>. Notwithstanding any other provision set forth in this Agreement, the Seller is not selling, conveying, transferring or assigning and the Buyer is not purchasing, receiving or accepting, any of the assets, rights or properties set forth below (such assets being referred to as the "Excluded Assets"):

**2.4.1.** all of the organizational documents, equity books, equity ledgers and minute books, and tax returns and related work papers, in each case, of the Debtor, and any other materials that Debtor is required by law to retain;

**2.4.2.** all executory contracts and unexpired leases that Buyer does not designate in writing as of the Closing Date to be treated as Assumed Contracts;

**2.4.3.** all rights in connection with employee benefit plans (including any pension plans) of the Debtor;

**2.4.4.** except to the extent any interest in real property is designated by Buyer in writing as an Assumed Contract, all interests in real property of the Debtor;

**2.4.5.** any and all tax refunds related to the operations of the Debtor;

**2.4.6.** all current and prior director and officer insurance policies of the Debtor and all rights of any nature with respect thereto, including all insurance proceeds and recoveries thereunder and rights to assert claims with respect to such insurance proceeds and recoveries.

**2.4.7.** all causes of action, lawsuits, judgments, claims and demands of any nature except those described in Section 2.1.7;

**2.4.8.** any cause of action arising under Chapter 5 of the Bankruptcy Code which belongs to the bankruptcy estate of the Debtor, including, but not limited to, claims of the estate which the Seller could bring pursuant to the Trustee's strong-arm power under §544 of the Bankruptcy Code, except, in each case, any such cause of action arising from or relating to an Assumed Contract.

### 3. Purchase Price Consideration.

**3.1.** <u>Purchase Price</u>.  The consideration to be paid by Buyer to Seller is cash in the amount of $5,000,000.00 (the "Purchase Price"), plus any cure costs associated with the Assumed Contracts designated as such by Buyer at any time prior to and as of the Closing Date.

**3.2.** <u>Deposit Terms</u>.

> Within two (2) business days of the execution of this Agreement by Buyer and Seller, Buyer shall promptly deposit by wire transfer the sum of $250,000.00 (the "Deposit Amount") to the Seller, which Deposit Amount shall be non-refundable unless: (i) Buyer is not the Winning Bidder, as defined herein; (ii) Buyer terminates this Agreement pursuant to Section 7, or (iii) Seller cancels or terminates the Sale (other than under Section 7.1.6), in which case, whether under (i), (ii), or (iii) of this Section 3.2.1, the Deposit Amount shall be returned to Buyer pursuant to Section 7.2 below.  Upon the Closing, if the Buyer is the Winning Bidder, the Deposit Amount shall be paid to Seller and shall automatically be credited against the Purchase Price.  The balance of the Purchase Price shall be paid by Buyer at Closing.  Except for Seller, no creditor or other party in interest shall have any security interest or other lien on, interest in, or claim to, the Deposit Amount.

### 4. Sale "As Is" And "Where Is."

EXCEPT IN EACH CASE TO THE EXTENT OTHERWISE PROVIDED IN THIS AGREEMENT OR THE SALE ORDER: (A) BUYER IS ACQUIRING THE ASSETS "AS IS" AND "WHERE IS" WITH ALL FAULTS AND DEFECTS (INCLUDING DEFECTS OF

4

*Execution Version*

TITLE), (B) BUYER ACKNOWLEDGES AND AGREES THAT SELLER HAS NOT MADE AND DOES NOT MAKE, AND SELLER SPECIFICALLY DISCLAIMS, ANY REPRESENTATIONS, WARRANTIES, PROMISES, COVENANTS, AGREEMENTS OR GUARANTIES OF ANY KIND OR CHARACTER WHATSOEVER, WHETHER EXPRESS OR IMPLIED, ORAL OR WRITTEN, PAST, PRESENT OR FUTURE, OF, AS TO, CONCERNING OR WITH RESPECT TO THE VALUE, NATURE, QUALITY, QUANTITY OR CONDITION OF THE ASSETS, (C) BUYER ACKNOWLEDGES THAT BUYER, HAVING BEEN GIVEN THE OPPORTUNITY TO INSPECT THE ASSETS, IS RELYING ON ITS OWN INVESTIGATION OF THE ASSETS, (D) BUYER FURTHER ACKNOWLEDGES THAT NO INDEPENDENT INVESTIGATION OR VERIFICATION HAS BEEN OR WILL BE MADE BY SELLER WITH RESPECT TO ANY INFORMATION SUPPLIED BY SELLER CONCERNING THE ASSETS AND THAT SELLER MAKES NO REPRESENTATION AS TO THE ACCURACY OR COMPLETENESS OF SUCH INFORMATION, AND (E) BUYER ACKNOWLEDGES THAT THE DISCLAIMERS, AGREEMENTS AND OTHER STATEMENTS SET FORTH IN THIS SECTION ARE AN INTEGRAL PART OF THIS AGREEMENT AND THAT SELLER WOULD NOT AGREE TO SELL THE ASSETS TO BUYER FOR THE PURCHASE PRICE WITHOUT THE DISCLAIMERS, AGREEMENTS AND OTHER STATEMENTS SET FORTH IN THIS SECTION.

**5. Bankruptcy Court Matters.**

**5.1.** Motion to the Bankruptcy Court.  As soon as practicable after the Parties execute this Agreement, but in any event no later than three (3) business days after the Parties execute this Agreement, Seller will file with the Bankruptcy Court a motion, in form and substance satisfactory to Buyer, seeking entry of an order of the Bankruptcy Court approving the Sale Procedures Order described in Section 6 and setting the Sale Hearing for authorization and approval of the Sale and entry of the Sale Order ("Sale Hearing").  Seller will use its best efforts to obtain entry of an order of the Bankruptcy Court approving the Sale Procedures provided herein within seven (7) business days after the Acceptance Date.  Seller will use its best efforts to obtain entry of the Sale Order on or before May 10, 2021.

**5.2.** Bankruptcy Court Approval.  Seller and Buyer each acknowledges that this Agreement and the sale of the Assets are expressly subject to Bankruptcy Court approval and, without such approval, this Agreement and the sale of the Assets shall be null and void and the Deposit Amount promptly returned to Buyer.

**6. Sale Procedures; Buyer Protections; Closing.**

**6.1.** Sale Procedures.  The "Sale Procedures" are set forth on Exhibit A to this Agreement and the "Sale Procedures Order" is attached as Exhibit B to this Agreement.  Seller shall use his best efforts to obtain Bankruptcy Court approval of the Sale Procedures Order, including the Termination Fee (defined below) in accordance with section 6.2 below, within seven (7) days of the Acceptance Date. This Agreement and the transactions contemplated herein and hereby are subject to approval by the Bankruptcy Court and the Trustee's right and ability to consider higher and better competing bids with respect to the Assets pursuant to the Sale Procedures Order (each a "Competing Bid"), including, without limitation, by way of auction (the "Auction") as set forth in the Sale Procedures Order.

37306334.11/159982.00001

**6.2.** Buyer Protections. If (i) the Buyer is not in material breach of any provision of this Agreement, and (ii) a sale pursuant to section 363 of the Bankruptcy Code or pursuant to a confirmed plan of reorganization or otherwise of all or substantially all of the Assets in a single transaction or a series of transactions to one or more persons (a "Third Party") other than the Buyer or an affiliate of the Buyer (a "Third-Party Sale"), whether at an Auction, pursuant to a plan of reorganization or otherwise, is consummated, then the Buyer shall be entitled to receive, without further order of the Bankruptcy Court, from the proceeds of the Third-Party Sale, payable in full at such closing of the Third-Party Sale, an amount in cash equal to the sum of (i) $150,000 (USD), *plus* (ii) the amount of the reasonable, documented fees and expenses paid by the Buyer with respect to the transactions contemplated hereby, including attorneys' fees and expenses and those of other advisors and consultants in an amount not to exceed the sum of $75,000 (USD) ((i) and (ii) collectively, the "Termination Fee"). The Termination Fee shall be payable in full in cash from the proceeds of the applicable Third-Party Sale, at the closing of the Third-Party Sale, by wire transfer of immediately available funds to an account designated by the Buyer.

**6.3.** Closing Date. The closing of the transactions contemplated hereby ("Closing") shall take place remotely via electronic exchange of documents on a date ("Closing Date") as soon as practicable after the entry of the Sale Order or on such later date that is mutually agreed to by the Parties, but, subject to the next sentence, in no event shall the Closing Date be later than 10 days after the entry of the Sale Order without the written consent of the Buyer. On the Closing Date, unless expressly waived by Buyer in writing, the Sale Order shall be in full force and effect and not subject to any stay, injunction, appeal, or pending motion that, if granted, would have the effect of modifying, vacating or otherwise affecting the terms of the Sale Order or this Agreement. Unless otherwise expressly provided in this Agreement, all actions to be taken on the Closing Date pursuant to this Agreement and the Sale Order shall be deemed to have occurred simultaneously.

**6.4.** Sale Procedures Order and Sale Order. The Bankruptcy Court shall have entered the Sale Procedures Order as a condition precedent to this Agreement and entry of the Sale Order. The Bankruptcy Court shall have entered the Sale Order as defined in and including the requirements of Section 8.4 of this Agreement.

**6.5.** Assumed Contracts. The Trustee shall use his best efforts to assume and assign to Buyer all of the Assumed Contracts on Schedule 2.1.3. The Trustee shall include on the "Cure Schedule" (as defined in the Sale Procedures Order) all of the Debtor's executory contracts and unexpired leases, including, without limitation, the Assumed Contracts set forth on Schedule 2.1.3. Schedule 2.1.3 may be amended to add or delete an Assumed Contract by Buyer at any time, in Buyer's sole discretion, through the Closing. From the Acceptance Date through the entry of the Sale Order, the Trustee shall not reject any executory contract or unexpired lease unless otherwise agreed to in writing by Buyer. Notwithstanding anything in this Agreement to the contrary, in the event and to the extent that any of the Assumed Contracts cannot be assumed and assigned to Buyer under Section 365 of the Bankruptcy Code or otherwise, then this Agreement shall not constitute an agreement to assign any such particular Assumed Contract (or any claim or right or any benefit arising thereunder or resulting therefrom) if the agreement to assign or attempt to assign, without the consent of a third party, would constitute a breach thereof, accelerate any obligations thereunder, permit the termination thereof or in any other way adversely affect the rights of Buyer thereunder. Until such consent is obtained, or if an attempted assignment thereof would be

6

ineffective or would affect the rights of the Debtor thereunder so that Buyer would not, in fact, receive all such rights, the Trustee shall provide, to the extent practicable, for Buyer the benefits of (upon the same terms as in existence on the Acceptance Date), and to permit Buyer to assume, insofar as expressly set forth herein, the stated liabilities under such particular Assumed Contract (upon the same terms as in existence on the Acceptance Date), including enforcement at the request and expense and for the benefit of Buyer of any and all rights of the Debtor against a third party thereto arising out of the breach or cancellation thereof by such third party or otherwise. Any transfer or assignment to Buyer by the Trustee of any property or property rights or any contract or agreement that shall require the consent or approval of any third party shall be made subject to such consent or approval being obtained.

**6.6.** <u>Seller's Deliveries to Buyer at Closing</u>.  The obligation of Buyer to consummate the transactions contemplated by this Agreement is subject to the Seller making the following deliveries to Buyer on the Closing Date (collectively, "Seller's Deliveries"):

**6.6.1.** a Bill of Sale executed by Seller for all of the Assets, including, but not limited to, all of the Scheduled Assets;

**6.6.2.** delivery by Seller of, or otherwise making unrestricted access available to Buyer of, all Scheduled Assets;

**6.6.3.** assignments of the Intellectual Property set forth on <u>Schedule 2.1.4</u> hereto, in the form of an IP Bill of Sale, executed by Seller, together with releases from existing secured parties thereof;

**6.6.4.** assignment and assumption agreements for the Assumed Contracts to the extent reasonably required by the Buyer;

**6.6.5.** the title and registration certificates, together with such duly executed assignment documents required by the State of Michigan, in respect to the motor vehicles set forth on <u>Schedule 2.1.2(b)</u>;

**6.6.6.** a certificate duly executed by Seller, certifying the Seller's representations and warranties set forth in Section 8.3.2 of this Agreement as of the Closing Date; and

**6.6.7.** the Sale Procedures Order;

**6.6.8.** the Sale Order; and

**6.6.9.** such other documents, instruments, and agreements as Buyer reasonably requests for the purpose of consummating the transactions contemplated by this Agreement.

**6.7.** <u>Buyer's Deliveries to Seller at Closing</u>.  On the Closing Date, Buyer shall deliver or cause to be delivered to Seller (the "Buyer's Deliveries"):

**6.7.1.** the Purchase Price (less the Deposit Amount) in cash or immediately available funds; and

**6.7.2.** such documents and instruments as are contemplated by this Agreement or are reasonably required by Seller to transfer the Assets to Buyer.

**7. Termination.**

**7.1.** This Agreement may be terminated at any time prior to Closing by:

**7.1.1.**   Either Party if prior to the Auction, Sale Hearing or Closing, any third party commences any legal action and obtains a temporary restraining order, preliminary injunction or other order from a court of competent jurisdiction to stay, prevent or otherwise delay the Auction, Sale Hearing and/or the Closing, as the case may be, and the same is not set aside within 21 days after the same is entered.

**7.1.2.** The Buyer if, after the conclusion of the Auction or the Sale Hearing, but before the Closing, Seller materially breaches its obligations under this Agreement.

