```
1                   UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF MICHIGAN
2                        SOUTHERN DIVISION

3                          —  —  —

   PALLTRONICS, INC.,
4
                 Plaintiff,
5
     v.                               Case No. 2022-cv-12854
6
   PALIoT SOLUTIONS, INC., f/k/a
7  PALIoT SOLUTIONS, LLC,

8                Defendant.
   _____/
9
              MOTION FOR TRO AND PRELIMINARY INJUNCTION
10              BEFORE THE HONORABLE DENISE PAGE HOOD
                    (Held via Zoom technology)
11
                    United States District Judge
12            Theodore Levin United States Courthouse
                    231 West Lafayette Boulevard
13                       Detroit, Michigan
                    Thursday, December 22, 2022
14

15 APPEARANCES:

16  For the Plaintiff:      Jacob D. Koering
                            MILLER, CANFIELD, PADDOCK & STONE,
17                          PLC
                            227 West Monroe Street, Suite 3600
18                          Chicago, Illinois  60606
                            (312) 460-4272
19
                            Joel C. Bryant
20                          MILLER, CANFIELD, PADDOCK & STONE,
                            PLC
21                          101 N. Main Street, Suite 700
                            Ann Arbor, Michigan 48104
22                          (734) 663-2445

23

24      To obtain a copy of this official transcript, contact:
               Sheila D. Rice  Official Court Reporter
25         (313) 234-2610 • sheila_rice@mied.uscourts.gov
```

```
 1   APPEARANCES:   (Continued)

 2   For the Defendant:       R. Christopher Cataldo
                              JAFFE RAITT HEUER & WEISS
 3                            27777 Franklin Road, Suite 2500
                              Southfield, Michigan  48034
 4                            (248) 351-3000

 5                            Jonathan E. Sriro
                              JAFFE RAITT HEUER & WEISS
 6                            28 West Adams Avenue, Suite 1500
                              Detroit, Michigan 48226
 7                            (313) 800-6500

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                        TABLE OF CONTENTS

2    MATTER_____PAGE

3    MOTION FOR TRO AND PI
     Motion by Mr. Koering..............................   7
4    Response by Mr. Cataldo............................  28
     Reply by Mr Koering...............................  40
5
     Certificate of Court Reporter.....................  45
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1    Detroit, Michigan
 2    Thursday, December 22, 2022
 3    2:07 p.m.
 4                                    —   —   —
 5            THE CLERK:  The United States District Court for the
 6    Eastern District of Michigan is now in session, the Honorable
 7    Denise Page Hood presiding.
 8            Calling Case Number 22-12854, Palltronics, Inc. versus
 9    PALIoT Solutions, Inc.
10            Appearances, please, counsel, starting with the
11    Plaintiff.
12            MR. KOERING:  Good afternoon, your Honor.
13            THE COURT:  Good afternoon.
14            MR. KOERING:  Good afternoon, your Honor.  This is
15    Jacob Koering on behalf of the Plaintiff, along with my
16    colleague, Joel Bryant.  We're appearing here.  I also have on
17    the phone -- I believe I caught the names, but Mr. Marc Swanson
18    and Mr. Steve Roach as well.
19            THE COURT:  Okay.  Good afternoon to all of you.
20            MR. CATALDO:  Good afternoon, your Honor.  For the
21    Defendants, Christopher Cataldo.  I'm here with my partner, Jon
22    Sriro.  And they should be connected on the phone, client
23    representatives Paul Barry and Mr. David Distel.
24            THE COURT:  How do you spell Distel?
25            MR. CATALDO:  D-I-S-T-E-L.
```

```
 1              THE COURT:  Okay.  And who was the other person?

 2              MR. CATALDO:  Paul Barry, B-A-R-R-Y.

 3              THE COURT:  Okay.  Good afternoon to all of you as

 4    well.

 5              Who's in Chicago?

 6              MR. KOERING:  That would be me, your Honor.

 7              THE COURT:  Is it already snowing there?

 8              MR. KOERING:  It is, yes.

 9              THE COURT:  Okay.  All right.

10              MR. KOERING:  I have to thank you very much for your

11    kind consideration in moving this.  I appreciate it.

12              THE COURT:  I hope it snows on you and goes straight

13    to Cleveland, so ...

14              Okay.  I have here a Plaintiff's motion for a

15    temporary restraining order and preliminary injunction; is that

16    right?

17              MR. KOERING:  That's correct, your Honor.

18              THE COURT:  Okay.  I'm ready to proceed.

19              MR. KOERING:  Thank you, your Honor.  As I said at the

20    introduction, my name is Jacob Koering.  I'm one of the counsel

21    for Palltronics, the Plaintiff in this case.  I had mentioned a

22    few of my colleagues on the way in are here.  I also have on

23    the phone several of our client representatives, including --

24    and I apologize.  I don't see them so I may miss one or two,

25    but Marty DiFiore and Damian Kassab who are both in the
```

 1     leadership at Palltronics.

 2             THE COURT:  Okay.

 3             MR. KOERING:  So --

 4             THE COURT:  I should be -- I should have also -- well,

 5     they're very welcome to listen in as well.  I should have said

 6     at the beginning that we need to complete the arguments by no

 7     later than 3:30, okay, everything.  All right.

 8             MR. KOERING:  Thank you, your Honor.

 9             THE COURT:  So does that mean you want to take how

10     long?  Do you have the video or someone else?

11             MR. CATALDO:  Your Honor, the Defendants have the

12     video, which is three minutes.  It really shouldn't impact the

13     length of the hearing materially.

14             THE COURT:  Okay.  So how long are you going to take

15     Mr. -- is it Koering?

16             MR. KOERING:  Koering.  Yes, your Honor.  I don't

17     anticipate me taking more than about a half an hour for our

18     initial presentation.

19             THE COURT:  Okay.  That's it.  I'm sure you can -- for

20     your initial presentation.

21             Okay.  And what about your, Mr. Cataldo?

22             MR. CATALDO:  Your Honor, we think we can make our

23     presentation and response in a half hour as well.

24             THE COURT:  All right.  Very good.  Let's go ahead and

25     go then.

1      MR. KOERING:  Thank you, your Honor.  We're here on

2  Palltronics' motion for a preliminary injunction.  And

3  Palltronics' motion really seeks pretty straightforward relief.

4  We're asking the court to enforce the terms of a bankruptcy

5  sale order that was entered in the Eastern District of Michigan

6  Bankruptcy Court, but gave exclusive ownership and use of

7  certain assets of a company called Lightning Technologies, a

8  debtor in that bankruptcy proceeding, which those rights were

9  then given to our client, Palltronics, after winning the bid in

10  that case.

