# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

PALLTRONICS, INC.,

       Plaintiff,                            Case No. 22-12854

v.                                        Hon. Denise Page Hood

PALIoT SOLUTIONS, INC.,

       Defendant.

_____/

## ORDER MOOTING MOTION FOR TEMPORARY RESTRAINING ORDER AND GRANTING MOTION FOR PRELIMINARY INJUNCTION

## 1.    BACKGROUND

This matter is before the Court on a Motion for Temporary Restraining Order and Preliminary Injunction[1] filed by Plaintiff Palltronics, Inc.. (ECF No. 8, 11/29/22) Plaintiff seeks an order enjoining Defendant PALIoT Solutions, LLC from continued violations of a bankruptcy court's Final Sale Order and its associated Asset Purchase Agreement ("APA"). Plaintiff seeks to halt and correct what Plaintiff deems the brazen and malicious theft and misappropriation of Assets exclusively acquired by Plaintiff from Lightning Technologies, Inc. under the Sale Order and APA entered in the Bankruptcy Action, Case No. 21-4109-tjt.

_____

[1]Plaintiff indicated that it is not seeking a temporary restraining order because the motion was not filed *ex parte*.

On November 23, 2022, Plaintiff filed the instant Complaint against Defendant alleging: Declaratory Judgment Regarding Violation of the Bankruptcy Court's Sale Order (Count I); Misappropriation of Trade Secrets under the Defend Trade Secret Act, 18 U.S.C. § 1836 *et seq.* (Count II); Misappropriation, MCL 445.1901 *et seq*. (Count III); Computer Fraud and Abuse Act, 18 U.S.C. § 1030 (Count IV); Unfair Competition, Common Law (Count V); and, Intentional Interference with Prospective Economic Advantage, Common Law (Count VI).  (Complaint, ECF No. 1)

A chapter 7 involuntary bankruptcy petition was filed against Debtor Lightning by its creditors.  Prior to the bankruptcy action, Lightning developed a state-of-the-art shipping pallet and matching business applications for using the innovative pallet.  *Id.*, PageID.2.  During the bankruptcy proceedings, Lightning's Assets were sold at auction, free of any other claim or interest.  *Id.* Plaintiff was the winning bidder; Defendant was the losing, backup, bidder.  *Id.*  The Trustee closed the sale of the Assets on May 26, 2021, and Plaintiff paid the purchase price of $5 million.  *Id.* at PageID.447-48.  Defendant set up a directly competing business by stealing key portions of lightning's assets, including trade secrets.  ECF No. 1, PageID.2.  Defendant and/or its agents, have distributed, offered to sell, imported, manufactured, and/or advertised assets, infringing on Plaintiff's property rights in violation of the Bankruptcy Court Order, as well as federal, state and common laws.  *Id.*

2

On June 23, 2022, Plaintiff filed an adversary proceeding against Defendant before the Bankruptcy Court. Defendant filed a Motion to Dismiss the adversary proceeding based on lack of jurisdiction, or alternatively, for abstention. In a November 21, 2022 Opinion, the Bankruptcy Court found it had subject matter jurisdiction over Plaintiff's adversary proceeding, but abstained from exercising its jurisdiction over Plaintiff's adversary proceeding. (ECF No. 23-10, PageID.1278-1317. No appeal was filed from the Bankruptcy Court's Order. Plaintiff thereafter filed its Complaint before the district court on November 23, 2022, followed by the instant Motion on November 29, 2022.

In its six year existence, Lightning spent tens of millions of dollars developing a state-of-the-art shipping pallet (the "Lightning Pallet" or the "Pallet") and implementing matching business applications for using that Pallet all of which constituted valuable intellectual property, including but not limited to trade secrets (the "Lightning Inventions" or "Debtor's Inventions"). *Id*. at PageID.9. The Pallet was a multi-component shipping pallet made of an engineered wood core structure coated with a proprietary polymer to give it strength and rigidity. Lightning's Inventions for the Pallet included identifying and sourcing the engineered wood used in the Pallet. Lightning treated the sources for and the identity of this engineered wood as confidential and proprietary information. Lightning's Inventions for the Pallet also