**7.1.3.** The Buyer, within 45 days after the Acceptance Date, upon written notice to the Seller, if it is not satisfied, in its sole and absolute discretion, with the results of its ongoing due diligence investigation of the Assets.

**7.1.4.**   The Buyer, within 45 days after the Acceptance Date, upon written notice to the Seller, if it is not satisfied, in its sole discretion, with the results of its ongoing due diligence investigation of the Intellectual Property; provided, however, that the notice to Seller of Buyer's decision to terminate under this Section 7.1.4 shall describe with reasonable particularity the reason Buyer is not satisfied and that reason must be true.

**7.1.5.** The Buyer, if any of Seller's Deliveries in Section 6.6 is not satisfied on the Closing Date (unless waived by Buyer in writing and in its discretion).

**7.1.6.** The Seller, if any of Buyer's Deliveries in Section 6.7 is not satisfied on the Closing Date (unless waived by Seller in writing and in its discretion).

**7.2.** <u>Effects of Termination</u>. Upon termination of this Agreement under Section 7, this Agreement shall become null and void and have no effect and there shall be no liability on the part of either Party or its representatives, affiliates, directors, officers, shareholders, members or agents to the other Party, except (a) Buyer shall be entitled to (i) the return of the Deposit Amount, unless Buyer terminates this Agreement exclusively under Section 7.1.3 at any time within 30 days after the Acceptance Date, in which case Buyer shall forfeit $125,000 of the Deposit Amount (and shall be entitled to the return of the other $125,000 of the Deposit Amount) or more than 30 days after the Acceptance Date, in which case Buyer shall forfeit the Deposit Amount, and (ii) receive the Termination Fee if Buyer is entitled to receive the Termination Fee under Section 6.2 of this Agreement and (b) Seller shall be entitled to retain the Deposit Amount if it terminates this Agreement under Section 7.1.6.   For the avoidance of doubt, the sole and exclusive remedy available to the Seller for a breach of this Agreement and failure to Close by Buyer is the forfeiture by Buyer of the Deposit Amount to Seller.

**8. Additional Agreements.**

*Execution Version*

**8.1.** Further Assurances.

**8.1.1.** Upon the terms and subject to the conditions hereof, each Party shall use its reasonable efforts to take or cause to be taken all appropriate action and to do or cause to be done all things necessary, proper or advisable under applicable law, to consummate the transactions contemplated by this Agreement as promptly as practicable, including using its reasonable efforts to obtain all licenses, permits, consents, approvals, authorizations, qualifications and orders of Governmental Authorities (defined in Section 8.1.3.3 below), and make any filings with respect thereto, as are necessary for the consummation of the transactions contemplated by this Agreement and to fulfill the conditions to the Closing.

**8.1.2.** Each Party agrees to cooperate in good faith in obtaining any other consents and approvals that may be required in connection with the transactions contemplated by this Agreement; provided, however, that no Party shall be required to compensate any third party to obtain any such consent or approval.

**8.1.3.** From the date of this Agreement until the earlier of the Closing Date or the termination of this Agreement, Seller and Buyer shall promptly:

**8.1.3.1.** notify the other Party in writing of any pending action, proceeding or investigation by any Governmental Authority or any other person (i) challenging or seeking material damages in connection with this Agreement or the transactions contemplated hereunder or (ii) seeking to restrain or prohibit the consummation of the transactions contemplated hereunder or otherwise limit the right of Buyer or its affiliates to own or operate all or any portion of the Business or Assets.

**8.1.3.2.** consult with each other to provide any necessary information with respect to (and, in the case of correspondence, provide the other Party copies of), all filings made by such Party with any Governmental Authority or any other information supplied by such Party to, or correspondence with a Governmental Authority in connection with this Agreement and the transactions contemplated hereby.

**8.1.3.3.** inform each other of any communication from any Governmental Authority regarding any of the transactions contemplated by this Agreement. If any of Buyer or Seller or any of their respective affiliates receives a request for additional information or documentary material from any Governmental Authority with respect to the transactions contemplated by this Agreement, then such Party shall use commercially reasonable efforts to make, or cause to be made, promptly and after consultation with the other Party, an appropriate response in compliance with such request. "Governmental Authority" means any (a) nation, region, state, county, city, town, village, district or other jurisdiction, (b) federal, state, local, municipal, foreign or other government, (c) governmental or quasi-governmental authority of any nature (including any governmental agency, branch, department or other entity and any court or other tribunal), (d) multinational organization or (e) body exercising, or entitled to exercise, any administrative, executive, judicial, legislative, police, regulatory or taxing authority or power of any nature.

9

**8.1.3.4.** notify the other Party upon having actual knowledge of (i) the occurrence, or non-occurrence, of any event, which would reasonably be expected to cause any representation or warranty of such Party contained in this Agreement to be untrue or inaccurate in any material respect, (2) any failure to comply with or satisfy in any material respect any covenant or agreement to be complied with or satisfied by such Party under this Agreement, or (3) the failure of any condition precedent to the other Party's obligations under this Agreement.

**8.2.** Intentionally Omitted.

**8.3.** Representations and Warranties.

**8.3.1.** *Buyer's Representations and Warranties*. Buyer represents and warrants to Seller that:

**8.3.1.1.** it has full power and authority to execute and deliver this Agreement and all ancillary documents contemplated by this Agreement and to perform its obligations hereunder;

**8.3.1.2.** the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated by this Agreement have been duly authorized by all necessary company action on the part of Buyer;

**8.3.1.3.** subject to approval of the Bankruptcy Court, upon the execution and delivery hereof, this Agreement and all ancillary documents contemplated by this Agreement will be valid, binding and enforceable upon it in accordance with its terms, subject to the effect of any applicable bankruptcy, moratorium, insolvency, reorganization or other similar law affecting the enforceability of creditors' rights generally and to the effect of general principles of equity which may limit the availability of equitable remedies (whether in a proceeding at law or in equity); and

**8.3.1.4.** the execution and delivery of this Agreement does not and will not contravene, conflict with, violate or constitute a default under any material agreement governing Buyer.

**8.3.2.** *Seller's Representations and Warranties*. Seller represents and warrants to Buyer that:

**8.3.2.1.** subject to approval of the Bankruptcy Court, Seller has full power and authority to execute and deliver this Agreement and all ancillary documents contemplated by this Agreement, and to perform its obligations hereunder;

**8.3.2.2.** subject to approval of the Bankruptcy Court, upon the execution and delivery hereof, this Agreement and all ancillary documents contemplated by this Agreement will be valid, binding and enforceable upon it in accordance with its terms, subject to the effect of any applicable bankruptcy, moratorium, insolvency, reorganization or other similar law affecting the enforceability of creditors' rights generally and to the effect of general principles of equity which may limit the availability of equitable remedies (whether in a proceeding at law or in equity);

**8.3.2.3.** subject to approval of the Bankruptcy Court, the execution and delivery of this Agreement does not and will not contravene, conflict with, violate or constitute a default under any agreement governing Seller;

10

**8.3.2.4.** except for CRS Capstone Partners, LLC, neither Seller, nor any agent acting on behalf of Seller has incurred any liability to pay any fees or commissions to any broker, finder or agent or any other similar payment in connection with any of the transactions contemplated by this Agreement.

**8.3.2.5.** except as set forth on <u>Schedule 8.3.2.5</u>, to the best of Seller's knowledge, there are no pending proceedings (i) by or against Seller that could reasonably be expected to affect the Business or the Assets, (ii) that challenge, or that may have the effect of preventing, delaying, making illegal or otherwise interfering with, any of the transactions contemplated by this Agreement or (iii) that in any way may result in a Material Adverse Effect. "Material Adverse Effect" means any event, change, circumstance, effect or other matter that has, or could reasonably be expected to have, either individually or in the aggregate with all other events, changes, circumstances, effects or other matters, with or without notice, lapse of time or both, a material adverse effect on the Business, Assets, financial condition, prospects, operating results or operations of the Business; provided, however, that the following shall not by itself constitute a Material Adverse Effect: (i) effects caused by changes or circumstances affecting general market conditions in the U.S. or foreign economies or which are generally applicable to the industry in which the Business operates, or (ii) effects caused by COVID-19 (*i.e.*, the Coronavirus) on the Business;

**8.3.2.6.** to the best knowledge of Seller, without inquiry or independent investigation, the Schedules to this Agreement are true and correct;

**8.3.2.7.** no representation or warranty of Seller in this Section 8.3.2. and no statement made by Seller in any ancillary agreements to which it is a party, or any certificate, instrument or other document delivered by or on behalf of Seller pursuant to this Agreement or any ancillary agreement to which it is a party, contains or will contain any untrue statement of a material fact or omits or will omit to state a material fact necessary to make the statements contained herein or therein, in light of the circumstances in which they were made, not misleading; and

**8.3.2.8.** the Debtor is not engaged in the manufacturing of pallets as of the date of this Agreement and, to the best of the knowledge of Seller, will not be engaged in the manufacturing of pallets through the Closing Date.

**8.4.** <u>Sale Order.</u> Seller intends to sell the Assets to Buyer pursuant to 11 U.S.C. §§105, 363(b) and (f), and 365 after entry of the Sale Order by the Bankruptcy Court. The term "Sale Order" as used in this Agreement means an order entered by the Bankruptcy Court in a form and substance satisfactory to Buyer (i) that was granted after appropriate notice to all parties entitled to notice of any motion relating to the Assets, Sale Procedures and this Agreement; (ii) that is not subject to a stay pending appeal; (iii) unless waived by Buyer, as to which the time to appeal from, or to seek review, rehearing, reconsideration, amendment or petition for certiorari of, has expired without a pending appeal or application or motion seeking review, rehearing, reconsideration, amendment or petition for certiorari; and (iv) that provides, at least, the following: (A) the Assets will be transferred to Buyer free and clear of all liens, claims, encumbrances and other interests of every and any kind or nature whatsoever, whether at law or in equity, including, but not limited to, free and clear of any rights or claims based on any theory of successor, derivative, or vicarious liability of any kind or character including, on a theory of successor or transferee liability, de facto merger

11

or continuity, environmental, labor and employment, products antitrust liability, or tax liability, whether known or unknown as of the Closing, now existing or hereafter arising, asserted or unasserted, fixed or contingent, liquidated or unliquidated, whether arising before, on or after the entry of the Order for Relief under chapter 7 of the Bankruptcy Code, save and excepting only those liabilities expressly assumed by Buyer in writing under this Agreement; (B) all liens, claims, encumbrances and other interests shall be transferred from the Assets to the proceeds of Sale in the same order of priority as such liens, claims, encumbrances and other interests existed in and against the Assets immediately before the Closing, pending a further order of the Bankruptcy Court distributing such proceeds; (C) requiring any party who is in possession of the Scheduled Assets, including, without limitation, any Intellectual Property stored electronically or digitally, to deliver to Buyer such Scheduled Assets, including, without limitation, all copies of Intellectual Property, and to certify in writing to the Seller that such party has delivered all Scheduled Assets and copies to the Buyer, and has permanently erased all digital or other electronically stored copies; (D) Buyer has acted in "good faith" within the meaning of and is entitled to the protections of section 363(m) of the Bankruptcy Code; (E) the consideration provided by Buyer for the Assets is for all purposes valuable, fair and reasonably equivalent value and consideration under the Bankruptcy Code and any other applicable law, and the transaction may not be avoided, or costs or damages imposed or awarded, under Section 363(n) of the Bankruptcy Code or any other provision of the Bankruptcy Code;  (F)  the acquisition of the Assets does not amount to a consolidation, merger or de facto merger of Buyer and Debtor and/or Debtor's estate;  (G) Buyer's operation of the Sale Assets are not deemed a continuation of Debtor's business, and all "persons" (as defined in section 101(41) of the Bankruptcy Code)  are enjoined from asserting against Buyer, or its successors or assigns, any claim or cause of action based upon the theory or "successor liability"; (H) as to the Assumed Contracts, (1) the sale, assumption and assignment, and transfer is approved pursuant to sections 363, 365 and 105 of the Bankruptcy Code; (2) Seller is authorized in accordance with Bankruptcy Code sections 365(b)(1) and (f)(2), to: (a) assume the Assumed Contracts; (b) sell, assign and transfer to Buyer each of the Assumed Contracts; and (c) execute and deliver to Buyer, such assignment documents as may be necessary to sell, assign and transfer the Assumed Contracts; (3) all defaults or other obligations or any default provisions of the kind specified in Bankruptcy Code section 365(b)(2) are deemed cured; and (4) Buyer has provided adequate assurance of its future performance of the Assumed Contracts and the proposed assumption and assignment of the Assumed Contracts satisfies in all respects the requirements under section 365 of the Bankruptcy Code; (I) Seller is authorized and directed to (1) execute, deliver, perform under, consummate and implement this Agreement and all additional instruments and documents that are contemplated under this Agreement, or may be reasonably necessary or desirable to implement this Agreement, and (2) take all further actions as may be requested by Buyer for the purpose of transferring the Assets to Buyer and carrying out the intents and purposes of this Agreement; (J) this Agreement was negotiated, proposed and entered into by the Parties without collusion, in good faith and from arm's length bargaining positions; and (K) waiving any stay of the Sale Order pursuant to Bankruptcy Rule 6004(h), such that the Sale Order is immediately effective and can be acted and relied upon by the Parties in Closing the transaction contemplated in this Agreement upon entry of the Sale Order.