11      The assets in that bankruptcy proceeding included not

12  just trade secret assets, but also other kinds of intellectual

13  property, including confidential and proprietary information of

14  Lightning, all relating to a new and improved shipping pallet.

15      And so we're asking your Honor to enter an order

16  enjoining the violation -- any further violation of the sale

17  order in that bankruptcy court and to enjoin any ongoing

18  misappropriation of trade secret information related to the

19  trade secret assets of that company.

20      Now, there are two separate bases again to enjoin

21  PALIoT's conduct here.  One is based on the sale order.  I'll

22  discuss that separately.  And then second is on trade secret

23  misappropriation.

24      Now, it's notable here that PALIoT claims that it is

25  not using the assets of Lightning or any of its trade secrets.

1    Assuming as much, this could be a short hearing.  It should be
2    a straightforward request to have an injunction issued that
3    would enjoin the use of these assets, or of the trade secret
4    assets of Lightning purchased through Palltronics if, in fact,
5    PALIoT is not using those assets.  So we would just raise that
6    up front.
7          Now, before I get into the substance of the argument
8    here, your Honor, I think it's important to get a little bit of
9    background in terms of how we got here.  The story here when
10   you boil it down is not complicated.  In February of 2021
11   Lightning Technologies was placed into Chapter 7 involuntary
12   bankruptcy by its creditors.  Now, Lightning Technologies was a
13   -- at its core, a technology company.  It spent five years,
14   five plus years and 25 million dollars developing a shipping
15   pallet.
16         Now, I know that doesn't sound very interesting on its
17   face, but the reality is that shipping pallets play a core
18   component role in our product supply chain.  And as we've all
19   seen recently, the product supply chain is a key aspect of many
20   parts of our economy and our business.  As a matter of fact,
21   there are two billion pallets that are used in the United
22   States alone every year -- that's a B.  So that's a lot of
23   product that's being shipped around the United States.  And
24   it's used by companies to stack their goods on top of them and
25   ship them from place to place.

1      Lightning's development process was focused on

2  creating a very special kind of shipping pallet, one that

3  improved on shipping pallets in the past, one that was

4  reusable, long-lasting, strong and trackable.  All of those

5  features were key to a particular kind of business called

6  pallet pooling in which a company like our client, Palltronics,

7  rents its pallets, its shipping pallets, to manufacturers and

8  other producers who then stack their goods on top of those and

9  ship those pallets through the system.

10      Now, what's important about that process is that the

11  pallets need to meet certain requirements for these

12  manufacturers to use them.  They have to be strong and

13  resilient so that they can be used multiple times.  Otherwise,

14  they're wasting all of that effort renting out the pallets.

15  And then they need to be recoverable.  So they need to be able

16  to be found throughout the system so that the renting company,

17  the pallet pooler, can go back and get those pallets.  All of

18  the features that Lightning designed over its five plus years

19  of existence were aimed at trying to create an improved pallet

20  for that particular application.

21      Now, despite all of this investment, which again five

22  plus years and 25 million dollars, at the end -- at the time it

23  was put into bankruptcy Lightning did not have a revenue

24  stream.  It was not successful yet in terms of getting

25  companies to rent its pallets.  It wasn't ready to go.  And so

Motion for TRO and Preliminary Injunction - December 22, 2022          10

1    it was at that time essentially an IP company.  It had

2    developed this pallet, it was almost ready to go, but it didn't

3    have any revenue stream.  So going into bankruptcy what

4    companies were going to be buying was essentially the IP assets

5    of the company, a few hard assets.

6         Now, PALIoT was formed just one month prior to the

7    bankruptcy in this case, meaning that they didn't exist before

8    about two years ago.  Both PALIoT and Palltronics participated

9    in the bankruptcy process, meaning they had the opportunity to

10   comment upon and object to the decisions and the rulings of the

11   judge in that bankruptcy case.

12        Now, notably -- and I should say at the end of that

13   bankruptcy proceeding Palltronics was successful in bidding on

14   the assets of Lightning Technologies and purchased them subject

15   to a sale order from the bankruptcy court for five million

16   dollars.  PALIoT was the secondary bidder, the backup bidder.

17   Their bid was 3.2 million dollars, or about half of -- just

18   over half of what Palltronics' bid was.

19        During that bankruptcy proceeding, and what's I think

20   notable here, is that PALIoT did not make any of the

21   allegations in front of that court that they're making here.

22   PALIoT did not state to the bankruptcy court that Lightning's

23   assets did not include intellectual property, but only included

24   hard assets, for example.  And they never claimed that the core

25   technology of that company was that the pallets and its use was

1    somehow all in the public and, therefore, not an asset to the

2    company.  Instead it stayed silent, it bid for the assets, and

3    then when it lost it stayed on as the backup bidder hoping that

4    Palltronics would fail to make its payment.

5         Now, when Palltronics completed its process and made

6    the payment that it promised in the bankruptcy process, PALIoT

7    hired ex-Lightning employees.  And then less than a year after

8    it was founded and after it lost its bankruptcy proceeding it

9    started telling the world that it could provide essentially a

10   nearly identical pallet to the same customers and the same

11   purposes as Lightning using the same business method that

12   Lightning had identified.  In other words, PALIoT lost the bid,

13   decided not to bid more, and then hired ex-Lightning employees

14   to duplicate the product and business of Lightning.

15        Now, what's important here is -- what one important

16   piece of information here is that the bankruptcy court here has

17   already held PALIoT in contempt for exactly this kind of

18   behavior.  In early 2022, Palltronics became aware that someone

19   had changed the information on Lightning's Linked In page and

20   falsely represented connection between Lightning and PALIoT.

21   Specifically they included on there a link to PALIoT's website,

22   it included a contact number of which somebody could contact

23   PALIoT from the Lightning Linked In page, and it made other

24   changes to make it look like Lightning and PALIoT were related

25   companies.

1          So Palltronics filed a motion with the bankruptcy

2     court, and much like here PALIoT made some arguments trying to

3     claim that it didn't do anything wrong.  It even went so far as

4     to blame Palltronics as being the party who made these changes

5     to the Lightning page to direct customers to PALIoT.

6          Now, Palltronics did its job, asked for discovery, and

7     then took discovery from Linked In to find out what happened.

8     And it turned out that the discovery from Linked In showed that

9     one of the co-founders of PALIoT, Mr. Rich MacDonald, who is

10    their chief technology officer and chief sustainability

11    officer, he was the one who logged in and made those changes.

12         So even as far as I think it was July of 2021 PALIoT

13    was trying to represent to the world that it could do the same

14    business as Lightning.  The court held PALIoT in civil contempt

15    for violating the bankruptcy stay based on this conduct and it

16    granted Palltronics its attorney fees, but did not foreclose

17    any further damages related to that.