3

included the development and sourcing of the proprietary polymer used in the Pallet. Lightning called this polymer Exobond, which was a specifically identified Asset. *Id.*

Lightning's Inventions also included the methods for assembling and manufacturing the Pallet. Those methods included methods for preparing the engineered wood to be assembled by milling it with a CNC machine, a fastener-less assembly method that used a proprietary adhesive to hold Pallet sections in place before being coated with a polymer, and methods and equipment for assembling and spraying the Pallet to encapsule it in the Exobond in an even manner, including assembly machinery and handling and spray robots. Finally, the spraying method developed by Debtor included an innovative method and custom spray booth for spraying the Pallet and recovering excess spray material, called "overspray," for recycling or further use. The assembly process, CNC milling, and Pallet spraying methods required the use of proprietary equipment and coding for CNC machines and for spray and handling robots, and the spraying method required the development of a spray booth and associated recovery methods and chemistry. Lightning treated these methods, the associated coding, and the equipment structure and sourcing as confidential and proprietary information. *Id.* at PageID.10.

In addition, Lightning's Inventions further included the development, incorporation and use of a proprietary tracking device in the Pallet. The tracking

4

device could monitor the physical location of the Pallet, the temperature and humidity, and shock or vibration. The tracking device had a physical feature called a snorkel that allowed the device to be placed inside the Pallet prior to spraying the Pallet so that an aperture remained into the interior of the tracking device after spraying. Lightning treated the information associated with the development, incorporation, and use of the tracking device into the Pallet as confidential and proprietary information. *Id*. at PageID.10-.11.

The Inventions also included developing business methods to track the movement of the Pallet through the supply chain and earn an accumulation of carbon credits. Lightning treated this business method as confidential and proprietary information.  All of these  Inventions (and other Assets) arose from years of development and financial investment and constituted the core valuable intellectual property of Lightning.  The Inventions are not Excluded Assets (as defined by the APA) and were thus purchased by Plaintiff from the Defendant "free and clear of and from any and all Interests. ..." *Id.* at PageID.11.

Two weeks before creditors filed the chapter 7 bankruptcy action, a former employee of Lightning incorporated Defendant in Delaware.  *Id.* at PageID.14. Defendant is managed and controlled by former employees of Lightning.  Plaintiff alleges that employees of Lightning are now working for Defendant.  Defendant's

website lists nine former employees of Lightning:  (1) Paul Barry, listed as founder and chief executive; (2) Richard MacDonald, listed as founder, chief sustainability officer, and chief commercial officer; (3) Jim Gruber, listed as project manager; (4) Jacob Gabel, listed as R&D Operations Manager; (5) Michael Lacrosse, listed as director of pooling sales; (6) Sebastian Chaskielberg, listed as global wood procurement manager; (7) Yashwant Maruvada, listed as mechanical engineer; (8) Micah Reeser, listed as manufacturing technician; and (9) Cody Gehrig, listed as launch operations manager.  ECF No. 8, PageID.618 and Exhibit 1 - Heiberger Decl. ¶ 31.   Certain former Lightning employees downloaded information about the Lighting Pallet assembly and spraying process while they were still working for Lightning, including CAD drawings of the Lightning pallet design, CNC programming for the CNC machines, and coding for the automated robot operations. *Id.*

Lightning employees were bound by confidentiality agreements with Lightning and obligations arising from their responsibilities to Lightning.   ECF No. 8, PageID.619 and Exhibit 2 - VanBynen Decl.¶¶ 4-6. Those confidentiality obligations were echoed in the employment guide at Lightning, and the general understanding among employees. *Id.*; Exhibit 2 - VanBynen Decl. ¶¶ 3-7; Exhibit 1 - Heiberger Decl. ¶¶ 15, 17, 19, 29, 32; Exhibit 4 - Hunt Decl. ¶ 3. Employees and management

personnel regularly signed Confidentiality and Non-Disclosure Agreements identifying "information relating to [Lightning's] Polyurea Hybrid Spray Technology . . . Pallet Designs, Pallet Manufacturing Processes, Materials, Construction, . . . Identify of Customers and Suppliers as well as Business Strategies and Information" as "Confidential Information". *Id.*; Exhibit 2 - VanBynen Decl. ¶¶ 3-7; Exhibit 5 - Dunahay Decl. at Exs. 1 and 2. In all, PALIoT's business is nearly a carbon copy of Lightning's business. Exhibit 1 - Heiberger Decl. ¶ 34; Exhibit 4 - Hunt Decl. ¶ 9. Defendant is now offering to the public a shipping pallet that is the same kind of pallet as Lightning's pallet. *Id*. at PageID.15.