**8.5.** No Implied Rights or Remedies. Except as otherwise expressly provided herein, nothing herein is intended or shall be construed to confer upon or to give any person other than Seller and Buyer any rights or remedies under or by reason of this Agreement.

37306334.11/159982.00001

**8.6.** Risk of Loss. Except with respect to a breach of any of the representations and warranties made herein by Seller, the risk of any loss that may occur with respect to any of the Assets being purchased hereunder shall be borne by Buyer immediately upon consummation of the Closing and at all times from and after the Closing Date.

**8.7.** Limited Responsibility. It is the mutual intent of the Parties that the obligations, representations, warranties and covenants hereunder or as a result hereof or of the transactions contemplated hereby are and shall be limited to only those expressly set forth herein, and not enlarged by implication, operation of law or otherwise.

## 9. Indemnification.

Except as otherwise provided for in this Agreement, nothing in this Agreement shall be construed to create a specific obligation on the part of either Party to indemnify or hold the other Party harmless from and with respect to any claims, liabilities, losses, damages, costs or expenses whatsoever.

## 10. Miscellaneous.

**10.1.** Notices. Any notices, consents or other communications required to be sent or given hereunder by any of the Parties shall in every case be in writing and shall be deemed properly served if and when (a) delivered by hand, (b) transmitted by facsimile or email with confirmation of transmission or receipt, or (c) delivered by Federal Express or other express overnight delivery service, or registered or certified mail, return receipt requested, to the Parties at the addresses as set forth below or at such other addresses as may be furnished in writing:

To Seller:

Fred J. Dery
803 W. Big Beaver
Site 353
Troy, MI 48084

With a copy to:

The Taunt Law Firm
Attn: Erika D. Hart, Dean R. Nelson, Jr.
700 E. Maple Rd., Second Floor
Birmingham, Michigan 48009

To Buyer:

Damian Kassab and John Garcia
Solyco Advisors
400 Water Street, Suite 203
Rochester, MI 48307

*Execution Version*

Email: dkassab@solycoadvisors.com
Email: jgarcia@solycoadvisors.com

With a copy to:

Steven Roach and Marc Swanson
Miller, Canfield, Paddock and Stone, PLC
150 West Jefferson, Suite 2500
Detroit, MI 48226
Email: roach@millercanfield.com
Email: swansonm@millercanfield.com

**10.2.** <u>Entire Agreement</u>. This Agreement, the Schedules and the Exhibits attached hereto, and the documents to be executed pursuant hereto contain the entire agreement between the Parties relating to the sale of Assets. Any oral representations or modifications concerning this Agreement, or any such other document shall be of no force and effect excepting a subsequent modification in writing, signed by the Party to be charged.

**10.3.** <u>Modification</u>. This Agreement may be modified, amended or supplemented only by a written instrument duly executed by each Party.

**10.4.** <u>Severability</u>. Should any term, provision or paragraph of this Agreement be determined to be illegal or void or of no force and effect, the balance of the Agreement shall survive.

**10.5.** <u>Waiver</u>. No waiver of any of the provisions of this Agreement shall be deemed, or shall constitute, a waiver of any other provisions, whether or not similar, nor shall any waiver constitute a continuing waiver. No waiver shall be binding unless executed in writing by the Party making the waiver. No failure or delay by a Party in exercising any right or remedy under this Agreement or any of the documents delivered pursuant to this Agreement, and no course of dealing between the Parties, operates as a waiver of such right or remedy, and no single or partial exercise of any such right or remedy precludes any other or further exercise of such right or remedy or the exercise of any other right or remedy.

**10.6.** <u>Captions</u>. All captions and headings contained in this Agreement are for convenience of reference only and shall not be construed to limit or extend the terms or conditions of this Agreement.

**10.7.** <u>Payment of Fees and Expenses</u>. Except as provided herein, each Party to this Agreement shall be responsible for, and shall pay, all of its own fees and expenses, including those of its counsel, incurred in the negotiation, preparation and consummation of this Agreement and the transaction described herein.

**10.8.** <u>Tax Matters</u>. Seller shall not be responsible for the preparation and filing of any tax returns for Buyer. Seller acknowledges and agrees that it shall pay in a timely manner all applicable sales, use, transfer, conveyance, documentary, recording, notarial, value added, excise,

37306334.11/159982.00001

registration, stamp, gross receipts and similar Taxes and fees ("Transfer Taxes"), arising out of or in connection with or attributable to the transactions effected pursuant to this Agreement and the ancillary agreements, excluding expenses and fees relating to registering the Intellectual Property in the name of Buyer or its designee, regardless of whether such Transfer Taxes, expenses and fees are imposed by law on Buyer, the Assets or Seller.

**10.9.** <u>Survival</u>.  The representations, warranties, covenants and agreements of Seller and Buyer herein, or in any documents delivered prior to or at the Closing, shall not be deemed waived or otherwise affected by the Closing, except as otherwise set forth herein.

**10.10.** <u>Assignments</u>.  This Agreement shall be binding on and inure to the benefit of the Parties and their successors and assigns. Buyer may not assign this Agreement to any entity without the prior approval of the Seller, which approval shall not be unreasonably withheld; provided however, consent of the Seller shall not be required to any assignment by Buyer to one or more of its affiliates.

**10.11.** <u>Specific Performance</u>.  The Parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed by Seller in accordance with their specific terms or were otherwise breached. The Parties accordingly agree that, in addition to any other remedy to which Buyer is entitled at law or in equity, Buyer is entitled to injunctive relief to prevent breaches of this Agreement and otherwise to enforce specifically the provisions of this Agreement and that Buyer shall not be required to post any statutorily required bond in connection therewith. Seller expressly waives any requirement that Buyer obtain any bond or provide any indemnity in connection with any action seeking injunctive relief or specific enforcement of the provisions of this Agreement.

**10.12.** <u>Governing Law; Jurisdiction</u>. The validity and construction of this Agreement shall be governed by the internal laws of the State of Michigan without regard to principles of conflicts of laws. Any judicial proceedings against Seller or Buyer involving, directly or indirectly, this Agreement shall be brought in the United States Bankruptcy Court for the Eastern District of Michigan.

**10.13.** <u>Construction</u>.  In the interpretation and construction of this Agreement, the Parties acknowledge that the terms hereof reflect extensive negotiations between the Parties and that this Agreement shall not be deemed, for the purpose of construction and interpretation, drafted by either Party.

**10.14.** <u>Counterparts</u>.  This Agreement may be executed in one or more counterparts, all of which taken together shall constitute but one and the same instrument. Delivery of an executed counterpart of this Agreement by facsimile transmission or e-mail (in .pdf or similar format) shall be as effective as delivery of a manually executed counterpart hereof, shall be treated as an original signature for all purposes of this Agreement and shall be fully effective to bind such Party to the terms of this Agreement.

**10.15.** <u>Time is of the Essence</u>.  Time is of the essence in this Agreement, and all of the terms, covenants and conditions hereof.

37306334.11/159982.00001

*Execution Version*

**10.16.** <u>Interpretation and Rules of Construction</u>.  In this Agreement, except to the extent that the context otherwise requires:

**10.16.1.** when a reference is made in this Agreement to a Section, Schedule or Exhibit, such reference is to a Section of, or a Schedule or Exhibit to, this Agreement unless otherwise indicated;

**10.16.2.** whenever the words "include," "includes" or "including" are used in this Agreement, they are deemed to be followed by the words "without limitation";

**10.16.3.** the words "hereof," "herein" and "hereunder" and works of similar import, when used in this Agreement, refer to this Agreement as a whole and not to any particular provision of this Agreement;

**10.16.4.** the definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms;

**10.16.5.** any law defined or referred to herein or in any agreement or instrument that is referred to herein means such law or statute as from time to time amended, modified or supplemented, including by succession of comparable successor laws;

**10.16.6.** any use of "it" or formatives thereof contained in this Agreement shall be construed to mean his or its, as applicable;

**10.16.7.** all references to "$" or "dollars" shall refer to the currency United States dollars;

**10.16.8.** references to a person are also to its permitted heirs, successors and assigns;

**10.16.9.** the use of "or" is not intended to be exclusive unless expressly indicated otherwise; and

**10.16.10.** all Schedules attached hereto are incorporated herein and expressly made a part of this Agreement as though completely set forth herein. All references to this Agreement herein or in any of the Schedules hereto shall be deemed to refer to this entire Agreement, including all such Schedules; provided, however, that information furnished in any particular Schedule shall be deemed to be included in another Schedule if a specific cross-reference is contained therein.

37306334.11/159982.00001

*Execution Version*

[Signature Page Follows]

17

*Execution Version*

        IN WITNESS WHEREOF, the Parties hereto have duly executed this Amended 363 Sale
Asset Purchase Agreement as of the date first written above

**SELLER**

FRED J. DERY, Chapter 7 Trustee for the bankruptcy estate of Lightning Technologies, Inc

By:
Name: Fred J. Dery
Title:   Chapter 7 Trustee for the estate of Lightning Technologies, Inc.

Acceptance Date:   March 4, 2021

**BUYER**

**Palltronics, Inc.**, a Michigan corporation

By:
Name: Damian Kassab
Title:   President

*Signature Page*
*Amended 363 Sale Asset Purchase Agreement*

37308334.10\:59982.00\:01

*Execution Version*

## <u>SCHEDULE 2.1.1</u>
### Certain General Intangibles and other UCC Collateral

Any and all cloud based storage, including without limitation Debtor's Citrix FileShare, the Debtor's S Drive, any internal or external hard drives or thumb drives of the Debtor, any laptops or other computers of the Debtor, any information contained within any of the foregoing, and the Office 365 Account of the Debtor and any emails and other information contained within it pursuant to the Court's Order and Opinion [Docket No. 189]

## SCHEDULE 2.1.2(a)
### Equipment

| Vendor | Description |
|---|---|
| Multiple, Crown | various racks and shelving in all plants (3) |
| Atlas Copco Compressed Air System | 2 air compressors installed (Oxford)<br>Model GA37VSD+FF SN# API831-290<br>Model GA37VSD+FF SN# API831-320 |
| Fanuc America Corporation | M20iB / 25 Robot & Servo Table  SN# F173835 with controller |
| Fanuc America Corporation | R2000iC / 210F Robot SN# R16X02138 with controller |
| Fanuc America Corporation | 4 - R2000 Robots<br>R2000iB / 165F Robot SN# R07Z06871 with controller<br>R2000iB / 210F Robot SN# R08306031 with controller<br>R2000iB / 210F Robot SN# R08701557 with controller<br>R2000iB / 210F Robot SN# R07Z06904 with controller |
| Deco Tools | Robot Pedestal, Fence Kit, Gun Bracket, Servo Table Tooling, Spray Gun Bracket |
| North American Processing | PMC 25, 3HP, 220V Spray Machine |
| North American Processing | Gun, AP,AR4242, Auto & Fusion Round Spray Gun  (2 Total) |
| North American Processing | Husky 1050 Diaphragm Pump, 1050A SS/SS/PT/A Pump    (2) Total |
| Fluid Transfer Systems | Pump, 1050A, SS/SS/PT/A (2) & Pump, Maple 30 Adapters (1) (3 Total) |
| Fluid Transfer Systems | Poly Tote Transfer System |
| Ultimate Linings, Ltd. | HFR-Glue Machine and PR70 Meter Mixer |
| Ultimate Linings, Ltd. | Gun P2 Automatic 24x636 PG-24X636 (2 Total) & Fluid Manifold, Kit Accy Frt End, Mixing Chamber |
| Ultimate Linings, Ltd. | HFR-GSM Machines (5 units) - HFRB-14ALALCCM Chemical Metering Equipment<br>SN #UC0569-F17B-N102, #UC0626-B19B-N104, #UC0637-D19B-N101, #UC0649-F19B-N101, #UC0649-F19B-N102 |
| Triton Automation Group | Robotic Spray Booth Load System |
| Triton Automation Group | Robotic Spray Load System; Conveyance, Wall Window, Light Screen & Guarding |
| Triton Automation Group | Assembly Fixture (2) |
| Triton Automation Group | Pooling Pallet Manual Assembly Trunnion Fixture |
| Triton Automation Group | Robotic CNC Tending System |

| Vendor | Description |
|---|---|
| Air and Liquid Systems Inc. | Spray Booth Tank (Wetted) with Palin system |
| Dustpipe | One FAS-300 Series Central Outside Dust Collection System  SN #FAS-300-MI-102017 |
| EMC | Semi Automated Spray Cell Loading System |
| EMC | Robot Riser (wall mount) in use |
| Tennant | T16 Power Scrubber, Electric Rider (Xcelsior Location) 2016 SN# 26903 with charger |
| Tennant | T16 Power Scrubber, Electric Rider (Silverbell Location) 2017 SN# 27422 with charger |
| Jaantek | EOAT- Manifold Bracket (2) |
| JKL Machinery | Busellato Jet Optima RT21WWD CNC Machining Center Gantry Style Router SN# AH-119150 |
| JKL Machinery | Dustek C1000 3 Bag Dust Collection System SN #C1000-15-110 |
| JKL Machinery | Striebig Compact Vertical Panel Saw SN #45656 |
| Mechanical Contractors | Booth Floor Modifications |
| Leoni | Dress Package Lower and Upper Umbilical (2) |
| Air Technologies | Vacuum Pump GVS A |
| TBD | Sewage pumps |
| TSC | Sludge pump |
| Stiles Machinery Inc. | 2 - Homag Vantech 510 V7 POPT (M/S # 41934 & 42063) SN #0-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 and #0-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 CNC Machining Center Gantry Style Router |
| Stiles Machinery Inc. | 4- Homag Vantech 512 V7 PO PT (M/S # 40932, 40933, 41082, & 41083) SN #0-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, #0-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, #0-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 and #0-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 CNC Machining Center Gantry Style Router |
| Stiles Machinery Inc. | Down payment for 2 Homag CNC (50% of the overall price) |
| Triton Automation Group | down payment for CNC handling automation |
| Crown Equipment | 7 Douglas Legacy Hi Lo  batteries, 8 charger model F55-mp330-5, magnetic battery handling |
| Jet Power Belt Sander | belt sander for mudded legs   708447 |
| Atlas Copco Compressed Air System | 2 - units GA37VSD (Silverbell- Air Compressors) Model GA37VSD+FF SN# API833-714 Model GA37VSD+FF SN# API833-758 |
| Atlas Copco Compressed Air System | 1 – Air Compressor unit (located at Thomas Road) Model GA15FF SN# WUX581583 |