18         It's clear PALIoT has an interest in showing to the

19    world that it is engaged in the same business as Lightning was,

20    but it cannot do so without violating the terms of the

21    bankruptcy sale order, without violating the rights that

22    Palltronics legally bought out of the bankruptcy case.

23         But let me turn to the sale order.  The most

24    straightforward basis for enjoining PALIoT's conduct here is

25    for the court to enjoin PALIoT from any further violations of

1    the sale order by its use of any assets of Lightning.  Now, I

2    can't capitalize the word "assets" when I speak it, but the

3    word "assets" in the sale order has a capital A to it and it

4    has a meaning.  And what does the sale order say about the word

5    "assets"?

6          Well, the sale order granted Palltronics exclusive use

7    and ownership of assets of Lightning which were broadly defined

8    as, quote, anything that was used, usable or capable of being

9    used in the business.  So what that means is that PALIoT

10   obtained -- I'm sorry, Palltronics obtained significant assets

11   through this bankruptcy proceeding and brought assets relating

12   to Lightning's business, and that makes sense.  After all, the

13   purpose of a bankruptcy proceeding is to compensate creditors

14   of the debtor company.  And in a Chapter 7 provision it's to

15   sell the assets of the company for the highest possible value

16   to compensate those creditors the most that you can.

17         It makes sense that a court would want to give broad

18   rights to the party purchasing the assets on a bankruptcy,

19   because then they will pay the most for those assets.  If on

20   the other hand it were to allow another bidder as part of that

21   process to instead of bidding on the assets instead hire

22   ex-employees of a debtor company and then just duplicate the

23   business afterwards, it would undermine the bankruptcy process

24   and lower the value of the assets that are purchased through

25   that process.

1           Now, that's not just Palltronics saying that.  It's

2    Judge Tucker and the bankruptcy court who said this explicitly.

3    When he issued his sale order in May of 2021, he -- it had two

4    pieces.  It had multiple pieces, but the two most important

5    here are it had the sale order itself in which the bankruptcy

6    court authorized the sale of the assets to Palltronics.  And

7    then it had an asset purchase agreement in which the details of

8    that purchase were laid out.

9           And that language that I read to you before about the

10   purchase of anything that was used, useful or capable of being

11   used, that comes from the asset purchase agreement, which is,

12   for your Honor's reference, at Exhibit 4 to the Complaint, Page

13   ID 338.  And what the sale order says is that those assets were

14   to be, quote, transferred to buyer free and clear of any and

15   all interests, which for the intellectual property assets which

16   were part of what was purchased the sale order defined that as

17   any other claim or interest that might impair either the title

18   to or the value of that intellectual property.

19          And, as Judge Tucker stated in that order, he said the

20   buyer would not enter into the final APA or consummate the

21   transaction under the final APA unless the assets are

22   transferred to buyer free and clear of any and all interests

23   other than assume liabilities in respect to assumed contracts.

24   A sale of the assets other than one free and clear of all

25   interests would yield substantially less value for the

1    bankruptcy estate.

2         And that's what we have here, the -- if a bidding

3    party like PALIoT were allowed to simply hire ex-employees of

4    the debtor and then take those assets through those employees

5    for their own use, it would undermine the value of the

6    intellectual property that was purchased and would yield

7    substantially less value and creates an issue here.

8         Now, what we know is based on the testimony -- based

9    on the website of PALIoT that just one year after it was

10   founded it was advertising to the world that it was able to

11   provide a nearly identical pallet product just a year after the

12   bankruptcy bid.  The fact that it did so with nine plus

13   ex-Lightning employees in its leadership team demonstrates how

14   they got there.  They didn't spend five years of time

15   developing this pallet product.  They didn't spend 25 million

16   dollars to develop this pallet product.  Instead, they hired

17   ex-Lightning employees, they mined them for information and

18   then they made an identical pallet product, or some

19   substantially identical pallet product.

20        It's notable here that PALIoT does not provide any

21   evidence of independent development.  It does not claim --

22        THE COURT:  I'm sorry.  Does not provide any evidence

23   of what?

24        MR. KOERING:  Independent development.

25        THE COURT:  Okay.

1          MR. KOERING:  That it spent its own time and resources

2    and effort to independently come up with this pallet or to

3    independently come up with the improvements that are part of

4    the pallet.  It does not list as any evidence its own R and D

5    costs, if they exist, or explain how it came up with the

6    substantial identical pallet without relying on Lightning's

7    assets.

8          Now, we would point to, your Honor, a chart that is

9    included in the evidence that we submitted with our opening

10   bid.  This is Exhibit 1 to our motion, which is the declaration

11   of Roland Heiberger.  Mr. Heiberger is one of the key

12   development people at Lightning and he also works with

13   Palltronics.

14         At paragraphs 31 to 33 of his declaration, which are

15   at Page ID 643 and 45 on the docket, he outlines and compares

16   the Lightning product and the advertised functionality and

17   structure of PALIoT's product.  And you see a one-to-one

18   comparison of things like, for example, they both have the same

19   hybrid wood and sprayed plastic structure.  They both have a --

20   they're both made with the same kind of plastic -- sprayed

21   plastic material.

22         And I was going to show this, but I want to be

23   cognizant of the court's time.  I direct you to that chart,

24   which does have that comparison, and I'd note this.  For the

25   most part, Palltronics does not -- or PALIoT does not dispute

1    that their product includes each one of these elements.  Now,

2    again this is the elements that PALIoT advertises on the

3    website that their product has.

4            But, for example, one of the allegations that they

5    make, that PALIoT makes on its website, is that PALIoT's

6    product is made from an engineered wood substrate.  And what

7    the testimony here is is that Lightning spent time and money

8    developing and selecting a list of acceptable woods and sources

9    of wood that would work with the strength-to-weight ratio

10   required for this pallet to be used in this pallet pooling

11   business.

12           One of those types of wood is, as PALIoT's own witness

13   admits, this is Mr. Chaskielberg, his declaration in Exhibit J

14   to PALIoT's response, he states that one type of wood that was

15   used at Lightning was birch, and it turns out that PALIoT is

16   also using birch wood.

17           Similarly, there is a -- PALIoT lists on its website

18   that it uses a proprietary polyurea coating.  Now, this is

19   plastic, and this is the plastic that is sprayed on top of

20   these pallets in order to give them strength and rigidity.

21           In its response at Exhibit M, Jacob Gabel, again on

22   behalf of PALIoT, admits that it's -- PALIoT's plastic is the

23   same basic plastic that was used at Lightning, which is this

24   polyurea plastic.

25           Now, what's important here is less that there is a

1    one-to-one comparison between these products basically for the

2    structure of them than it is the fact that PALIoT was trying to

3    copy the same product that Lightning was making.  And, in the

4    context of the sale order, it's impossible for them to do that

5    without using the broadly defined assets under the sale order.