The Sale Order required all persons or entities in possession of Assets to deliver them to Plaintiff.  On June 2, 2021, Plaintiff demanded that Defendant deliver all Assets, including Intellectual Property and Electronically Stored Data to Palltronics. Other than two laptops, Defendant responded that it had none by a June 8, 2021 letter. Plaintiff claims this was not true because Defendant used and controlled Lightning's LinkedIn Page, which noted Defendant's website and placed a link to Defendant's website.  Plaintiff filed a motion before the Bankruptcy Court on January 28, 2022, asking the Bankruptcy Court to find that Defendant violated the Sale Order with its conduct regarding Lightning's LinkedIn Page.  After discovery on the issue, Plaintiff established that MacDonald, the Co-Founder, Chief Technology Officer and Chief

Sustainability Officer of Defendant, was the person who made the changes to Lightning's LinkedIn Page.  The Bankruptcy Court granted Plaintiff's motion to enforce the Sale Order and found Defendant in civil contempt of the Sale Order.  *Id.* at PageID.11-.14.

## II.   <u>ANALYSIS</u>

### A.   **Standard of Review**

The Federal Rules of Civil Procedure provides for preliminary injunctions with notice under Rule 65(a) and temporary restraining orders without notice under Rule 65(b).  Fed. R. Civ. P. 65; *Deleon v. Hamilton County Sheriff's Dep't*, Case No. 1:12-CV-68, 2012 WL 3116280 at *13 (E.D. Tenn. Jul 31, 2012); *Walnut Private Equity Fund, L.P. v. Argo Tea, Inc.*, Case No. 1:11-cv-770, 2011 WL 6013000 at *9 (S.D. Ohio Dec. 2, 2011) (Because defendants are on notice, the court treats the plaintiff's motion as a motion for a preliminary injunction rather than a motion for a temporary restraining order.).  Given that Plaintiff provided Defendant with notice of the instant motion and Plaintiff has filed a response, the Court considers Plaintiff's Motion as a Motion for Preliminary Injunction under Rule 65(a) instead of a Motion for a Temporary Restraining Order under Rule 65(b).

"The court may issue a preliminary injunction only on notice to the adverse party." Fed. R. Civ. P. 65(a)(1).  Four factors must be balanced and considered before

the Court may issue a preliminary injunction pursuant to Fed. R. Civ. P. 65(a):  1) the likelihood of the plaintiff's success on the merits; 2) whether plaintiff will suffer irreparable injury without the injunction; 3) the harm to others which will occur if the injunction is granted; and 4) whether the injunction would serve the public interest. *In re Delorean Motor Co.*, 755 F.2d 1223, 1228 (6th Cir. 1985); *In re Eagle-Pitcher Industries, Inc.*, 963 F.2d 855, 858 (6th Cir. 1992); and *N.A.A.C.P. v. City of Mansfield, Ohio*, 866 F.2d 162, 166 (6th Cir. 1989).  The first factor is the most critical inquiry of the four criteria.  *Mason County Med. Ass'n v. Knebel,* 563 F.22d 256, 261 (6th Cir. 1977).

### B.    Likelihood of Success on the Merits

#### 1.    Parties' Arguments

Plaintiff asserts that it is likely to succeed on the merits because Defendant violated the Sale Order, to which Defendant was bound under the Sale Order since it was the Backup bidder.  Plaintiff argues that allowing Defendant to continue violating the Sale Order undermines the integrity of the bankruptcy process.  The Bankruptcy Court found that the purchase price for Lightning's Asserts was based, in part, on the exclusive use of the Intellectual Property by Plaintiff and that Plaintiff was entitled to the Assets free and clear of other interests.  Defendant never raised any issues regarding the Sale Order, nor sought any further interpretation of the language in the

Sale Order as to included or excluded Assets.