| Vendor | Description |
|---|---|
|  |  |
| BBG | Manual pallet assembly fixture |
| various suppliers | pallet life cycle test fixture |
| various suppliers | hand tools (other than Snap-On-Tools listed below) |
| N/A | Petty cash |
| various suppliers | All art, sports memorabilia, pictures, etc. |
| various suppliers | All office supplies including paper, pens, etc. |
| various suppliers | All Furniture in 8 offices |
| various suppliers | All documents and files in 8 offices |
| various suppliers | All Furniture and technology devices in two conferences (including A/V equipment and four 65-inch Samsung LCDs) |
| various suppliers | Computers, servers (and other related computer/systems items), cell phones, printers, tablets, etc. |
| various suppliers | All uniforms and Lightning Technology logo shirts |
| various suppliers | All items stored in storage room between Roland and Jeffrey Owen's office |
| various suppliers | All Furniture in employee two (2) breakrooms (including kitchen appliances and dishware) – warehouse and corporate offices |
| Snap-On-Tools | 2 blue 4x6x2.5 tool chests each containing full sets of Snap-On-Tools hand tools |
| various suppliers | Hydro cyclone System |
| various suppliers | All branded pallets in large display room including various substrates (including specialty pallets) |
| various suppliers | All Furniture and fixtures in R&D engineering room in plant (including the SnapOn Tool Chest, molds, hydraulic equipment, samples, etc.) |
| Service Tectonics | Industrial Pad Printer and Work Station SN #P120613416 |
| Various suppliers | Entire contents of Oxford annex (All equipment, tooling, and suppliers) |
| various suppliers | All spray booth equipment, robotics, chemicals, and related supplies |
| various suppliers | All tooling in plant including charging station for jitneys, gravity pallet text fixture, etc. |
| various suppliers | All furniture, pallet fixtures, and displays in Lobby |
| Jaantek | Aluminum Wire Harness Mold, Manifold and Tooling |

| Vendor | Description |
|---|---|
| Various | Chemicals marked in green at 2171 Xcelsior, Oxford, Michigan, 315 West Silverbell Road, (Suite #190), Lake Orion, MI 48359, and at 325 West Silverbell Road, (Suite #270), Lake Orion, MI 48359 |
| Findlay Machine & Tool | Two 2-stage industrial washing machines with the following serial numbers: 51601355-1 and 51601355-2 |
| Apple | Ipad in the possession of Jeffrey Owen |
| Not known | Floor cleaner located at 2171 Xcelsior, Oxford, Michigan |
| Various | CNC Machines located at Thomas Road, Oxford, Michigan |
| Various | Air filtration system located at Thomas Road, Oxford, Michigan |

For the sake of clarification, the entire custom spray booth located at the Oxford location, including all tools related thereto, is part of the Equipment.

**Schedule 2.1.2(b)**
**Vehicles**
**(Collateral Evidenced by Documents)**

| Make and Model | State & Plate No. | Description VIN No. |
|---|---|---|
| Lamar 2018 FG-02402C | MI- D754381 | 42 Ft 5th Wheel Retractable Covered Trailer VIN #5RVFG4028JP055115 |
| Ford – 2017 F350 | MI-DTA3532 | Diesel Dually 4 Door Pick Up VIN #1FT8W3DT8HEE24600 |

**Schedule 2.1.3**

**Schedule of Assumed Contracts**

All capitalized words and terms used in this Schedule of Assumed Contracts and not defined herein will have the respective meanings ascribed to them in the Amended 363 Sale Asset Purchase Agreement (as further amended and filed at docket no. 239, the "Agreement") or the Bankruptcy Court Order dated May 13, 2021, authorizing the Agreement filed at docket no. 244 ("Sale Order"), as applicable.  This Schedule of Assumed Contracts supersedes and replaces all prior schedules and lists of possible or potential Assumed Contracts or executory contracts or unexpired leases that might have otherwise become Assumed Contracts under the Agreement or the Sale Order, including, by way of example only, those executory contracts, unexpired leases, and Assumed Contracts listed on the Initial Possible Assumption Notice.

This is revised Schedule 2.1.3 of the Agreement. The cure amount for each of the five Assumed Contracts on this Schedule of Assumed Contracts is $0.

1. Supply Agreement dated as of February 27, 2019, amended July 22, 2019 by the Amendment to Supply Agreement, by and among Lightning Technologies, LLC and Ultimate Linings, LLC

2. License and Supply Agreement dated as of April 15, 2019 by and among Lightning Technologies, LLC and Microban International, Ltd.

3.  Technology Exploitation and License Agreement effective as of June 20, 2019, by and among Lightning Technologies LLC and LT Lender, LLC and/or Structural Coatings and Products LLC.

4.  License Agreement Customer No. 10008318, by and among Citrix Systems, Inc. and Lightning Technologies Inc.

5.  License Agreement User No. XXXXXXX11A4AEDF4, by and among Microsoft and Lightning Technologies Inc.

No executory contracts or unexpired leases are Assumed Contracts except the five Assumed Contracts specifically listed above.

## SCHEDULE 2.1.4
## Intellectual Property

All of the Debtor's and bankruptcy estate's entire right, title and interest in, to and under the following (all of which shall collectively be called the "Intellectual Property"):

(a)     Any and all copyright rights, copyright applications, copyright registrations and like protections in each work or authorship and derivative work thereof, whether published or unpublished and whether or not the same also constitutes a trade secret, now or hereafter existing, created, acquired or held.

(b)     Any and all trade secrets or similar protection for confidential information (including proprietary business processes, knowledge, ideas, research and development, know-how, data or any other information or technique relating  to the Business, any and all formula, pattern, device, schematics, technology, technical data, designs, drawings, flowcharts, block diagrams, specifications, whether or not patentable, or compilation of information that is used, usable or capable of being used in the Business; including information relating to the formulation of chemical compounds and their application methods or processes, material handling, coating and spray technology and techniques, pooling,  and pallet manufacturing and design (including the track and trace and RFID technology embedded therein and related software)), including without limitation the "Exobond" secret formula and the "Exobond" secret process; and any and all intellectual property rights in computer software and computer software products now or hereafter existing, created, acquired or held.

(c)     Any and all design rights which may be available now or hereafter existing, created, acquired or held.

(d)     All patents, patent applications and like protections including without limitation improvements, divisions, continuations, renewals, reissues, extensions and continuations-in-part of the same, including without limitation the patents and patent applications set forth below (collectively, the "Patents"):

| App. No. / Reg. No. of Pub. No. | Country | Title | Inventors | Current Assignee |
|---|---|---|---|---|
| 62/624,832 | US | WIRE  BUNDLE  COATING ASSEMBLY AND METHOD | Gabel, Jacob | Lightning Technologies, LLC |
| 16/265579 | US | WIRE  BUNDLE  COATING ASSEMBLY AND METHOD | Gabel, Jacob | Lightning Technologies, LLC |
| D869813 S | US | PALLET | Heiberger, Roland B. | Lightning Technologies, LLC |
| 201830420437X | China | PALLET | Heiberger, Roland B. | Lightning Technologies, LLC |
| 2018-016779 JPD1620188 | Japan | PALETTE | Heiberger, Roland B. | Lightning Technologies, LLC |
| 30-2018-0035495 | Korea | PALLET | Heiberger, Roland B. | Lightning Technologies, LLC |
| 005516135-0001 | EU | PALLETS | Heiberger, Roland B. | Lightning Technologies, LLC |

(e)      Any trademark and servicemark rights, whether registered or not, applications to register and registrations of the same and like protections, and the entire goodwill of the business of Grantor connected with and symbolized by such trademarks, including without limitation those set forth below (collectively, the "Trademarks"):

| App. No. /Reg. No. | Country | Mark | Goods/Services | Current Owner | Registration Date |
|---|---|---|---|---|---|
| 87479216 5698113 | US | EXOBOND | Class 2: Protective coatings comprised of thermoset plastic, applied by spray, cast, or overmold process, for use on cardboard, wood, plastic, multicellular expanded synthetic resins, sponge, and concrete surfaces | Lightning Technologies, LLC | March 12, 2019 |
| 87825348 | US | PALLETCHAIN | Class 9: software for logistics and supply chain management allowing exchange of data, analytics via blockchain technology in the field of pallets; computer software, namely, operating and management software for pallet inventory management systems and asset management systems incorporating active RFID technology | Lightning Technologies, LLC | N/A |
| 87825294 | US | CREATE THE ONE THING THAT CHANGES EVERYTHING | Class 40: Consulting services pertaining to the material transformation of the surface of industrial and commercial products by application of material coatings comprised of thermo set plastic; Application of coatings for others, namely, material transformation of the surface of industrial and commercial products by application of material coatings comprised of thermo set plastic by spray, cast, or over mold process | Lightning Technologies, LLC | N/A |

| App. No. /Reg. No. | Country | Mark | Goods/Services | Current Owner | Registration Date |
|---|---|---|---|---|---|
| 87479224 | US | LIGHTNING COATINGS | Class 2: Protective coatings comprised of thermoset plastic, applied by spray, cast, or overmold process, for use on cardboard, wood, plastic, multicellular expanded synthetic resins, sponge, and concrete surfaces Class 40: Consulting services pertaining to the material transformation of the surface of industrial and commercial products by application of material coatings comprised of thermo set plastic; Application of coatings for others, namely, material transformation of the surface of industrial and commercial products by application of material coatings comprised of thermo set plastic by spray, cast, or over mold process | Lightning Technologies, LLC | N/A |

(f)      Any website, domain name, and customer portal.

(g)      Any and all claims for damages by way of past, present and future infringement and/or misappropriation of any of the rights included above, with the right, but not the obligation, to sue for and obtain such legal and equitable relief for said use, misappropriation and/or infringement of the intellectual property rights identified above, including in addition to all rights to enforce, but without obligation to do so, any and all confidentiality, non-disclosure and non-compete provisions and/or agreements.

(h)      All licenses or other rights to use any of the Copyrights, Patents or Trademarks, and all license fees and royalties arising from such use to the extent permitted by such license or rights, including without limitation, those rights granted under Contracts set forth on Schedule 2.13.

(i)      All amendments, renewals and extensions of any of the Copyrights, Trademarks or Patents.

(j)      All proceeds and products of the foregoing, including without limitation all payments under insurance or any indemnity or warranty payable in respect of any of the foregoing.