6          Now, knowing that there's a comparison between these

7    two products out there in the evidence is helpful, but it's

8    also notable to know that not only are these products

9    identical, but that PALIoT is advertising to the world some of

10   the features and capabilities of the Lightning product as a

11   basis for its own.

12         So, for example, I point you to the declaration of

13   Ellwood Hunt, which is attached as Exhibit 4 to Plaintiff's

14   motion, and specifically to paragraph 10 of that declaration at

15   Page ID 716.  Mr. Hunt testified as part of his testimony that

16   he in observing the information that PALIoT advertises about

17   its product that PALIoT claims to have that its pallet has a

18   ten-year life span and that its pallet can meet the vigorous

19   standards of a particular standard called ISO 8611.

20         So what's important about this is those two standards

21   are some of the key features that Lightning developed and spent

22   years developing as part of its product.  And as Mr. Hunt

23   testified, it takes a significant amount of time and effort to

24   get your product testified -- tested and verified to have a

25   particular life span and to be compliant with particular

1    standards, including ISO 8611.  There's no evidence that PALIoT

2    has ever done that testing.  Instead, it appears that they're

3    relying upon the testing done by Lightning for the nearly

4    identical product to say that their own product can meet those

5    standards.

6          Now, based on these comparisons it's clear that

7    PALIoT's product is using the same material, the same pallet

8    structure, the same manufacturing processes and the same

9    vendors as Lightning.  Their only argument is that for some of

10   these identicalities they claim they're not trade secrets.  But

11   for the purpose of the sale order, that argument is irrelevant.

12   It doesn't matter if they are trade secrets under the law.  It

13   matters whether or not they are assets as defined under the

14   sale order.

15         So it doesn't matter, for example, if some general

16   information was disclosed about these products in

17   advertisements or in media.  It doesn't matter that somebody

18   may have disclosed that their product is coated with a plastic

19   when the spraying process we're doing was not disclosed.  It

20   doesn't matter, for example, that the idea that these pallets

21   can be used by companies to save money, by getting carbon

22   credits, that doesn't matter so long as how the companies can

23   save that money using carbon credits it's not also disclosed.

24         It also doesn't matter if Lightning may have hired

25   third parties to work with it in those development processes.

1    So, as Mr. Richard Crow testifies in his declaration, and this

2    is -- I believe it's Exhibit 3 to our motion and specifically

3    paragraph 9 at Page ID 709.  Mr. Crow testifies that there were

4    regularly nondisclosure agreements and confidentiality

5    agreements entered into with third parties.  And when those

6    third parties were hired to work with Lightning they were done

7    so under those kinds of confidentiality agreement.

8            And in general, as you can imagine, if a company pays

9    for a third party to work with them as to a technology that the

10   ownership of that technology then transfers to the party who

11   pays for that technology, and that's what happened with

12   Lightning.

13           Now, from our perspective, this is a pretty

14   straightforward way for this court to find an injunction

15   related to enjoining the conduct of PALIoT here.  Specifically,

16   an injunction should issue which provides that PALIoT shall be

17   enjoined from using the media assets of Lightning in its

18   business, and it can be that simple.

19           And because PALIoT is selling substantially an

20   identical product, we believe that they can't sell that product

21   without using those assets, but that kind of an injunction is

22   something that would be consistent with a sale order and would

23   be appropriate under the law.  So that's one basis for an

24   injunction.

25           Your Honor, I can pause here for a minute if you have

1    any questions with respect to that.  Otherwise, I'll move on to

2    trade secrets as well.

3         THE COURT:  No, no.  You can go on.

4         MR. KOERING:  Thank you, your Honor.  A second basis

5    for an injunction here, a preliminary injunction, is PALIoT's

6    ongoing misappropriation of Lightning's and thus Palltronics'

7    trade secret information.  Again, this is information that was

8    purchased as an asset by Palltronics out of the bankruptcy

9    proceeding.

10        Now, in our Complaint and in our motion we've

11   identified three general categories of trade secrets.  The

12   material, equipment and selection and sourcing assets, pallet

13   assembly and manufacturing assets, and pallet tracking and use

14   assets.  These are all assets that meet the definition of a

15   trade secret under Michigan law and under federal law, because

16   these are assets that derive independent economic value from

17   not being generally known.  These are features that were

18   developed internally at Lightning under confidentiality

19   protections, and they're information that is the subject to

20   reasonable efforts under the circumstances to maintain their

21   secrecy.  And there's two pieces of evidence we will point to

22   on that, your Honor.

23        First, the declarants that were submitted on behalf of

24   Palltronics, the Plaintiff, all identify that confidentiality

25   was a major concern at Lightning, that the employees and the

1    management understood that the details of the pallet and its

2    use were confidential information of Lightning and should be

3    treated as such.  And I point to Mr. VanBynen's declaration at

4    paragraph 4 to 6, Mr. Heiberger's declaration at numerous

5    places, including paragraphs 15, 17, 19, 29 and 32, Mr. Hunt's

6    declaration at 3, paragraph 3, and Ms. Dunahay's declaration at

7    paragraphs 1 and 2.

8          And while PALIoT responds to this with witness

9    testimony offering unfounded legal opinions about whether

10   something was a trade secret or not, they don't dispute this

11   expectation of confidentiality at Lightning.  And so there

12   is -- there was an expectation of confidentiality at Lightning,

13   and the parties and the individuals at Lightning treated

14   information as confidential there.

15         And we note that we had identified one of the

16   co-founders of PALIoT was Mr. Rich MacDonald.  As an exhibit to

17   Mr. VanBynen's declaration, he also attached a nondisclosure

18   agreement, which shows a good example of the kinds of

19   nondisclosure agreements that Lightning was entering into with

20   third parties and with its employees.

21         PALIoT -- and so this is information that was subject

22   to confidentiality, and it was also information that was

23   valuable, and we know that because of the bankruptcy process

24   here.  In the bankruptcy process, the assets of Lightning

25   Technologies included trade secrets, explicitly including in

1    the sale order under Schedule 2.1.4 of that order.  And those

2    trade secrets, amongst others, were what the parties paid

3    millions of dollars to acquire.

4          We believe that there are a lot of trade secrets

5    potentially available here, but I want to focus on two just

6    given time and wanting to focus on clear issues here for the

7    court in this hearing.  So the two trade secrets I really want

8    to focus on are the spraying process for the pallets and the

9    carbon credit model that was developed for those products at

10   Lightning.

11         So focusing on the spraying process first, the

12   spraying process for these pallets is actually a pretty

13   complicated process given the nature of the pallet and the

14   purpose of the spraying.  Mr. Richard Crow and Mr. Roland

15   Heiberger testified in their declarations about the development

16   of that process and how it went.

17         Part of the reason it's a complicated process is

18   because of the desired end structure of the really solid, rigid

19   pallet made of this lightweight wooden core.  So that

20   lightweight wooden core is made up of a top surface and a

21   bottom surface with nine individual supports in the middle.