Plaintiff also asserts that it will likely succeed on its Trade Secret Misappropriation claim because it has shown that Lightning Trade Secrets were subject to efforts to maintain their secrecy, including acknowledgments to such by Lightning employees.  Employees and management personnel regularly signed Confidentiality and Non-Disclosure Agreements protecting Lightning's Assets.  The value of the Assets Plaintiff claims is reflected by its successful bid for the Assets at $5,000,000.  The value of the Assets is further shown by Defendant's continued use of the Assets in its business.  Defendant and its employees violated their obligations when information was downloaded from Lightning computers after the Petition Date and when Defendant used Lightning's LinkedIn website to promote Defendant's business.

In response, Defendant claims that "[t]he fatal defects in Plaintiff's motion are legion."  ECF No. 20, PageID.869.  Defendant claims that Plaintiff's attempts to explain what it acquired from Lightning is a tortured analysis of what "Assets" means in the APA.  Defendant claims that neither the APA, nor the Sales Order transfers any intellectual property not specifically set forth in Schedule 2.1.4 and creates no intellectual property rights beyond what Lightning had before the sale.  Defendant argues that the Bankruptcy Court did not have the authority to transfer assets,

10

including intellectual property, that Lightning never owned.  Defendant asserts that the only US patent held by Lightning was an apparatus for coating and wire bundle and some trade/service marks.  Defendant claims that the APA only lists Lightning's assets "to the extent that they have any rights" to those.  Nothing in the APA and in Schedule 2.1.4 states that Lightning had any interest in any of the "trade secrets" claimed by Plaintiff, such as I) the equipment selection for manufacturing pallets; ii) the sourcing of the manufacturers of that equipment; iii) the assembly of pallets; iv) the pallet manufacture/assembly process for constructing pallets and spraying a polymer coating; and v) tracking technology and its application.

Even assuming that Plaintiff owns the intellectual property rights, Defendant asserts that it did not misappropriate anything.  Defendant claims that Plaintiff must identify its trade secrets with specificity and that information in the realm of general skills, knowledge and experience is not a trade secret.  Defendant also claims that public information is not a trade secret.  Defendant asserts that Plaintiff fails to specify the exact processes and ideas it claims Defendant misappropriated, especially since the APA noted that the Debtor was not engaged in the manufacturing of pallets as of the date of the APA and will not be engaged in the manufacturing of the pallets through the Closing Date.  Defendant asserts that other manufacturers are currently selling smart pallets with similar manufacturing processes with the exact features that

11

Plaintiff claims are its trade secrets  Defendant cites to the Ahrma Group as an example.  Defendant attached the declaration of Jeffrey Owen, Lightning's CEO, that none of the items Plaintiff claims are trade secrets were in fact proprietary to Lightning because these were publicly disclosed or actually owned by third party vendors.  *Id*. at PageID.873-74.

Defendant claims that the trade secrets identified by Plaintiff are all publicly disclosed:  I) the use of a wood-core frame for its pallet; ii) the type of wood that could be coated with a sprayable polymer; iii) the identity of chemical manufacturers that sell sprayable polymer coatings; iv) its assembly and manufacturing process; and v) its pallet tracking technology; and v) its carbon credit program.  Defendant further claims that the source of wood used by Lightning was widely known, as Owens often had discussion with the media.  *Id.* at PageID.875.  Defendant also claims that Lightning openly advertised its polymer and its polymer suppliers. *Id.* at PageID.876. Defendant claims it is not using Exobond but a different polymer blend.  While Lightning's polymer was a hybrid polyurethane-polyurea material, Defendant's polymer is not.  *Id*. at PageID.877.   Defendant claims that Lightning had no intellectual property regarding the tracking devices and that Lightning openly disclosed the tracking capabilities of its pallets. *Id.* at PageID.878. Defendant further claims that Lightning advertised its use of the temperature and accelerometer

technology and that several other pallet companies also used this technology. *Id.* at PageID.879.

Defendant claims that the tracking of pallets through the supply chain to earn carbon credits is also not a trade secret since Lightning widely advertised its business model of obtaining carbon credits for its customers and affiliates and that was widely known in the pallet industry. *Id.* at PageID.880. As to the spray method and assembly process, Defendant claims that the processes were openly disclosed and it did not create or own any intellectual property for the spraying process. Defendant claims that a company called Air and Liquid Systems, Inc. owned the process. *Id.* at PageID.880-82.