**SCHEDULE 2.1.5**
**Inventory**

| Lake Orion Locations<br>315 West Silverbell Road, (Suite #190)<br>Lake Orion, MI 48359<br>325 West Silverbell Road, (Suite #270)<br>Lake Orion, MI 48359 | |
| --- | --- |
| **Part or Description** | **Units** |
| Production Ready Corner's | 1,932 |
| Corner Pieces | 3,456 |
| 1525 x1525x 12 plywood | 54 |
| Bad not cut corners | 448 |
| Bad wood legs | 2,196 |
| Unfinished wood plates by assembly | 68 |
| Production Oblong | 868 |
| Type 3 Oblong (production) | 731 |
| Type 3 corner Production | 570 |
| Work-in-progress legs | 144 |
| work-in-progress pallets assembled | 12 |
| work-in-porgress wood legs | 936 |
| 1525 x 1525 x 12 wood pallets | 1,947 |
| Baltica #29 Phase 2 wood plates | 1,980 |
| Baltica #29 Phase 2 wood plates | 8,118 |
| Bad work-in-progress drilled pieces | 1,540 |
| 1525 x 1525 x 12 wood pallets | 33 |
| Bad work-in-progress drilled pieces | 1,430 |
| 22mm x 4 x 8 plywood | 14,718 |
| partially finished pallet tops | 2,350 |
| partially finished pallet bottoms | 3,100 |
| partially finished pallet tops | 150 |
| partially finished pallet tops | 400 |

| **Lake Orion Locations**<br>315 West Silverbell Road, (Suite #190)<br>Lake Orion, MI 48359<br>325 West Silverbell Road, (Suite #270)<br>Lake Orion, MI 48359 | |
|---|---|
| **Part or Description** | **Units** |
| work-in-progress tops (cut) | 65 |
| work-in-progress bottoms (cut) | 73 |
| put together pallets (not coated) | 2,500 |
| Birch D3-E3 | 45,000 |
| Finished Pallets (coated) | 60 |
| put together pallets (not coated) | 2,518 |
| cut pallet tops (not coated) | 200 |
| Fat drops (48.25 x 19.375 x 12mm) | 25,600 |
| window drops | 27,600 |
| Skinny drops | 11,600 |
| Pepsi Legs | 1,197 |
| Pepsi Legs Oblong | 1,295 |
| Production Butcher Block Good Oblong | 1,080 |
| Production Butcher Oblong | 1,080 |
| Type 3 Vertical Oblong Production | 1,080 |
| Butcher Block Good Oblong Production | 1,080 |
| Type 1 Butcher Corner | 1,080 |
| Good Butcher Corner | 1,080 |
| Butcher Block Good Corner Production | 1,080 |
| Butcher Block Good Oblong Production | 4,320 |
| Type 1 Butcher Oblong Production | 3,240 |
| Corner | 4,320 |
| Bad Corner (Vertical) | 1,080 |
| Type 1 Bad Corner | 2,160 |
| Bad Butcher Corner | 2,160 |

| **Lake Orion Locations**<br>315 West Silverbell Road, (Suite #190)<br>Lake Orion, MI 48359<br>325 West Silverbell Road, (Suite #270)<br>Lake Orion, MI 48359 | |
| --- | --- |
| **Part or Description** | **Units** |
| Butcher Block Bad Corner | 1,080 |
| Type 1 Bad Butcher Corner | 3,240 |
| Butcher Block Bad Corner | 1,080 |
| Type 1 Bad Oblong | 1,080 |
| Bad Butch Oblong | 1,080 |
| Type 1 Bad Oblong | 1,080 |
| Butcher Block Type 1 Bad Oblong | 3,240 |
| Bad Vertical Corner | 580 |
| Bad Butcher Corner | 657 |
| Type 3 Bad Vertical Oblong | 748 |
| Type 2 Bad Corner | 1,080 |
| Bad Butcher Block Corner | 1,080 |
| Scrap Corner Legs | 165 |
| Bad Butcher Corner | 115 |
| Scrap Oblong | 170 |
| Type 2 Oblong Pending | 665 |
| Scrap Legs Unrepairable | 704 |
| Fresh Cut Plywood | 568 |
| WIP Complete Bad Lim Hole | 70 |
| Gen 2 Pallet Core | 3 |
| All scanning technology for pallet chips (including all surplus computer chips for pallet assembly) | |
| Annex Receiving dock area – pallets, wood, and Hilo | |
| All scrap wood (offal) generated from CNC machines) | |

| **Lake Orion Locations** 315 West Silverbell Road, (Suite #190) Lake Orion, MI 48359 325 West Silverbell Road, (Suite #270) Lake Orion, MI 48359 | |
|---|---|
| **Part or Description** | **Units** |
| Computer room items (including system to control CNC machines and any documentation for CNC machines) | |
| All items in office used as a storage room | |
| All office furniture and files in two offices | |
| Cleaning storage room items (mops, snow shovels, etc.) | |
| Employee breakroom items (employee uniforms, TV's, and appliances) | |
| Boring Drill (used to mill center pallet leg computer chip) | 1 |
| All CNC machines and associated tooling, computers, and robotics) | |
| Pallet assembly stations (including related equipment and supplies) | |
| Supplies, glue guns, UV systems to cure pallets, racking system, adhesives, chemicals, etc. | |
| Crowne charging stations | |
| Dust collections systems (including piping, fire suppression, hoppers, etc) | 2 |
| Findlay Tooling – Pallet Washers | 2 |

| **Oxford Location** 2171 Xcelsior Drive, Oxford, MI 48371 | |
|---|---|
| **Part or Description** | **Units** |
| Finished Pallets | 5,000[1] |

---

[1] This is an estimate.

**SCHEDULE 2.1.6**
**Equity Interests**

| Holder | Issuer | Shares/Units | Percentage of Ownership |
|---|---|---|---|
| Lightning Technologies Inc., a Delaware corporation | Structural Coatings and Products LLC, a Michigan limited liability company | N/A | 35% |
| Lightning Technologies Inc., a Delaware corporation | Airofy, LLC, a Michigan limited liability company | N/A | 100% |

## SCHEDULE 8.3.2.5

*Solyco, LLC*, Plaintiff, *v. Lightning Technologies, Inc.*, Defendant. Oakland County Circuit Court, Case No. 2020-182243-CK.

*Paul Shamo*, Plaintiff, *v. Lightning Technologies, Inc., Jeffrey Owen and Damian Kassab*, Defendants. Oakland County Circuit Court, Case No. 2020-181753-CK.

*Gevork G. Khachatrian a/k/a/ Greg Khachatrain*, Plaintiff, *v. Lightning Technologies, Inc.*, Defendant. Oakland County Circuit Court, Case No. 2020-182248-CK.

*Ken Cauley*, Plaintiff, *v. Lightning Technologies, Inc.*, Defendant. Oakland County Circuit Court, Case No. 2020-182254-CK.

*Michael McClear*, Plaintiff, *v. Lightning Technologies, Inc.*, Defendant. Oakland County Circuit Court, Case No. 2020-182244-CK.

*Blake George,* Plaintiff, *v. Lightning Technologies, Inc., Jeffrey Owen and Damian Kassab*, Defendants. Oakland County Circuit Court, Case No. 2020-182253-CK.

*Dems Assoc.*, Plaintiff, *v. Lightning Technologies, Inc.*, Defendant. Oakland County Circuit Court, Case No. 2020-181259-CB.

*Jeffrey Torrice*, Plaintiff, *v. Lightning Technologies, Inc.*, Defendant. Oakland County Circuit Court, Case No. 2020-184640-CK.

*Tom (TRPKO) Dimovski*, Plaintiff, *v. Lightning Technologies, Inc.*, Defendant. Oakland County Circuit Court, Case No. 2021-185579-CK

# EXHIBIT A

**Sale Procedures**

*In re Lightning Technologies, Inc.* **(Bankr. E.D. Mich. Case No. 21-41019)**

The duly appointed and acting Chapter 7 trustee ("Trustee") for the bankruptcy estate of Lightning Technologies, Inc.  (the "Debtor") has determined that entering into the Section 363 Asset Purchase Agreement ("APA")[1] with, and thereby accepting an initial bid for the Assets described in and subject to the APA ("Stalking Horse Bid") from, Palltronics, Inc. ("Buyer"), subject to higher and better offers to be solicited and considered pursuant to the Sale Procedures described herein, will enable the Trustee to obtain the highest and best price for the Assets consistent with his duties under Section 704(a)(1) of the Bankruptcy Code to collect and reduce to money the property of the Debtor's bankruptcy estate and close the estate as expeditiously as is compatible with the best interests of parties in interest.

1.      Notice of Auction and Sale.  Within seven (7) days after entry of an order (the "Sale Procedures Order") approving these Sale Procedures, the Trustee will provide notification of the Sale Procedures to the following parties ("Notice Parties") in the form and manner described below:

      (a)      Trustee will serve the Sale Procedures Order and the APA, by mail, postage prepaid on:

           (i)      The Office of the United States Trustee;

           (ii)      All parties that have requested notice in this case pursuant to Bankruptcy Rule 2002;

           (iii)      All entities that have executed a nondisclosure agreement in form and substance acceptable to the Trustee in connection with the proposed sale of the Assets;

           (iv)      Buyer; and

           (v)      All entities known by the Trustee to have asserted a lien, claim, or encumbrance on or against any of the Assets.

      (b)      Trustee will serve a notice of the Sale Procedures Order and the Notice of Auction and Sale, by mail, postage prepaid, in the form of **Attachment A** (with the blanks filled in), on the creditor matrix.

2.      Due Diligence.  Parties interested in purchasing the Assets may obtain due diligence materials regarding the Assets from the Trustee. Interested parties must execute a form nondisclosure agreement acceptable to the Trustee ("NDA") before any due diligence materials will be provided.  The NDA will include a provision that any copies made or otherwise obtained

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Section 363 Asset Purchase Agreement dated March 4, 2021.

- 1 -

of any Intellectual Property will be returned to the Trustee and any electronically stored information will be permanently deleted if the counterparty to the NDA is not the Winning Bidder or does not Close the Winning Bid. All due diligence requests should be directed to Scott Eisenberg, Capstone Headwaters, 255 E. Brown St., Suite 120, phone 248.633.2150; email: seisenberg@capstoneheadwaters.com. All due diligence shall be completed by the Auction.

3. <u>Stalking Horse Bid</u>.

(a) The aggregate consideration for the Assets is cash payable at Closing (as defined below) in the total amount of $5,000,000.00, inclusive of the Deposit Amount (the "<u>Purchase Price</u>"). In addition to the Purchase Price, all cure costs in connection with Assumed Contracts will be paid by the Buyer.

(b) Subject to the approval of the Bankruptcy Court, if (i) the Buyer is not in material breach of any provision of the APA and (ii) a sale pursuant to section 363 of the Bankruptcy Code or pursuant to a confirmed plan of reorganization or otherwise of all or substantially all of the Assets in a single transaction or a series of transactions to one or more persons (a "<u>Third Party</u>") other than the Buyer or an affiliate of the Buyer (a "<u>Third-Party Sale</u>"), whether at an Auction, pursuant to a plan of reorganization or otherwise, is consummated, then the Buyer shall be entitled to receive, without further order of the Bankruptcy Court, from the proceeds of the Third-Party Sale and payable in full at such Closing, an amount in cash equal to the sum of (i) $150,000 (USD), plus (ii) the amount of the reasonable, documented fees and expenses paid by the Buyer with respect to the transactions contemplated hereby, including attorneys' fees and expenses and those of other advisors and consultants in an amount not to exceed the sum of $75,000 (USD) ((i) and (ii) collectively, the "<u>Termination Fee</u>"). Such Termination Fee shall be made by wire transfer of immediately available funds to an account designated by the Buyer from the proceeds of the applicable Third-Party Sale at Closing.

4. <u>Qualified Bidders</u>.

(a) Additional bidders must be Qualified Bidders (as defined below) to participate at the Auction (as defined below).

(b) A "Qualified Bidder" is any person or entity that submits a Qualified Bid (as defined below) in accordance with these Sale Procedures. Buyer is and shall be treated as a Qualified Bidder for all purposes.

(c) A "Qualified Bid" is a written offer to purchase the Assets from a Qualified Bidder that complies with all of the following requirements:

(i) <u>Deadline to Submit Qualified Bids</u>: Any person or entity that wishes to submit a Qualified Bid must submit its bid so that it is actually

- 2 -

received by the Trustee's counsel no later than 5:00 p.m. prevailing Eastern Time on May 3, 2021 (the "Qualified Bid Deadline").

(ii)    Where to Submit Bids:  Bids must be submitted by electronic mail to the Counsel for the Trustee and the Office of the United States Trustee and must include an address, telephone number and electronic mail address at which the entity submitting the bid may be contacted:

> Counsel for the Trustee
> Erika D. Hart
> THE TAUNT LAW FIRM
> 700 E. Maple Road, Birmingham, MI 48009
> Office: (248) 644.7800
> ehart@tauntlaw.com
>
>
> Office of the United States Trustee
> c/o Sean M. Cowley
> 211 West Fort Street, Suite 700
> Detroit, MI 48226
> Sean.cowley@usdoj.gov

The Trustee shall provide Buyer with a complete copy of any Qualified Bid it receives, by electronic mail, promptly upon receipt, to the following email addresses:

> Counsel for Buyer
> Miller, Canfield, Paddock and Stone, PLC
> Steven A. Roach
> roach@millercanfield.com
> Marc N. Swanson
> swansonm@millercanfield.com
> 150 West Jefferson, Suite 2500
> Detroit, MI 48226

(iii)   Content of Qualified Bids:  The Stalking Horse Bid is deemed to be a Qualified Bid submitted by a Qualified Bidder. All other Qualified Bids must include the following items ("Bid Package"):

(1)    An unconditional cash offer for the Assets.  No credit bids are permitted.

(2)    An executed NDA in form and substance reasonably satisfactory to the Trustee

(3)    A cash purchase price that is not less than $5,325,000.

- 3 -

(4)     A signed asset purchase agreement that contains, with the exception of the cash purchase price in paragraph (3) above, terms substantially similar to the terms and conditions contained in the APA. Any changes to the APA shall be marked against the APA in a separate document.

(5)     A designation of the executory contracts and unexpired leases that such Qualified Bidder desires to be assumed and assigned to such Qualified Bidder.  A potential Qualified Bidder will make a good faith showing of future performance with respect to any unexpired leases or executory contracts that are to be assumed and assigned to the potential Qualified Bidder.  In addition to the cash purchase requirement identified in (3) above, all cure costs will be paid by the Qualified Bidder.

(6)     A disclosure of the identity of each person or entity that will be bidding for the Assets.

(7)     A binding and irrevocable offer.

(8)     The audited (if in existence) or unaudited financial statements and/or other written evidence of a financing commitment or other evidence satisfactory to the Trustee of the financial ability to consummate the proposed transaction.

(9)     A board resolution or written evidence of some type that demonstrates to the reasonable satisfaction of the Trustee that the bidder has obtained all corporate or other authority necessary for it to close and fund the proposed transaction and that the person or persons authorized to bid at the Auction on behalf of such entity is authorized to do so.

(10)    A deposit in cash or other immediately available funds ("Deposit") to be wired into a bank account to be designated by the Trustee, which Deposit is actually received on or before the Qualified Bid Deadline and in an amount of not less than 5% of the cash purchase price component of the Qualified Bid (exclusive of cure costs to be paid by the Qualified Bidder).