22   That makes for a pretty complex structure, especially because

23   in order for this pallet to achieve the rigidity that you want

24   you have to evenly and completely spray not just the top and

25   the bottom, but inside of those individual supports that --

1    it's a very complex spraying process.

2          It's made more complex by the fact that this spraying

3    process, this polymer that we're spraying on top, is actually

4    not a polymer when you spray it.  It's made of two different

5    reactive chemicals that when they spray they actually react in

6    the air as they're being sprayed so that they turn into a

7    polymer that they out, polymerize on the surface of the pallet

8    as they're being sprayed.  So how far the nozzle is from being

9    sprayed, the pattern that it would be sprayed and all of the

10   complicated maneuverings of the wooden pallet in order to be

11   sprayed make that process very complicated.

12         And, of course, in order to produce a significant

13   number of these pallets in a short period of time this has to

14   be done at high speed.  So the spraying process involved

15   rotating and maneuvering a wooden pallet and rotating these

16   complicated spray heads for robots.  The end result bottom line

17   is that there was a complicated set of computer code for

18   managing and moving these pallets through the system and in

19   order to make sure that you could create a end product that was

20   sprayed appropriately.

21         Here there is undisputed evidence that PALIoT took in

22   using this robot coding, specifically -- and I'm pointing you

23   to the declaration of Richard Crow, Exhibit 3 at paragraphs 12

24   to 15.  He describes that in April of this past year

25   Palltronics met with a robotics company called FANUC.  And

 1   FANUC worked with -- did work with Lightning and is also

 2   working with, as they admit in their evidence, is also working

 3   with PALIoT.

 4        The purpose of the meeting in April was to conduct a

 5   study as to the movement of the arms of a robot within the

 6   spraying system for Palltronics.  And when they went to this

 7   meeting Mr. Crow noted that there was a preliminary

 8   presentation that was provided by FANUC.  And in that

 9   preliminary presentation it had a presentation for Palltronics,

10   but it also had a identical presentation for PALIoT.

11        So what he observed was that FANUC, this company that

12   does robot work, had both evidence -- and it had a study for

13   Palltronics and it had a similar study, if not an identical

14   study, for PALIoT.  To accomplish that study, you have to know

15   how the robots move in the space.

16        THE COURT:  How do robots move in what?  How the --

17        MR. KOERING:  In the space that the -- I'm sorry, your

18   Honor.

19        THE COURT:  Okay.  I just didn't hear you.

20        MR. KOERING:  I apologize.  I'll try and speak a

21   little bit more slowly.  The robots are placed into a spray

22   booth, and they have to move their arms within that spray

23   booth.

24        THE COURT:  Okay.

25        MR. KOERING:  So in order to know where those arms are

1    going to move you have to know where the pallets are going to

2    be placed and moved within that spray booth during the spray

3    process.  They call it a reach study.  But in order to do that

4    reach study you need to know where the pallets are going to be

5    moved and where and when and understand the programming of the

6    robot to do that.  You need the robot programming to be able to

7    do that reach study.

8             And when Mr. Crow met with FANUC they had already done

9    this preliminary simulation suggesting they already had the

10   robot code.  Now, this is the same robot code that was

11   developed at Lightning and that Palltronics purchased through

12   this bankruptcy system -- bankruptcy process.

13            Now, when Mr. Crow asked FANUC do you need my computer

14   code to complete this reach study, FANUC said, no, we're fine,

15   and they said they didn't because they already had the code.

16   Now, what that means is that they had done a reach study for

17   PALIoT and they had done a reach study for Palltronics, and

18   then they said they already had the code necessary to deal with

19   the -- to understand the movement of the robots in that system.

20   So a reasonable conclusion, the only reasonable conclusion from

21   that, is that they got that code from somebody at PALIoT.

22            The second major trade secret that is at issue is the

23   carbon credit model, and this is a feature of the business use

24   system at Lightning for how they were advertising to their

25   customers how they could save money and benefit from -- they

1    could save money and benefit from the lesser weight of this

2    composite system, the composite pallet.

3          What Lightning did -- what the individuals at

4    Lightning did is they developed a system for parties using this

5    pallet to gain carbon credits for shipping these pallets over a

6    period of time -- over a length of distance.  And Lightning

7    developed this methodology to reduce their customers' costs and

8    to provide benefits for them.

9          Now, PALIoT does not dispute it is using this model.

10   As a matter of fact, it's on its website.  It says that it is

11   using this carbon credit model.  PALIoT's only defense is that

12   it claims that this carbon credit model was advertised, and

13   this is at their response at Pages 17 to 18.  But even a

14   cursory look at the evidence it cites showing that it -- it

15   shows that all that was discussed was a very high level concept

16   of carbon credits.  The specific methodology to how was not

17   disclosed.  Instead, that was taken with -- by the ex-Lightning

18   employees, including Mr. Rich MacDonald.  Now, these are two

19   key assets of Lightning that were purchased by Palltronics and

20   that are nevertheless clearly and unambiguously being used by

21   PALIoT right now.

22         So I know I'm coming up on a half an hour, so I want

23   to be sensitive about the time, but based off of these two

24   bases, the clear definition and broad definition of assets

25   under the sale order and the clear and unambiguous use of at

 1      least these two kinds of -- these two particular trade secrets

 2      from Lightning, there should be an injunction issued that

 3      prevents the further violation of a sale order and that

 4      prevents the use of any trade -- misappropriation of any trade

 5      secret of assets purchased by Palltronics from Lightning during

 6      the bankruptcy process.

 7              THE COURT:  Okay.

 8              MR. KOERING:  That's my presentation.  If you have any

 9      questions, I'm happy to answer them.

10              THE COURT:  Okay.  I don't have any questions at this

11      time.  Let's hear from the other side.

12              MR. KOERING:  Thank you.

13              MR. CATALDO:  Thank you, your Honor.  Christopher

14      Cataldo for PALIoT.

15              Your Honor, we dispute virtually every one of the

16      factual assertions that they have made.  We have set forth

17      detailed affidavits from not only representatives of PALIoT,

18      but from the former CEO of Lightning who has thoroughly

19      explained how the items they're claiming here as their assets

20      were disclosed publicly.

21              We've laid out in detail, contrary to what counsel

22      said, how we have independently derived and created all of

23      these items and which -- virtually all of which the things

24      they're talking about are technology that are owned by third

25      parties.  It wasn't owned by Lightning.  It was never purchased

1    by Palltronics.  And, your Honor, we request an evidentiary

2    hearing if you think there's a dispute on these issues of fact.

3    We have rebutted every single point that they've made and then

4    some.