Defendant asserts that Plaintiff has made no showing that any trade secret was misappropriated. Plaintiff only lists former Lightning employees who are now employed by Defendant, yet fails to identify what confidential information was disclosed. Defendant claims that Plaintiff's suggestion that Jim Gruber and Cody Gehrig misappropriated trade secrets is based upon pure speculation. Defendant submits the declarations of Gruber and Gehrig that neither used nor retained the information from their Lightning laptops and neither had access to any coding or CAD drawings. *Id.* at PageID.885.

Plaintiff replies that the unambiguous language in the Sale Order states that

13

Plaintiff purchased and was given exclusive use of Lightning's "Assets," including its intellectual property and all information "used, usable or capable of being used in the Business."  ECF No. 23, PageID.1110.  Plaintiff states that Defendant does not dispute that the Sale Order granted Plaintiff exclusive rights, but that Defendant distracts the court by arguing Plaintiff only acquired "physical assets."  Owen, Lightning's CEO, expressly pledged as collateral Lightning's "trade secrets," as well as its patents, trademarks and licenses.  *Id*. at PageID.1111.  Defendant's purchase agreement proposed buying Lightning's "trade secrets, discoveries, concepts, ideas, research and development, algorithms, know-how, formulae, inventions (whether or not patentable), processes, techniques, technical data, designs, drawings, specifications, databases, and customer lists."  *Id.*   Before the Bankruptcy Court, Defendant asserted that it did not dispute that Plaintiff purchased Lightning's intellectual property through the APA.  *Id.*  As to the language in the APA, Plaintiff asserts that the APA's enumerated list of trade secrets is much broader that those categories of intellectual property claimed by Plaintiff.  Schedule 2.1.4 covers "any other information or technique relating to the Business" and any "compilation of information that is used, usable or capable of being used in the Business."  *Id*. at PageID.1112.

Plaintiff claims that regardless of whether Defendant's pallets were not copied

14

from Lightning, Defendant was aware it was not authorized to use of any of the Trade Secrets and processes set forth in the APA. Plaintiff asserts that Defendant's carefully worded response where it repeatedly stated it did not use "trade secrets" ignores the language in the Sale Order and APA which indicated Assets included those that were "used, usable or capable of being used in the Business," which language is much broader than the term "trade secrets" alone.

Plaintiff further claims that as to Defendant's argument that information was publicly available, there is a world of difference between describing the features of a product or making general statements about the product is built and disclosing how to manufacture the product with those features. Plaintiff argues that a new combination of known steps or processes can be entitled to trade secret protection since a trade secret can exist in a combination of characteristics that are in the public domain. Even if there is general knowledge of a certain process, Plaintiff asserts that misappropriation of trade secrets is about inappropriately accessing confidential information, not absolute novelty.

Regarding Gruber's and Gehrig's denial of bringing any Lightning confidential information to Defendant, Plaintiff asserts that there are many more individuals from Lightning now associated with Defendant. Stating that Defendant did not use Lightning materials in designing its polymer, is different from using Lighting

information to design the polymer.  Plaintiff claims that the Crow testimony is

unrebutted that someone at Defendant retained and provided Lightning's valuable

robot coding to a third party, FANUC.  Plaintiff claims that it does not matter if there

may be minor differences between Lightning's pallet and Defendant's pallet,

especially when the overall product design is the same.  Plaintiff argues that

wrongfully taking a trade secret and modifying it is still misappropriation.

Plaintiff notes that Defendant is a brand new company, but yet managed to

accomplish in one year, what it took Lightning over five years and $25 million in

research and development to achieve.  Defendant cannot explain how such dramatic

progress was possible if Defendant was not relying on confidential information from

Lightning and its former employees.