(11)    The bid must not contain any financial or due diligence contingencies.

(12)    The agreement of the person or entity making the Qualified Bid to serve as a Back-Up Bidder providing a Back-Up Bid as defined in and pursuant to the terms of Sections 7(f) and 8 of these Sale Procedures.

- 4 -

The Trustee reserves the right to work with any potential bidder in advance of the Auction to cure any deficiencies in a bid that is not initially deemed to be a Qualified Bid.

5. <u>"As Is, Where Is"; No Reliance by Bidders</u>. All entities seeking to be designated as Qualified Bidders shall be conclusively presumed to represent, warrant, and acknowledge as follows:

(a) The Assets shall be sold on an "as is, where is" basis and without representations or warranties of any kind, nature, or description by the Trustee, its agent, or the bankruptcy estate, other than as contained in the APA or the asset purchase agreement submitted by the Qualified Bidder.

(b) All of Debtor's right, title, and interest in and to the Assets pursuant to the terms of the Sale Order shall be sold free and clear of all liens, claims, encumbrances, restrictions, and other interests of any kind or nature thereon to the full extent authorized under Bankruptcy Code §§ 363(f), 365 and 105, with the same to attach to the net proceeds of the sale of the Assets according to their priority immediately prior to Closing of the sale of the Assets.

(c) Each Qualified Bidder understands and is bound by the terms of these Sale Procedures, and any order approving these Sale Procedures.

(d) Each Qualified Bidder has had an opportunity to conduct reasonable due diligence, if requested, and it has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or Assets in making its bid and has not relied upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express or implied, by operation of law or otherwise, regarding the Assets except as expressly stated in the Sale Procedures Order or in an executed asset purchase agreement, or the accuracy or completeness of any information provided in connection with the Assets, the Sale Procedures Order, or the Auction.

(e) Each Qualified Bidder has not colluded with any party with respect to its bid and has submitted its bid in good faith and not by any means forbidden by law. Nothing herein shall be construed to prohibit disclosed joint bids, however.

6. <u>Designation of Qualified Bids</u>.

(a) On or before May 5, 2021, at 5:00 p.m. prevailing Eastern Time, Trustee will designate those submitted bids, if any, that are Qualified Bids. The Trustee may determine at the Auction that a previously Qualified Bidder has altered its bid in a way that causes it no longer to be a Qualified Bidder.

- 5 -

(b)     If no Qualified Bids, other than the Stalking Horse Bid, are received by the Qualified Bid Deadline, the Trustee will seek Bankruptcy Court approval of a sale of the Assets to Buyer pursuant to the APA.

7.      <u>Auction</u>.  If one or more Qualified Bids is received (in addition to the Stalking Horse Bid) by the Qualified Bid Deadline, then an auction between or among the Buyer and those persons and entities submitting Qualified Bids will be conducted remotely via zoom on May 6, 2021, commencing at 12:00 p.m. prevailing Eastern Time ("<u>Auction</u>").

(a)     Only representatives of the Trustee, the Buyer, and any other Qualified Bidder will be entitled to attend and participate in the Auction.

(b)     Trustee may announce at the Auction additional procedural, non-material substantive rules as determined in good faith in the exercise of his business judgment for bidding and other procedures that are reasonable under the circumstances (*e.g.*, regarding the amount of time allotted to make subsequent overbids) for conducting the Auction, so long as such rules are not inconsistent with the provisions of the Sale Procedures Order, any order of the Court entered in connection herewith, the APA, or the Bankruptcy Code.

(c)     The Trustee shall designate at the start of the Auction the Qualified Bid determined by the Trustee in the exercise of his business judgment to be the highest or otherwise best bid as the initial bid for the Assets ("<u>Initial Qualified Bid</u>").

(d)     The first overbid above the Initial Qualified Bid (as determined by the amounts to be paid in clauses (3) and (5) of its Bid Package) and each subsequent overbid must be in the form of cash consideration and must be determined by the Trustee to be equal in value to the sum of $100,000.00 above the immediately preceding Initial Qualified Bid or subsequent overbid (if applicable).

(e)     After each round of bidding, the Trustee will announce the identity of the Qualified Bidder deemed by Trustee at that point to have made the highest or otherwise best offer for the Assets.

(f)     Promptly after the conclusion of the Auction, the Trustee will designate the highest or best Qualified Bid (taking into account all relevant factors, including, but not limited to, cash consideration, the terms and conditions of the proposed agreement, the aggregate value offered by the Qualified Bidder, the speed and certainty of consummation of a sale of the Assets to such Qualified Bidder), and the net proceeds that will be made available to the Debtor's bankruptcy estate upon a sale of the Assets (the "<u>Winning Bidder</u>") and shall designate the next highest or otherwise best Qualified Bid (the "<u>Back-Up Bid</u>") and the entity submitting the Back-Up Bid ("<u>Back-</u>

Up Bidder"). The Trustee will file a notice with the Court immediately after the Auction setting forth the identity of the Winning Bidder.

(g)     At the conclusion of the Auction, the party making the highest or otherwise best bid for the Assets shall be designated the Winning Bidder and the party submitting the second highest or otherwise best bid shall be designated the Back-Up Bidder. If the Winning Bid is approved by the Court and the Winning Bidder fails to close, the Trustee shall be authorized, but not directed, to close on the Back-Up Bid without further order of the Court.

8.     Presentation of Winning Bidder and Back-Up Bid; Acceptance of Qualified Bid Only Upon Court Approval. A hearing shall occur as soon as practicable after the Auction given the schedule of the Court, at which hearing the Trustee shall seek entry of an order approving the sale of the Assets to the Winning Bidder ("Sale Order") and that is effective immediately upon entry, notwithstanding Bankruptcy Rule 6004(h). The Sale Order shall provide that, if the transaction with the Winning Bidder for sale of the Assets fails to close because of a breach or failure to perform on the part of the Winning Bidder, the Trustee may consummate a sale of the Assets pursuant to the Back-Up Bid without further order of the Court.  If an Auction is conducted, and the Buyer is not the Winning Bidder,  the Buyer shall, if its bid is determined to be the next highest bid, serve as the Back-Up Bidder and keep the Buyer's bid to consummate the transactions contemplated by the APA on the terms and conditions set forth in the APA in addition to any increased bid amount that the Back-Up Bidder may make at the Auction open and irrevocable until the date which is 30 days after the date of the Auction (the "Buyer Outside Back-up Date").  The Back-Up Bid of a Back-Up Bidder shall also remain open and irrevocable until the Buyer Outside Back-Up Date.  A Qualified Bid, including any Winning Bid or Back-Up Bid, shall be deemed accepted by the Trustee only when that Qualified Bid has been approved by the Court and the Sale Order entered by the Court.

9.     Treatment of Deposits.

(a)     Any Qualified Bidder that submitted a Deposit and that is not designated at the Auction as having submitted the Winning Bid or the Back-Up Bid shall have its Deposit returned to it no later than two (2) business days after the designation of the Winning Bid.

(b)     If Buyer is the Back-Up Bidder, its Deposit shall be returned to it within two (2) business days after the Buyer Outside Back-Up Date, unless its Back-Up Bid becomes the Winning Bid.

(c)     If a Qualified Bidder other than Buyer is the Back-Up Bidder, its Deposit shall be returned to it within two (2) business days after the Buyer Outside Back-Up Date, unless its Back-Up Bid becomes the Winning Bid.

(d)     Notwithstanding anything to the contrary in any agreement between a Qualified Bidder and Trustee or any other entity, if such Qualified Bidder fails to consummate a transaction approved pursuant to the Sale Order because of a breach or failure to perform on the part of such Qualified

- 7 -

Bidder, such Qualified Bidder shall not be entitled to the return of its Deposit and the Deposit shall be irrevocably forfeited to the Debtor's estate. Such Deposit shall be deemed property of Debtor's estate and such Deposit shall be retained by Debtor's estate in full satisfaction of any damages due to Debtor's estate as a result of such Qualified Bidder's failure to consummate the transaction. Such Deposit shall not be subject to any security interest or other lien.

10.  <u>Closing</u>.  The closing of the transactions contemplated by the APA or the Winning Bid, as applicable ("<u>Closing</u>"), shall take place remotely via electronic exchange of documents, on the date ("<u>Closing Date</u>") that is mutually agreed to by the Parties, but in no event shall be later than 10 days after the entry of the Sale Order.

11.  <u>Sale Hearing</u>.  A hearing to consider entry of the Sale Order will be held before the Court on a date to be set at the hearing on the entry of the Sale Procedures Order.

37230787.10/159982.00001

**Attachment A – Notice**

37230787.10/159982.00001

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | |
|---|---|
| In re: | Case No. 21-41019-tjt |
| Lightning Technologies, Inc., | Chapter 7 |
| Debtor. | Judge Thomas J. Tucker |

## NOTICE OF AUCTION AND SALE

**PLEASE TAKE NOTICE** that on March [**], 2021, the Trustee filed his motion ("Sale Motion") for entry of orders pursuant to sections 105(a), 363 and 365 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. ("Bankruptcy Code") and Rules 2002, 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules"): (a) approving the Sale Procedures (as defined below) in connection with the sale ("Sale") of substantially all of the Debtor's assets ("Assets"); (b) authorizing and scheduling an auction, if other bids are received ("Auction"), in connection with the Sale; (c) approving a termination fee and certain other protections to the Trustee's current stalking horse bidder, Palltronics, Inc. ("Buyer"), under the Trustee's stalking horse purchase and sale agreement ("APA"); (d) approving cure procedures relating to the assumption and assignment of certain executory contracts and unexpired leases ("Assumed and Assigned Agreements") in connection with the Sale; (e) approving the form and manner of notices; (f) setting a hearing ("Sale Hearing") to take place after the Auction (if an Auction is necessary), to approve the Sale and the assumption and assignment of the Assumed and Assigned Agreements.  By Order dated [***], 2021, the Bankruptcy Court entered an order ("Sale Procedures Order") approving the sale procedures as described therein ("Sale Procedures").

Any party that wishes to take part in the process and submit a bid for the Assets must comply with the Sale Procedures, including without limitation the following procedures.  Only "Qualified Bidders" may participate in the bidding and Auction process.  A "Qualified Bidder" is a potential bidder that has, no later than the bid deadline of May 3, 2021, at 5:00 p.m. prevailing Eastern Time ("Qualified Bid Deadline"), submitted a "Qualified Bid" by electronic mail to counsel to the Trustee, Erika D. Hart, 700 E. Maple Road, Birmingham, MI 48009, ehart@tauntlaw.com.

Subject to any other requirements established by the Court, an offer to purchase will only constitute a Qualified Bid if it contains the following items:

1.      An unconditional cash offer for the Assets.  No credit bids are permitted.

2.      An executed nondisclosure agreement in form and substance reasonably satisfactory to the Trustee.

3.      A cash purchase price that is not less than $5,325,000.

- 1 -

4.    A signed asset purchase agreement that contains, with the exception of the cash purchase price in paragraph (3) above, terms substantially similar to the terms and conditions contained in the APA. Any changes to the APA shall be marked against the APA in a separate document.

5.    A designation of the executory contracts and unexpired leases that such Qualified Bidder desires to be assumed and assigned to such Qualified Bidder.  A potential Qualified Bidder will make a good faith showing of future performance with respect to any unexpired leases or executory contracts that are to be assumed and assigned to the potential Qualified Bidder.  In addition to the cash purchase requirement identified in (3) above, all cure costs will be paid by the Qualified Bidder.

6.    A disclosure of the identity of each person or entity that will be bidding for the Assets.

7.    A binding and irrevocable offer.

8.    The audited (if in existence) or unaudited financial statements and/or other written evidence of a financing commitment or other evidence satisfactory to the Trustee of the financial ability to consummate the proposed transaction.

9.    A board resolution or written evidence of some type that demonstrates to the reasonable satisfaction of the Trustee that the bidder has obtained all corporate or other authority necessary for it to close and fund the proposed transaction and that the person or persons authorized to bid at the Auction on behalf of such entity is authorized to do so.

10.    A deposit in cash or other immediately available funds ("Deposit") to be wired into a bank account to be designated by the Trustee, which Deposit is actually received on or before the Qualified Bid Deadline and in an amount of not less than 5% of the cash purchase price component of the Qualified Bid (exclusive of cure costs to be paid by the Qualified Bidder).

11.    The bid must not contain any financial or due diligence contingencies.

12.    The agreement of the person or entity making the Qualified Bid to serve as a Back-Up Bidder providing a Back-Up Bid as defined in and pursuant to the terms of Sections 7(f) and 8 of the Sale Procedures

In the event the Trustee receives a Qualified Bid in addition to the APA, the Trustee will, unless otherwise ordered by the Court, conduct the Auction with respect to the Assets.  The Auction will be conducted via zoom on May 6, 2021, commencing at 12:00 p.m. prevailing Eastern Time ("Auction").