5           So let's get into some of the specifics.  Lightning

6    was a troubled company, was forced into bankruptcy from its

7    creditors.  It never created a functional process.  It never

8    completed a process to build this pallet, and it was never

9    actually in business selling pallets.  It was still in the

10   development stage when it was shut down.

11          The sale of assets was primarily -- and Mr. Owen lays

12   this out in his declaration.  He was the former CEO of

13   Lightning.  It was -- virtually all the five million is

14   attributable to physical assets.  They sold machinery,

15   equipment, inventory.  Yes.  Is there some intellectual

16   property that was included?  Yes, there is, and it's on a

17   schedule.  There's a specific schedule to the asset purchase

18   agreement that we're going to look at in a minute.  And, if

19   it's not on the schedule, then it wasn't purchased by

20   Palltronics.

21          And the fundamental rule, your Honor, that I think is

22   applicable here is that the Plaintiff in this case could not

23   have bought anything greater than what Lightning had, okay.

24   Lightning, if it didn't have that asset, it couldn't have sold

25   it, and they're trying to grossly overstate what, in fact,

1   Lightning had as if it had some sort of a monopoly on this

2   smart pallet when there were many people -- and we're going to

3   look at a video in a minute -- who were already in this space

4   doing the very same thing they're somehow claiming was

5   proprietary to them.

6          But, your Honor, they have seriously misrepresented

7   what's on the schedule in terms of what they bought.  And, if

8   we could bring the schedule to show you the language, because

9   that language about information used or usable it doesn't mean

10  what they say it means, because this is what they purchased.

11         THE COURT:  Is this Schedule 2.1.4?

12         MR. CATALDO:  It is.

13         THE COURT:  All right.  Okay.  All right.

14         MR. CATALDO:  So what they bought, all of the debtor's

15  and the estate's entire right entitled and interest and into

16  the following assets.  So only to the extent the debtor, which

17  is Lightning, had rights in these things were they sold.

18         And the section that they're talking about is Section

19  B, "Any and all trade secrets or similar protection for

20  confidential information."  Then it says "including proprietary

21  business," et cetera, et cetera.

22         And within that parenthetical relating to or

23  describing the trade secrets there is this language about

24  information used or capable of being used, but that's only if

25  it's a trade secret or similar protection.  They don't have any

1    rights or they don't have any protection above and beyond what

2    would qualify as a trade secret or otherwise protectable at

3    law.  So for them to just say somehow that if there's general

4    knowledge or information in the industry that Lightning was

5    using, that somehow they have a monopoly over public

6    information or information that's generally known in the

7    industry that wouldn't qualify as a trade secret, that is

8    absolutely a gross overstatement, because Lightning never had

9    that.  Lightning never had a monopoly.  It didn't have much of

10   anything in terms of actual trade secrets in this realm.

11       And, your Honor, I would ask -- I hope the court

12   reviewed the declaration under oath of Mr. Owen who was the CEO

13   of Lightning.  This was his project, developing this pallet.

14   And he goes through and explains in detail why virtually

15   everything counsel just talked to you about before a few

16   minutes ago was not a trade secret, or how it was derived from

17   intellectual property of third parties who still have those

18   rights, and we're going to talk about that in a minute.

19       And so the idea that counsel just presented that

20   somehow Lightning had a monopoly on information that pallets

21   that have these basic features, which is a wood core, that has

22   a polymer coating, that is -- that has smart technology, is

23   traceable in the industry, that's something that's been done

24   for years and is available.

25       There's a You Tube video that we referenced it in our

1    materials for another company that's been doing this for years,

2    and that's the video I want to play to the court right now.

3              If you would play that, Jon.

4              (At 2:53 p.m. at this time video is played.  Back on

5              the record at 2:57 p.m.)

6              MR. CATALDO:  So the point of that video, your Honor,

7    is everything that they've talked about a moment ago is already

8    being done.  That video is out there for six years.  There's

9    other companies been doing this.  There are other

10   manufacturers.

11             Counsel talked about this chart of general features.

12   It's like saying that Tesla has stolen all of Ford's ideas,

13   because Tesla's cars all have four wheels and so do -- and

14   Ford's.  It's ridiculous.  Every pallet in the industry has the

15   same basic features.  And they just talked about how Ahrma's

16   pallet who's been out there for six years has all of these same

17   basic features as well.  That's not proof of anything, your

18   Honor.  And we laid out in our response how every single one of

19   these items that they've talked about was derived independently

20   by us and/or was disclosed to the world by Lightning.

21             For example, they do make a big deal in their motion

22   papers about how they use this proprietary wood core.  Well, as

23   Mr. Owen explains, and we attached multiple interviews he gave

24   to the press where he openly talked about how they -- where

25   they were getting this wood, this specific Brazilian wood, the

1   public documents that are available that show exactly what wood

2   they were buying, where they're buying it.  But, your Honor, we

3   don't even use that wood.  We attached declarations from our

4   people who say we buy different wood from different suppliers.

5   But the fact that they're using a wood core, your Honor, is not

6   a trade secret, it's not an asset.  It's not violative of

7   anything.

8          Now, they make a big deal in their papers, and counsel

9   didn't say much about it here, about the plastic coating.

10  Every pallet in the industry has a plastic coating.  Now, the

11  one that they use and they claim these special rights in it is

12  called Exobond.  And Mr. Owen in his declaration that's

13  attached talks about how they created it with two

14  manufacturers, one called BASF and another one called Ultimate

15  Linings.  And Lightning indeed has the right to prevent one of

16  those companies called Ultimate Linings from selling that

17  specific polymer to any other company, but that's it.  He

18  acknowledges that Ultimate Linings is free to sell different

19  polymers, different plastics, to anyone else, your Honor.

20         And actually, Mr. Owen in his declaration says that

21  these polymers are really no different than the polyurethane if

22  you went down to Home Depot and bought a can of polyurethane

23  for wood.  It's pretty much the same stuff.  And there are

24  multiple manufacturers who make this material, and you saw it

25  in that video.  There's a huge conglomerate.  It's called BASF.

1    It's a multi-national billion-dollar company that has an

2    enormous product line of making these polyurethane components.

3              We don't use the same one, your Honor.  We

4    independently developed one that's just a polyurea.  It's

5    completely different blend and manufacturer that we

6    independently created on our own.  We're not using the one that

7    Lightning was using.  We didn't take anything from them and any

8    of their assets.  The fact that every pallet in the industry

9    has a coating on it, your Honor, is not a trade secret.

10             They also constantly talk about the spray technology.

11   And guess what?  Mr. Owen deals with that.  He was instrumental

12   in creating for Lightning the spray technology that they're

13   using.  Lightning didn't create it.  They bought it from a

14   company called ALSI.  ALSI has developed the spray technology

15   in connection with the OEM manufacturers.  This is the basic

16   technology.  And you saw some of it in that video where they

17   have the robots that are spraying.  That's the technology

18   that's used by Ford, GM, Chrysler to spray paint on cars.