### 2.    The Asset Purchase Agreement

The APA defines "Assets" as follows:

2.1. Assets. Upon the terms and subject to the conditions set forth
in this Agreement and the Sale Order, and pursuant to Sections 105, 363
and 365 of the Bankruptcy Code, at the Closing and effective on the
Closing Date, the Seller shall sell, convey, transfer, assign and deliver to
the Buyer, and the Buyer shall purchase, receive and accept from the
Seller, free and clear of all liens, claims, encumbrances and other
interests, all of the Assets. "Assets" shall mean all of the Debtor's and its
bankruptcy estate's right, title, and interest in and to the assets,
properties, and other rights used, useful or capable of being used in
connection with the Business (exclusive only of the Excluded Assets (as
defined in Section 2.4 below)). The Assets shall include, but shall not be

limited to, all of the Debtor's and its bankruptcy estate's right, title and interest in and to the Assets described in the following clauses of this Section 2.1 (but shall specifically exclude the Excluded Assets only).

ECF No. 1-4, PageID.338. SCHEDULE 2.1.4, Intellectual Property states:

All of the Debtor's and bankruptcy estate's entire right, title and interest in, to and under the following (all of which shall collectively be called the "Intellectual Property"):

(a) Any and all copyright rights, copyright applications, copyright registrations and like protections in each work or authorship and derivative work thereof, whether published or unpublished and whether or not the same *also constitutes a trade secret*, now or hereafter existing, created, acquired or held.

(b) *Any and all trade secrets or similar protection for confidential information (including proprietary business processes, knowledge, ideas, research and development, know-how, data or any other information or technique relating to the Business, any and all formula, pattern, device, schematics, technology, technical data, designs, drawings, flowcharts, block diagrams, specifications, whether or not patentable, or compilation of information that is used, usable or capable of being used in the Business; including information relating to the formulation of chemical compounds and their application methods or processes, material handling, coating and spray technology and techniques, pooling, and pallet manufacturing and design (including the track and trace and RFID technology embedded therein and related software))*, including without limitation the "Exobond" secret formula and the "Exobond" secret process; and any and all intellectual property rights in computer software and computer software products now or hereafter existing, created, acquired or held.

(c) *Any and all design rights which may be available now or hereafter existing, created, acquired or held*.

(d) All patents, patent applications and like protections including without limitation improvements, divisions, continuations, renewals, reissues, extensions and continuations-in-part of the same, including without limitation the patents and patent applications set forth below (collectively, the "Patents"): ...

17

ECF No. 1.4, PageID.361 (emphasis added).

### 3.   Count I, the Declaratory Judgment Claim

The Declaratory Judgment Act provides that "[i]n a case of actual controversy within its jurisdiction, ..., any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, ..." 28 U.S.C. § 2201.  The Declaratory Judgment Act is "an enabling Act, which confers a discretion on the courts rather than an absolute right upon the litigant." *Wilton v. Seven Falls Co.*, 515 U.S. 277, 288 (1995). The Declaratory Judgment Act cannot be invoked as subject matter jurisdiction because the statute confers no such jurisdiction; rather, the Declaratory Judgment Act is discretionary ancillary relief. *Michigan Sav. & Loan League v. Francis*, 683 F.2d 957, 960 (6th Cir. 1982).  "This court reviews the district court's exercise of discretion under the Declaratory Judgment Act, 28 U.S.C. § 2201(a), for abuse of discretion." *Scottsdale Ins. Co. v. Roumph*, 211 F.3d 964, 967 (6th Cir.2000); *AmSouth Bank v. Dale*, 386 F.3d 763, 784 (6th Cir. 2004).  Federal-question jurisdiction gives district courts jurisdiction over "all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331.  The principle that a court retains jurisdiction to enforce its own consent decree order, does not provide federal-question jurisdiction or a state law claim of breach of contract. *See City of Highland Park,*

*Michigan v. Env't Prot. Agency*, 817 F. App'x 42, 50–51 (6th Cir. 2020).

Count I is a claim for Declaratory Judgment Regarding Violation of the Bankruptcy Court's Sale Order.   (ECF No. 1, PageID.18) Plaintiff asserts that "PALIoT's retention and use of Debtor's Assets, including the Lightning Inventions, constitutes a violation of the Sale Order, and further violates Palltronics' exclusive rights regarding the Assets purchased under the Sale Order."  *Id.*  Count I is not an independent federal-question cause of action because it seeks an interpretation of the Bankruptcy Court's Sale Order.  This action was not filed as an appeal to review any of the Bankruptcy Court's Orders, including the Bankruptcy Court's decision to abstain from resolving the adversary proceeding before it.  As to Count I, the Court finds that Plaintiff has not shown it is likely to succeed on the merits since merely interpreting the Bankruptcy Court's Sale Order fails to allege a federal-question jurisdiction under 28 U.S.C. § 1331.  Plaintiff does raise claims of federal and state law causes actions based on misappropriation of trade secrets as set forth below.