If you seek to object to the sale of the Assets or any portion thereof, you must comply with the terms for making such objections as set forth in the Sale Procedures Order and the Sale Procedures.  Such objections must be filed with the Bankruptcy Court and served on the Trustee's counsel so as to be received, on or before May 7,2021.  The hearing on whether to approve the Sale will take place on May 10, 2021, at __:__ _.m. in the Courtroom of the Honorable Thomas Tucker, United States Bankruptcy Court for the Eastern District of Michigan,

- 2 -

at Courtroom 1925, 211 West Fort Street Bldg., Detroit MI 48226 ("Sale Hearing") or conducted by telephone, in the discretion of the Court. If the Sale Hearing is to be conducted by telephone, then at least five minutes before the scheduled time for the hearing, counsel and parties should call (888) 684-8852 and use Access Code 2388650.  If any party fails to timely file and serve an objection in accordance with the Sale Procedures Order, the Bankruptcy Court may disregard such objection.  The failure of any person to timely file its objection shall be a bar to the assertion, at the Sale Hearing or thereafter, of any objection to the Sale or the Trustee's assumption and assignment of the Assumed and Assigned Agreements or the consummation of the Sale and the performance of the APA.

Dated: March [***], 2021

                 THE TAUNT LAW FIRM

                 By:     /s/ Erika D. Hart
                        Erika D. Hart (P67457)
                        Dean R. Nelson (P 70818)
                        Attorneys for Trustee
                        700 E. Maple Rd., 2nd Floor
                        Birmingham, MI 48009
                        248.655.7800
                        ehart@tauntlaw.com
                        dnelson@tauntlaw.com

- 3 -

# EXHIBIT B

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| In re: | Case No. 21-41019-tjt |
| Lightning Technologies, Inc., | Chapter 7 |
| Debtor. | Judge Thomas J. Tucker |

**ORDER (I) ESTABLISHING SALE PROCEDURES, (II) SCHEDULING AN AUCTION AND A SALE HEARING IN CONNECTION WITH THE SALE OF SUBSTANTIALLY ALL OF DEBTOR'S ASSETS PURSUANT TO 11 U.S.C. §§ 105, 363 AND 365, (III) SETTING CERTAIN DATES AND DEADLINES IN CONNECTION THEREWITH, (IV) APPROVING THE FORM OF THE PURCHASE AND SALE AGREEMENT, INCLUDING THE TERMINATION FEE, AND (V) GRANTING RELATED RELIEF**

This matter having come before the Court on the Motion for the entry of an Order (I) Establishing Sale Procedures, (II) Scheduling an Auction and a Sale Hearing in Connection with the Sale of Substantially all of the Debtor's Assets Pursuant to 11 U.S.C. §§ 105, 363 and 365, (III) Setting Certain Dates and Deadlines in Connection Therewith, (IV) Approving the Form of the Purchase and Sale Agreement, including the Termination Fee, and (V) Granting Related Relief ("Sale Motion")[1], filed by the Chapter 7 Trustee duly appointed and acting in this case ("Trustee"), which seeks entry of, among other things, this order ("Sale Procedures Order"); proper notice of the Sale Motion having been provided to all

---

[1] All capitalized terms used in this Sale Procedures Order but not defined herein shall have the meanings ascribed to them in the Sale Motion.

parties entitled thereto as required by applicable law, and no other or further notice being required; objections, if any, to the entry of this Sales Procedure Order having been withdrawn, resolved, or overruled; the Court finding that (a) it has jurisdiction to enter this Sale Procedures Order pursuant to 28 U.S.C. § 1334; and (b) this is a core proceeding pursuant to 28 U.S.C. § 157(b); and it appearing to the Court that the relief granted by the Sale Procedures Order is in the best interest of Debtor, its estate, and its creditors; the Court being otherwise fully advised on the premises;

**NOW THEREFORE, IT IS HEREBY ORDERED THAT:**

1.     The Sale Motion is GRANTED, solely to the extent that it requests entry of this Sale Procedures Order and as provided herein. All objections to the entry of this Sale Procedures Order not settled, withdrawn, or otherwise resolved are overruled.

2.     The APA is authorized, approved, duly executed, and binding to the extent necessary to carry out and implement the terms of this Order, and Trustee and Buyer are authorized to perform as required thereunder, subject to the Sale Procedures, the Sale Order and as set forth herein.   No credit bids are permitted for the Assets.

3.     The Trustee is authorized and directed to pay to the Buyer an amount equal to (i) $150,000, plus (ii) an expense reimbursement for the reasonable fees,

2

including professional fees of the Buyer, of up to $75,000 ((i) and (ii), collectively, the "Termination Fee") on the terms, and subject to the conditions, set forth in the Sale Procedures and the APA.  The Termination Fee is hereby authorized and approved based on the substantial value the Stalking Horse Bid created for the bankruptcy estate and the exercise of the Trustee's business judgment.

4.    Objections, if any, to the remaining relief requested in the Sale Motion and the entry of the proposed Sale Order must: (a) be in writing; (b) conform to any applicable requirements of the United States Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, and any applicable local rules of procedure of this Court; (c) set forth the name of the objecting party and the nature of any claims or interests held by such party against or in Debtor's estate or property; (d) state with particularity the legal and factual bases for the objection and the specific grounds therefore; and (e) be filed with the Clerk of the Court, and served on the Chapter 7 Trustee's counsel so as to be received, on or before **May 7, 2021.**

5.    Any person or entity that fails to make an objection in compliance with the requirements of paragraph 4 above shall be forever barred from asserting any objection to the entry of the Sale Order.

6.    A hearing ("Sale Hearing") to consider the remaining relief requested in the Sale Motion and the entry of the proposed Sale Order shall be held on **May 10, 2021 at [****].**

37247088.5/159982.00001

7.      The Sale Procedures attached as **Exhibit 6A** to the Sale Motion are incorporated herein, are hereby approved, and shall apply to the sale of the Assets.

8.      The proposed assumption and assignment notice ("Assumption and Assignment Notice"), substantially in the form attached as **Exhibit 6B** to the Sale Motion, is hereby approved and deemed sufficient for all purposes, and no further notice shall be required.

9.      The following procedures are hereby approved and shall apply to the assumption and assignment by the Trustee of certain executory contracts and unexpired leases (the "Assumed and Assigned Agreements"):

   (a)   By no later than seven (7) days after entry of the Sale Procedures Order, the Trustee will file a schedule ("Cure Schedule") which will be attached to the Assumption and Assignment Notice, identifying (i) the Assumed and Assigned Agreements, potentially to be assumed and assigned to a buyer in the event of a Sale and (ii) the amount, if any, the Trustee believes is necessary to cure all monetary defaults and other defaults under such agreement pursuant to section 365 of the Bankruptcy Code ("Cure Costs").

   (b)   Upon the filing of the Cure Schedule, the Trustee will serve the Cure Schedule and the Assumption and Assignment Notice on each of the non-debtor counterparties listed on the Cure Schedule by first class mail. The Assumption and Assignment Notice will state that the Trustee is or may be seeking the assumption and assignment of the Assumed and Assigned Agreement and include (i) a description of each executory contract and unexpired lease that may be assumed and assigned in connection with the Sale, (ii) that the deadline for objecting ("Cure/Assignment Objection") to the amount of the proposed Cure Costs related to any executory contract or unexpired lease is **April 7, 2021** ("Cure/Assignment Objection Deadline") and

4

(iii) that the deadline for objecting ("<u>Adequate Assurance Objection</u>") to the ability of the Buyer to provide adequate assurance of future performance under any Assumed and Assigned Agreement is **May 7, 2021** ("<u>Adequate Assurance Objection Deadline</u>").

(c)     Each Cure/Assignment Objection and/or Adequate Assurance Objection must be filed with the Bankruptcy Court and served on Trustee's counsel so that it is received by Cure/Assignment Objection Deadline and/or the Adequate Assurance Objection Deadline, respectively.

(d)     If no objections are received with respect to any Assumed and Assigned Agreement, then the Cure Costs set forth in the Cure Schedule for such agreement will be binding upon the non-debtor counterparty to such agreement for all purposes and will constitute a final determination of the Cure Cost required to be paid by or on behalf of the applicable Debtor in connection with the assumption and assignment of such agreement. In addition, all counterparties to the Assumed and Assigned Agreements who fail to file an objection before the Cure/Assignment Objection Deadline and/or the Adequate Assurance Objection Deadline, as applicable, will be (i) forever barred from objecting to the Cure Costs or adequate assurance of future performance with respect to the Assumed and Assigned Agreements, and the Trustee and the buyer will be entitled to rely solely upon the Cure Cost set forth on the Cure Schedule; (ii) deemed to have consented to the assumption and assignment; and (iii) forever barred and estopped from asserting or claiming against the Debtor or the buyer that any additional amounts are due or other defaults exist, that conditions to assignment must be satisfied or that there is any other objection or defense to the assumption or assignment of the applicable Assumed and Assigned Agreement.

(e)     The Trustee or the Winning Bidder may amend the Cure Schedule to remove or add any Assumed and Assigned Agreement at any time before such Assumed and Assigned Agreement is actually assumed and assigned pursuant to an order of the Court. The non-debtor counterparty or parties to any such removed or added contract or lease will be notified of such

5

exclusion or addition by written notice mailed within five (5) business days after such amendment, and any non-debtor counterparty with an Assumed and Assigned Agreement which is added to the Cure Schedule shall have the longer of (a) seven (7) days after written notice is mailed to the non-debtor counterparty with an added Assumed and Assigned Agreement and (b) the Cure/Assignment Objection Deadline or Adequate Assurance Objection Deadline, as applicable, to file an objection.

10.    A hearing to consider any Cure/Assignment Objections shall be held on **April 21, 2021 at _____.**

11.    Any Adequate Assurance Objections will be heard at the Sale Hearing.

12.    The presence of an Assumed and Assigned Agreement on the Cure Schedule does not constitute an admission that such Assumed and Assigned Agreement is an executory contract or unexpired lease or that the Assumed and Assigned Agreement will be assumed, assigned or both.

13.    The Court retains jurisdiction to hear and determine all matters arising from or relating to the implementation and/or interpretation of this Order.

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| In re: | Case No. 21-41019-tjt |
| Lightning Technologies, Inc., | Chapter 7 |
| Debtor. | Judge Thomas J. Tucker |

**You are receiving this notice because you may be a party to a contract or lease with Lightning Technologies, Inc. Please read this notice carefully as your rights may be affected by the transactions described herein.**

**PLEASE TAKE NOTICE** that on February 5, 2021, an involuntary petition under Chapter 7 of the United States Bankruptcy Code, 11 USC §§101 *et. seq.,* as amended (the "Bankruptcy Code") was filed against Lightning Technologies, Inc. ("Debtor"), thereby commencing Case No. 21-41019-tjt (the "Bankruptcy Case") in the United States Bankruptcy Court for the Eastern District of Michigan ("Bankruptcy Court").

**PLEASE TAKE FURTHER NOTICE** that the Debtor consented to the involuntary petition and the Bankruptcy Court entered its Order for Relief on February 8, 2021 [Docket No. 5].

**PLEASE TAKE FURTHER NOTICE** Fred J. Dery was appointed as and is the duly acting Chapter 7 trustee ("Trustee") for the bankruptcy estate in the Bankruptcy Case.

**PLEASE TAKE FURTHER NOTICE** that on [***], 2021, the Trustee filed his Motion for Entry of (A) an Order (I) Establishing Sale Procedures, (II) Scheduling an Auction and a Sale Hearing in Connection with the Sale of Substantially all of the Debtor's Assets Pursuant to 11 U.S.C. §§ 105, 363 and 365, (III) Setting Certain Dates and Deadlines in Connection Therewith, (IV) Approving the Form of the Purchase and Sale Agreement, Including the Termination Fee and (V) Granting Related Relief; and (B) an Order (I) Authorizing the Sale of Substantially all of the Debtor's Assets Free and Clear of Liens, Claims, Encumbrances and Interests Pursuant to 11 U.S.C. §§ 105, 363 and 365, (II) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases pursuant to 11 U.S.C. § 365, and (III) Granting Related Relief ("Sale Motion").

**PLEASE TAKE FURTHER NOTICE** that on [***], the United States Bankruptcy Court for the Eastern District of Michigan ("Bankruptcy Court") entered an Order (I) Establishing Sale Procedures, (II) Scheduling an Auction and a Sale Hearing in Connection with the Sale of Substantially all of the Debtor's Assets Pursuant to 11 U.S.C. §§ 105, 363 and 365, (III) Setting Certain Dates and Deadlines in Connection Therewith, (IV) Approving the Form of the Purchase and Sale Agreement, including the Termination Fee, and (V) Granting Related

Relief [Doc. No. ___] ("Sale Procedures Order").[1]  Among other things, the Sale Procedures Order: (a) established certain procedures ("Sale Procedures") for the sale ("Sale") of the Debtor's assets pursuant to an auction ("Auction") and (b) scheduled the time and place for the Auction.  The hearing on whether to approve the Sale will take place on May 10, 2021, at __:__ _.m. in the Courtroom of the Honorable Thomas Tucker, United States Bankruptcy Court for the Eastern District of Michigan, at Courtroom 1925, 211 West Fort Street Bldg., Detroit MI 48226 ("Sale Hearing").  The hearing will be conducted by telephone. At least five minutes before the scheduled time for the hearing, counsel and parties should call (888) 684-8852 and use Access Code 2388650.

**PLEASE TAKE FURTHER NOTICE** that pursuant to the Sale Procedures Order, the Trustee may potentially assume and assign to the Winning Bidder one or more of those executory contracts and unexpired leases listed on Annex 1 attached hereto (collectively, the "Assumed and Assigned Agreements" and each, a "Assigned Agreement"), pursuant to section 365 of the Bankruptcy Code.

**PLEASE TAKE FURTHER NOTICE** that the Trustee has indicated on Annex 1 attached hereto the cure amounts the Trustee believes must be paid to cure all pre-petition defaults and pay all amounts accrued under the Assigned Agreements (in each instance, the "Cure Amount").