19   That's what ALSI does.  They create that spray system.

20             And what happened was ALSI changed the system to be

21   able to spray these polyurethanes.  And ALSI is seeking a

22   patent on that technology, not Lightning.  They have no rights

23   in that technology whatsoever, nothing.

24             So my client, as is anyone is free to in the world,

25   went to ALSI, and we made an agreement with them for them to

```
 1    create a technology -- for us to pay them for their technology,
 2    nothing to do with Lightning.  Lightning does not have any
 3    rights in that technology whatsoever.
 4          And so counsel made this big deal a moment ago about
 5    these conclusions that they've leaked to about these codes.
 6    And you saw the robot there on that video, and there are codes
 7    that tell the robots how to move.  They were set forth in the
 8    affidavit of Mr. Owen.  The codes are not the property of
 9    Lightning.  The codes are owned by the company that creates the
10    robots.  In this case it's a company called FANUC.
11          And, in fact, let's have an evidentiary hearing on
12    this.  We'll bring FANUC in to testify that they own the codes.
13    They're their codes.  We didn't steal anything.  We're not
14    using anything of Lightning's.  We never have used anything of
15    Lightning, your Honor.  And we're free, as anyone in the world,
16    to go to contract with FANUC and work out a deal with FANUC to
17    make robots and have them create and develop codes for us.
18    That is the free world and the free market.
19          And the other thing, counsel made this big deal of
20    these carbon credits.  Again, the tracking of these pallets
21    through the internet and the use of this carbon credit model.
22    If you go back to the materials we submitted, Mr. Owen made
23    public statements explaining how all of this works and what
24    they're doing.
25          And, your Honor, again we'll have an evidentiary
```

1   hearing, and I'll put Mr. Barry and our people on the stand to

2   testify how what we're doing we've created using our own

3   third-party vendors and using their technologies, not anything

4   that Lightning is doing, nothing, your Honor.  We are not using

5   anything that is theirs.

6       And, yes, was there a mistake that was made on that

7   Linked In page, which is social media that's not intellectual

8   property.  Yes, there was.  And the bankruptcy court dealt with

9   that.  Mr. MacDonald improperly accessed a Linked In page and

10  he shouldn't have, but that has nothing to do with intellectual

11  property rights, because we haven't used any of their

12  intellectual property rights.

13      And so again, your Honor, we request an evidentiary

14  hearing, because they cannot prove anything.  There is no

15  evidence of misappropriation whatsoever.  They've made these

16  wild allegations of these -- leaping to these conclusions about

17  stealing things.

18      The only thing that they put -- there was one

19  declaration they attached to their brief where this gentleman

20  made an accusation against two people, Mr. Gruber -- and who's

21  the other one -- claiming that he said -- that while they were

22  working at Lightning, this is before they left the company,

23  they had certain information on their laptops.  And he quote,

24  unquote suspected, that was it, suspected that they had kept

25  the information after they left the company.  That's it.

1    That's the extent of it.

2            We've submitted declarations for both of those

3    gentlemen saying unequivocally not true, they didn't take

4    anything with them after they left Lightning, and they're not

5    using anything of Lightning's for PALIoT.

6            Counsel talked about how they have all this

7    confidentiality was so important, so important.  Where are the

8    confidentiality agreements?  They haven't attached any.  There

9    was one attached, and that was for Mr. MacDonald.  All of the

10   other people that they talked about they do not have signed

11   confidentiality agreements for them.  No one is violating

12   confidentiality agreements.  No one is using their information.

13   We're using information that's in the public realm that other

14   manufacturers are also using, and we're using information

15   derived from third-party vendors.

16           One more that counsel didn't mention, but they make a

17   big deal about it in their brief, that Lightning had been

18   developing the method for how it manufacturers the pallets.

19   And again, we return the court's attention to Mr. Owen's

20   declaration.  He was the CEO of Lightning who said they didn't

21   develop that, it was developed by a third-party vendor who

22   created that for them.

23           My client went to a different company.  There are many

24   companies out there that manufacture -- that build assembly

25   lines.  That's their business.  And we used a company called

1    ATS.  They have built a lot of assembly lines for automakers.

2    It's their technology that's being used.

3           And, your Honor, we have not used any technology on

4    any of these issues of Lightning, and this is a gross

5    overstatement of, you know, what's been happening here.  I

6    mean, they filed this respectfully we think just because they

7    don't want another competitor in the marketplace, not because

8    we're using any information of theirs or anything that they

9    have any kind of a right to.

10          And so then in terms of irreparable harm, your Honor,

11   they haven't shown anything in terms of irreparable harm.

12   Remember, they're not functional.  Their company isn't even up

13   and running.  They're not selling.  We don't know if they have

14   developed an operational system.  We know that they bought the

15   Lightning system, which Lightning was -- before it went

16   bankrupt it never got that system to be functional, meaning it

17   wasn't actually running or building and didn't even have the

18   capability of building pallets.

19          THE COURT:  And is your company doing that?

20          MR. CATALDO:  We are also, your Honor, in the process

21   of trying to bring our pallet to market, and as of today's date

22   neither of these companies is actually selling a pallet in the

23   market.

24          THE COURT:  And so is it helping you that you have

25   these Lightning employees that may have information that might

1    be proprietary?

2            MR. CATALDO:  Well, your Honor, people are entitled to

3    make a living.  And Lightning shut down, it couldn't pay its

4    employees, and people had to go find jobs.  So, yes, some of

5    the people that did work for us used to work for Lightning, but

6    they're not violating any of their agreements, and they are not

7    doing anything other than using general know-how in terms of

8    it's available.

9            For example, Mr. Barry who founded the company he had

10   worked in the industry for years before he went and did

11   anything with Lightning.  He was not an employee there.  He was

12   a consultant for six months, did not sign as part of his

13   consulting work.  He did not sign any kind of a nondisclosure

14   or noncompete agreement.

15           And again, we're not using any of their information in

16   terms of what we've done.  We've done everything independently,

17   and that's why I'm asking for an evidentiary hearing on that so

18   we can show --

19           THE COURT:  And what would you show at the evidentiary

20   hearing, that you've done everything independently?

21           MR. CATALDO:  Absolutely, and or --

22           THE COURT:  And how will you show that?

23           MR. CATALDO:  Well, I will show that, because I'll

24   bring in, for example, Mr. Barry who will testify how all of

25   these items were created.  I'll bring in the vendor on the

1    paint, spray technology to explain it's their technology and

2    how we went to them and are using their technology, not any

3    technology of Lightning.  I'll bring in FANUC to explain how

4    the robot codes are theirs and how what we're doing is using

5    the proprietary technology of FANUC, not anything of Lightning.