### 4.     Counts II and III, Misappropriation of Trade Secrets Claims

Plaintiff also argues that it will likely succeed on its Trade Secret claims under Count II, Misappropriation of Trade Secrets under the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq*. and Count III, Misappropriation under Michigan law, MCL 445.1901 *et seq*.   The Michigan Uniform Trade Secrets Act permits courts to enjoin

the "[a]ctual or threatened misappropriation" of a trade secret. Mich. Comp. Laws §

445.1903(1). The Act defines "trade secret" to mean "information" that derives

economic value from being kept secret and that is subject to reasonable efforts to keep

it secret. *Id*. § 445.1902(d). The Act further defines "misappropriation" to include the

"[d]isclosure or use of a trade secret of another without express or implied consent by

a person who" "knew or had reason to know that his or her knowledge of the trade

secret was ... acquired under circumstances giving rise to a duty to maintain its secrecy

or limit its use[.]" *Id*. § 445.1902(b)(ii)(B). In the Defend Trade Secrets Act of 2016,

Pub. L. No. 114-153, 130 Stat. 376, Congress also authorized trade-secret owners to

seek injunctions against actual or threatened misappropriation of trade secrets for

products or services in interstate commerce. 18 U.S.C. § 1836(b)(1), (3)(A). This

federal law defines "misappropriation" and "trade secret" in similar ways. *Id*. §

1839(3), (5)(B)(ii)(III).  The elements of misappropriation under federal law are

"substantially similar" to the elements of misappropriation under state law.  *RGIS,*

*LLC v. Gerdes*, 817 F. App'x 158, 162 (6th Cir. 2020).

Based on the submission and arguments by the parties, for purposes of this

motion, the Court finds that Plaintiff will likely succeed on the merits as to Counts II

and III.  Defendant does not argue that it is not subject to the APA.  The APA

Schedule 2.1.4 provides that assets include various trade secrets, as noted above.  The

nature of the information and the status of Lightning's business establish that the at-issue Assets, including the Material Selection and Sourcing Assets, the Pallet Assembly and Manufacture Assets, and the Pallet Tracking and Use Assets, were confidential trade secret information of Lightning. Plaintiff has shown that Lightning's Trade Secrets were subject to efforts to maintain their secrecy, including acknowledgments to such by Lightning employees. Plaintiff has further shown that employees and management personnel regularly signed Confidentiality and Non-Disclosure Agreements protecting Lightning's Assets.

Defendant employs several former employees of Lightning, many are in leadership positions. Pursuant to the various confidentiality agreements signed by these employees, Plaintiff has shown that Lightning's former employees "knew or had reason to know that his or her knowledge of the trade secret was ... acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use." As shown by Plaintiff, Defendant is a brand new company, founded by one or more of Lightning's former employees. Defendant has managed to accomplish in one year, what it took Lightning over five years and $25 million in research and development to achieve. It can be inferred that such dramatic progress was possible because Defendant relied on Lightning's former employees' knowledge of the trade secrets, processes and other information they gained from working at Lightning to set up its

21

business. Defendant was found by the Bankruptcy Court to have violated its Sales Order by using Lightning's LinkedIn website to steer other businesses to Defendant's website. Plaintiff has further shown that Defendant is using Lightning's Trade Secrets and other assets without Plaintiff's authorization. Defendant essentially admits to using the same processes, but arguing that these processes may be obtained from others in the industry and are well-known in the industry.

The Court finds that the likelihood of success on the merits on Plaintiff's Trade Secrets Misappropriation claims in Counts II and III weighs in favor of Plaintiff. Plaintiff has submitted sufficient evidence that it owns certain trade secrets and various applications and processes as a result of the Bankruptcy Court's Sale Order and APA. Plaintiff has further shown that Defendant, through Lightning's former employees, used these trade secrets without Plaintiff's authorization.