**PLEASE TAKE FURTHER NOTICE** that any party seeking to object to the assumption by the Trustee and assignment/transfer to the Winning Bidder of any Assigned Agreement, including the validity and amount of the Cure Amount as determined by the Trustee, or otherwise assert that any other amounts, defaults, conditions or pecuniary losses must be cured or satisfied under any of the Assigned Agreement for such contract or lease to be assumed and assigned, must file an objection ("Cure/Assignment Objection") that (a) is in writing (b) sets forth the specific monetary amount the objector asserts to be due, and the specific types of the alleged defaults, pecuniary losses, accrued amounts and conditions to assignment and the support therefor, (c) is filed with the Clerk of the Bankruptcy Court, and served on the Trustee's counsel so that it is received, on or before **April 7, 2021** ("Cure/Assignment Objection Deadline").

**PLEASE TAKE FURTHER NOTICE** that a hearing to consider any Cure/Assignment Objections will be held on April 21, 2021,    at __:__ _.m. in the Courtroom of the Honorable Thomas Tucker, United States Bankruptcy Court for the Eastern District of Michigan, at Courtroom 1925, 211 West Fort Street Bldg., Detroit MI 48226.  The hearing will be conducted by telephone. At least five minutes before the scheduled time for the hearing, counsel and parties should call (888) 684-8852 and use Access Code 2388650.

**PLEASE TAKE FURTHER NOTICE** that any party seeking to object to the ability of the Winning Bidder to provide adequate assurance of future performance of an Assigned Agreement must file an objection ("Adequate Assurance Objection") with the Clerk of

---

[1] Capitalized terms not otherwise defined herein shall have the meanings given to them in the Sale Procedures Order.

2

Bankruptcy Court on or before May 7, 2021. Any such objections will be heard at the Sale Hearing.

      **PLEASE TAKE FURTHER NOTICE** that unless a Cure/Assignment Objection or Adequate Assurance Objection is filed and served before the applicable objection deadline, all parties shall (a) be forever barred from objecting to the Cure Amount or provision of adequate assurance of future performance and from asserting any additional cure or other amounts with respect to the Assigned Agreements, and the Trustee and the Winning Bidder shall be entitled to rely solely upon the Cure Amount; (b) be deemed to have consented to the assumption and assignment; (c) be forever barred and estopped from asserting or claiming defaults exist, that conditions to assignment must be satisfied under such Assigned Agreements or that there is any objection or defense to the assumption and assignment of such Assigned Agreements.

      **PLEASE TAKE FURTHER NOTICE** that if you agree with the Cure Amount indicated on Annex 1 and otherwise do not object to the Trustee's assumption and assignment of your lease or contract, you need not take any further action.

      **PLEASE TAKE FURTHER NOTICE** that the Trustee's decision to assume and assign the Assigned Agreements is subject to the approval of the Bankruptcy Court.

      **PLEASE TAKE FURTHER NOTICE** that the inclusion of any document on the list of Assigned Agreements shall not constitute or be deemed to be a determination or admission by the Trustee or the Winning Bidder that such document is, in fact, an executory contract or unexpired lease within the meaning of the Bankruptcy Code, or that your executory contract or unexpired lease will be assumed and/or assigned, and all rights with respect thereto are expressly preserved.

Dated: [***], 2021

                THE TAUNT LAW FIRM

                By:    /s/ Erika D. Hart
                      Erika D. Hart (P67457)
                      Dean R. Nelson (P 70818)
                      Attorneys for Trustee
                      700 E. Maple Rd., 2nd Floor
                      Birmingham, MI 48009
                      248.655.7800
                      ehart@tauntlaw.com
                      dnelson@tauntlaw.com

# FIRST AMENDMENT TO

## AMENDED 363 SALE ASSET PURCHASE AGREEMENT

This FIRST AMENDMENT TO AMENDED 363 SALE ASSET PURCHASE AGREEMENT (the "First Amendment") is entered into as of April 16, 2021 (the "Amendment Effective Date") between **Palltronics, Inc.**, a Michigan corporation ("Buyer"), and **Fred J. Dery, in his capacity as Chapter 7 Trustee for the bankruptcy estate of Lightning Technologies Inc., Case No. 21-41019-tjt** ("Trustee" or "Seller", and collectively with Buyer, the "Parties" and each a "Party").

## RECITALS

WHEREAS, on March 16, 2021, but effective as of March 4, 2021, the Parties entered into the Amended 363 Sale Asset Purchase Agreement (the "Agreement");[1]

WHEREAS, on March 18, 2021, the Court entered the Order (I) Establishing Sale Procedures, (II) Scheduling an Auction and a Sale Hearing in Connection with the Sale of Substantially All of Debtor's Assets Pursuant to 11 U.S.C. §§105, 363 and 365, (III) Setting Certain Dates and Deadlines in Connection Therewith, (IV) Approving the Form of the Purchase and Sale Agreement, Including the Termination Fee, and (V) Granting Related Relief ("Sale Procedures Order") [Docket No. 103] and, pursuant to decretal paragraph 2 thereof, the Agreement, in the form appended to the Trustee's Supplement to the Sale Motion [Docket No. 88], was authorized, approved, duly executed and binding to the extent necessary to carry out and implement the Sale Procedures Order;

WHEREAS, the Buyer has been conducting ongoing due diligence under and in connection with the Agreement pursuant to a Confidentiality Agreement between the Parties ("Confidentiality Agreement"), and Buyer requested additional due diligence relating to the Seller's Microsoft Office 365 account and usage of such account by third parties prior to the Opinion and Order dated April 15, 2021 issued by the Bankruptcy Court ("Opinion") [Docket No. 189];

WHEREAS, under the circumstances of the case, the Parties recognize and agree that an extension of the time for Buyer to terminate the Agreement relating to due diligence under Section 7.1.4 of the Agreement is both reasonable and appropriate under the circumstances;

WHEREAS, pursuant to Section 10.3 of the Agreement, the Agreement may be modified, amended or supplemented only by a written instrument duly executed by each Party; and

WHEREAS, the Parties desire to modify, amend and supplement the Agreement as set in this First Amendment.

---

[1] Unless otherwise defined herein, all capitalizes terms shall have the meanings ascribed to them in the Agreement.

1

# AGREEMENT

NOW, THEREFORE, in consideration of the premises and mutual representations, warranties and covenants herein contained and other good and valuable consideration, the receipt, adequacy and legal sufficiency of which are hereby acknowledged, and intending to be legally bound, the Parties hereto agree as follows:

1.　　Section 7.1.4 of the Agreement is hereby amended to read in its entirety as follows:

"7.1.4 The Buyer, on or before April 30, 2021 at 2:00 pm EST, upon written notice to the Seller, if it is not satisfied, in its sole discretion, with the results of its ongoing due diligence investigation of the Intellectual Property; provided, however, that the notice to Seller of Buyer's decision to terminate under this Section 7.1.4 shall describe with reasonable particularity the reason Buyer is not satisfied and that reason must be true."

2.　　The following is added as a new Section 8.8 of the Agreement:

"Buyer shall provide the Seller, on or before April 23, 2021, with updated assurances of the Buyer of financial ability to perform and comply with the requirements of this Agreement, to be held confidentially for review only by the Trustee and Trustee Professionals, in a similar form to those financial assurances previously provided by the Buyer to the Trustee."

3.　　From and after the Amendment Effective Date, each reference in Agreement to "this Agreement," "hereunder," "hereof," "herein," or words of like import referring to the Agreement and each reference to the Agreement in any certificate or document delivered in connection with the Agreement shall mean and be a reference to the Agreement as amended by this First Amendment.

4.　　Except as modified, amended or supplemented by this First Amendment, the Agreement is in all respects ratified and confirmed, and all the terms, provisions, and conditions thereof shall be and remain in full force and effect.

5.　　This First Amendment may be executed in any number of duplicate originals or counterparts, each of which will be deemed to be an original and which, taken together, will constitute but one and the same instrument.  Each of the Parties agrees that their respective signatures may be delivered by fax or pdf by email, and that fax and emailed pdf signatures will be treated as originals for all purposes.

6.　　Pursuant to Section 10.3 of the Agreement, Bankruptcy Court approval of this First Amendment is not required.

[Signature Page Follows]

2

IN WITNESS WHEREOF, the Parties hereto have duly executed this Amendment as of the date first written above.

**SELLER**

FRED J. DERY, Chapter 7 Trustee for the bankruptcy estate of Lightning Technologies, Inc.

By: _____
Name: Fred J. Dery
Title:   Chapter 7 Trustee for the estate of Lightning Technologies, Inc.

**BUYER**

**Palltronics, Inc.**, a Michigan corporation

By: _____
Name: Damian Kassab
Title:   President

37528145.8/159982.00001

IN WITNESS WHEREOF, the Parties hereto have duly executed this Amendment as of the date first written above.

**SELLER**

FRED J. DERY, Chapter 7 Trustee for the bankruptcy estate of Lightning Technologies, Inc.

By: _____
Name: Fred J. Dery
Title: Chapter 7 Trustee for the estate of Lightning Technologies, Inc.

**BUYER**

**Palltronics, Inc.,** a Michigan corporation

By: _____
Name: Damian Kassab
Title: President

## SECOND AMENDMENT TO

## AMENDED 363 SALE ASSET PURCHASE AGREEMENT

This SECOND AMENDMENT TO AMENDED 363 SALE ASSET PURCHASE AGREEMENT (the "Second Amendment") is entered into as of May 24, 2021 (the "Amendment Effective Date") between **Palltronics, Inc.**, a Michigan corporation ("Buyer"), and **Fred J. Dery, in his capacity as Chapter 7 Trustee for the bankruptcy estate of Lightning Technologies Inc., Case No. 21-41019-tjt** ("Trustee" or "Seller", and collectively with Buyer, the "Parties" and each a "Party").

## RECITALS

WHEREAS, on March 16, 2021, but effective as of March 4, 2021, the Parties entered into the Amended 363 Sale Asset Purchase Agreement (as amended by a first amendment dated as of April 16, 2021, the "Agreement");[1]

WHEREAS, pursuant to Section 10.3 of the Agreement and Paragraph 20 of the order authorizing the sale of the Assets under the Agreement [Docket No. 244], the Agreement may be modified, amended or supplemented only by a written instrument duly executed by each Party; and

WHEREAS, the Parties desire to modify, amend and supplement the Agreement as set in this Second Amendment.

## AGREEMENT

NOW, THEREFORE, in consideration of the premises and mutual representations, warranties and covenants herein contained and other good and valuable consideration, the receipt, adequacy and legal sufficiency of which are hereby acknowledged, and intending to be legally bound, the Parties hereto agree as follows:

1.      Section 2.1.7. of the Agreement is hereby amended to read in its entirety as follows:

"2.1.7. all causes of action, lawsuits, judgments, claims, rights to both legal and equitable relief and demands of any nature, to the extent reasonably necessary to protect and enforce Buyer's rights, title and interest in the Assets."

2.      Buyer believes that it will be practicable to close on or before May 26, 2021. Seller agrees to the Closing to occur on or before May 26, 2021. Neither Party waives or relinquishes any rights it has under Section 6.3 of the Agreement.

3.      The Deposit is non-refundable if Buyer does not close for any reason except as set forth in Sections 7.1.1, 7.1.2 or 7.1.5 of the Agreement.

---

[1] Unless otherwise defined herein, all capitalizes terms shall have the meanings ascribed to them in the Agreement.

1

4.      From and after the Amendment Effective Date, each reference in the Agreement to "this Agreement," "hereunder," "hereof," "herein," or words of like import referring to the Agreement, and each reference to the Agreement in any certificate or document delivered in connection with the Agreement, shall mean and be a reference to the Agreement as amended by this Second Amendment.

5.      Except as modified, amended or supplemented by this Second Amendment, the Agreement is in all respects ratified and confirmed, and all the terms, provisions, and conditions thereof shall be and remain in full force and effect.

6.      This Second Amendment may be executed in any number of duplicate originals or counterparts, each of which will be deemed to be an original and which, taken together, will constitute but one and the same instrument. Each of the Parties agrees that their respective signatures may be delivered by fax or pdf by email, and that fax and emailed pdf signatures will be treated as originals for all purposes.

7.      Pursuant to Section 10.3 of the Agreement and Paragraph 20 of the Sale Order, Bankruptcy Court approval of this Second Amendment is not required.

[Signature Page Follows]

IN WITNESS WHEREOF, the Parties hereto have duly executed this Amendment as of the date first written above.

**SELLER**

FRED J. DERY, Chapter 7 Trustee for the bankruptcy estate of Lightning Technologies, Inc.

By: _____
Name: Fred J. Dery
Title:  Chapter 7 Trustee for the estate of Lightning Technologies, Inc.

**BUYER**

**Palltronics, Inc.**, a Michigan corporation

By: _____
Name:  Damian Kassab
Title:  President

IN WITNESS WHEREOF, the Parties hereto have duly executed this Amendment as of the date first written above.

**SELLER**

FRED J. DERY, Chapter 7 Trustee for the bankruptcy estate of Lightning Technologies, Inc.

By: _____
Name: Fred J. Dery
Title: Chapter 7 Trustee for the estate of Lightning Technologies, Inc.

**BUYER**

**Palltronics, Inc.**, a Michigan corporation

By: _____
Name: Damian Kassab
Title: President