6    I'll bring in Ultimate Linings, the people that developed the

7    polymer, to explain how what we're doing in terms of what the

8    product we're using is not the same polymer that Lightning had

9    limited rights in, and so on and so forth.  I'll bring each and

10   every one of those.  I'll bring them in, your Honor, and we'll

11   put them on the witness stand and show you how this was all

12   created independently, and that our employees are not using,

13   they didn't take with them, any proprietary information of

14   Lightning and they're not using it.  And so we vigorously

15   dispute that, that anybody has misappropriated anything.

16          THE COURT:  Okay.  All right.  Thank you.

17          Do you wish to have a very brief reply?

18          MR. KOERING:  Just briefly I'd say two things.  First,

19   I note that if indeed PALIoT is not engaged in any wrongful

20   behavior here then they shouldn't object to entry of an

21   injunction that would prevent them from using the assets of

22   Lightning as defined in the sale order or for using any trade

23   secrets of Lightning.  So that -- again, as I said at the

24   beginning of this, this could be a short hearing if that's

25   really the allegation that's being made.

Motion for TRO and Preliminary Injunction - December 22, 2022

```
 1              Second, you know, I know that we've heard a lot about
 2     a lot of very broad statements about what everybody is doing in
 3     the industry and what everybody is -- what is out there and
 4     everybody must be doing.  I would just say this.  The essence
 5     of trade secret law is not novelty.  It is access to critical
 6     information that belongs to a company and that is protectable
 7     for that company.
 8              If PALIoT were to say we are absolutely copying this
 9     product from Ahrma, it would be a different issue, but they're
10     not.  Again, if you take a look at the chart that Mr. Heiberger
11     put together, it's not just one or two things that were being
12     copied from Lightning.  It's their whole business model and
13     their whole process.  And it's because they gathered this
14     information from Lightning that's the problem.
15              And certainly we can talk about some other issues, but
16     that's the basic point.  The issue here is access to
17     information from Lightning and using it in their business.  And
18     that's the source of the problem here, not any sort of
19     third-party issues.
20              With that, I just want to be cognizant of the court's
21     time and I'll end there, unless you have any additional
22     questions, your Honor.
23              THE COURT:  Well, Mr. Cataldo, Mr. Koering has thrown
24     out this wall to you twice about how if you're not in violation
25     why won't you agree to an injunction.
```

 1           MR. CATALDO:  Your Honor, because they've defined

 2    assets.  If you read their reply brief as simply being in the

 3    industry, being in the business.  If you're selling -- they're

 4    claiming that their assets, based on what they said in their

 5    reply, is that any pallet that has the same features.  That

 6    means if you have a pallet with a wood core, that you're

 7    coating it with plastic and it has the ability to be tracked,

 8    they claim that's their asset.  And that's unsustainable,

 9    because every pallet in the industry has those same features,

10    but they're claiming it here that that's their asset.

11           They're trying to put -- we're put out of business,

12    your Honor, if you grant this, because we are selling a pallet

13    that has common features with other pallets in the industry,

14    but we don't use their technology.  If it was limited to

15    anything that is specific to their technology, that is truly a

16    trade secret, it wouldn't be an issue, but they've defined it

17    so broadly beyond what is in any legitimate sense a trade

18    secret.

19           And again, your Honor, I come back to another point.

20    They haven't shown that they actually have any trade secrets

21    regarding these items, because every single item that we've

22    talked about was actually created by a third party.  For

23    example, the spray technology that they reference.  They don't

24    have a trade secret on the spray technology.  It's not theirs.

25           THE COURT:  Okay.

1        MR. CATALDO:  So, your Honor, they have the burden to

2   show this.  I don't have the burden to not show it, which

3   you're kind of putting it on me.

4        THE COURT:  No, I'm not swapping the burden.  I just

5   wanted to you to respond to it since he came out with it two

6   times.

7        I interrupted you.  Do you have more rebuttal, or I

8   guess it's a reply?

9        MR. CATALDO:  Is that directed to me, your Honor?

10       THE COURT:  No, no, that was not to you, because

11   you've had your opportunity.

12       Okay.  Go ahead, Counsel.

13       MR. KOERING:  Thank you, your Honor.  I don't have

14   anything further to add except that to the extent that your

15   Honor is interested in some sort of a evidentiary hearing we

16   would ask for the entry of at least a temporary restraining

17   order in the meantime.

18       And to the extent that it matters, what we have asked

19   for in terms of an injunction is the capital A assets, which is

20   defined in the sale order, not by us.  And counsel suggests

21   that he's fine with the definition of a sale order of assets

22   and the sale order under 2.1.4.  So again, it suggests that

23   maybe an injunction is appropriate here based on that language.

24       MR. CATALDO:  Your Honor, we are not conceding an

25   injunction is appropriate, because then no matter what we do

1    we'll be in here on countless contempt motions, because their

2    plan is to put us out of business.  It is not to protect

3    intellectual property, your Honor.

4              And I would then request if we're going to have any

5    kind of an injunction it would have to be a bond, as I'm

6    entitled to under Federal Rule of Civil Procedure 65.  But,

7    your Honor, respectfully until we have an evidentiary hearing,

8    there shouldn't be any type of preliminary order entered.  This

9    is our position.

10             THE COURT:  Okay.

11             MR. CATALDO:  They haven't shown anything.

12             THE COURT:  Well, thank you for your arguments.  And

13   it's my expectation that I'll have something out to you next

14   week on Tuesday or -- Tuesday or Wednesday, all right.

15   Probably Wednesday, all right.

16             MR. CATALDO:  Thank you, your Honor.

17             MR. KOERING:  Thank you very much, your Honor.  Happy

18   holidays.

19             THE COURT:  All right.  And so I hope everyone will

20   have a very lovely holiday.  And hopefully, as I said, we won't

21   get that snow that's in Chicago.

22             All right.  Thank you very much, and this matter is in

23   recess.

24             MR. CATALDO:  Thank you, your Honor.

25             MR. KOERING:  Thank you.

```
 1              (The proceedings were adjourned at 3:15 p.m.)

 2                              _   _   _

 3

 4

 5

 6                    CERTIFICATE OF COURT REPORTER

 7

 8         I, Sheila D. Rice, Official Court Reporter of the

 9    United States District Court, Eastern District of Michigan,

10    appointed pursuant to the provisions of Title 28, United States

11    Code, Section 753, do hereby certify that the foregoing pages

12    is a correct transcript from the record of proceedings in the

13    above-entitled matter.

14

15

16                           s/Sheila D. Rice
                             Sheila D. Rice, CSR-4163, RPR, RMR
17                           Federal Official Court Reporter
                             United States District Court
18                           Eastern District of Michigan

19
      Date:  12/23/2022
20    Detroit, Michigan

21

22

23

24

25
```