## C.    Irreparable Injury

Regarding the irreparable injury requirement, it is well settled that a plaintiff's harm is not irreparable if it is fully compensable by money damages. *Basicomputer Corp. v. Scott*, 973 F.2d 507, 511 (6th Cir. 1992). However, an injury is not fully compensable by money damages if the nature of the plaintiff's loss would make damages difficult to calculate. *Id.* at 511-512. "The loss of customer goodwill often amounts to irreparable injury because the damages flowing from such losses are

22

difficult to compute." *Id.* at 512.  The loss of fair competition that results from the breach of a non-competition covenant is also likely to irreparably harm an employer. *Id.*

The Court finds that Plaintiff has shown through its Complaint, briefs, documents and declarations submitted, that Plaintiff suffered and continues to suffer immediate and irreparable harm if an injunction is not entered.  Plaintiff's harm includes goodwill with potential clients and breaches of the confidentiality agreements signed by several of Defendant's employees (who are not parties to this action, but many are in leadership positions with Defendant) previously employed by Lightning. Plaintiff has further shown that Defendant has in fact solicited potential clients and customers of Plaintiff by manipulating Lightning's LinkedIn pages directing customers to Defendant's website.  The irreparable harm factor weighs in Plaintiff's favor.

### D.    Harm to Others and Public Interest

As to harm to others, Defendant asserts that it would be greatly harmed if it could not continue with its business and had to lay off its employees.  However, as stated at the hearing, Defendant has yet to sell a pallet in the market.  The injunction sought is not to enjoin Defendant from continuing to manufacture its pallet, but rather for Defendant to stop using the trade secrets as defined in the Sale Order and more

specifically in Schedule 2.1.4 of the APA, as stated by Plaintiff at the hearing. Schedule 2.1.4, as cited above, contains broad language as to what assets are involved in the sale and are now owned by Plaintiff. Defendant should not ignore the express language set forth in Schedule 2.1.4 and only pick certain words in the Schedule to support its arguments.

Regarding public interest factor, the public has an interest in ensuring that trade secrets and confidential information owned by a certain entity are not be used by others without authorization. The public also has an interest in fair competition between businesses in the same industry. This factor weighs equally between the parties, since Plaintiff's argument is that Defendant misappropriated its Trade Secrets, and Defendant argues that the processes at issue are well-known in the industry and available to all in the industry.

Weighing the factors noted above, because Plaintiff has shown it will likely prevail on the merits under the Trade Secret Misappropriation claims in Counts II and III, and Plaintiff has shown it is irreparably harmed by Defendant's use of its Trade Secrets and other confidential information. Preliminary injunction is issued in this matter pending the litigation and ultimate resolution of this matter. An evidentiary hearing is not required because the parties submitted numerous exhibits, declarations and affidavits to support their position, sufficient for the Court to rule on this motion.

24

### E.    Security

Rule 65(c) provides that "[t]he court may issue a preliminary injunction only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c).  The Court finds that such is appropriate in this instance based on Defendant's argument that the processes it uses are well known in the industry and that the injunction would put it out of business.  Defendant suggested a "significant" bond, with no specific amount.   A security in the amount of $100,000 to cover costs in litigating this case appears to be sufficient at this time.  The Court has nothing before it to determine the amount of damages Defendant may suffer if the injunction is found to be wrongly issued.

## III.   <u>CONCLUSION</u>

For the reasons set forth above,

IT IS ORDERED that Plaintiff's Motion for Temporary Restraining Order is MOOT and the Motion for Preliminary Injunction is GRANTED pending the resolution in this case.  (ECF No. 8)  Defendant, its employees and agents, are enjoined from using any Trade Secrets set forth in Schedule 2.1.4 of the Asset Purchase Agreement, which is expressly cited in this Order above, and attached as an Exhibit to the Complaint.

IT IS FURTHER ORDERED that Plaintiff must post with the Clerk's Office a security to cover costs in the amount of $100,000.00.  Plaintiff may contact the Clerk's Office for guidance on how such shall be filed with the Clerk's Office.


s/Denise Page Hood
DENISE PAGE HOOD
United States District Judge

DATED: February 27, 2023