# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

Palltronics, Inc.,
   *Plaintiff*,

 v.

PALIoT Solutions, Inc., f/k/a
PALIoT Solutions, LLC,
   *Defendant*.

Case No. 2022-cv-12854

Judge Denise Page Hood

_____ /

Steven A. Roach (P39555)
Marc N. Swanson (P71149)
Joel C. Bryant (P79506)
Anita C. Marinelli (P81986)
MILLER, CANFIELD, PADDOCK
AND STONE, P.L.C.
150 West Jefferson, Suite 2500
Detroit, MI 48226
Phone: (313) 496-7591
roach@millercanfield.com
swansonm@millercanfield.com
bryant@millercanfield.com
marinelli@millercanfield.com

Jacob D. Koering
MILLER, CANFIELD, PADDOCK
AND STONE, P.L.C.
225 W. Washington Street, Suite 2600
Chicago, IL 60606
Phone: (312) 460-4200
koering@millercanfield.com

*Attorneys for Plaintiff*

R. Christopher Cataldo (P39353)
Jon Sriro (P52100)
Paul R. Hage (70460)
TAFT STETTINIUS & HOLLISTER LLP
27777 Franklin Road, Suite 2500
Southfield, Michigan, 48034
Phone: (248) 351-3000
ccataldo@taftlaw.com

*Attorneys for Defendant*

# FIRST AMENDED COMPLAINT

Plaintiff Palltronics, Inc., ("Plaintiff" or "Palltronics"), for its Complaint against Defendant, PALIoT Solutions, Inc., ("PALIoT" or "Defendant") by and through its undersigned counsel, respectfully states as follows:

## NATURE OF THE ACTION

1.    This action seeks a declaratory judgment regarding Defendant's violation of an order entered by the Bankruptcy Court for the Eastern District of Michigan, pursuant to which Plaintiff became the exclusive owner of all the assets of Lightning Technologies, Inc., ("Lightning" or "Debtor"), including but not limited to the Debtor's intellectual property. Defendant has used and is continuing to use Debtor's assets, which constitutes a violation of the Bankruptcy Court's order and violates Plaintiff's exclusive rights regarding the assets purchased pursuant to the sale order.

2.    Prior to its bankruptcy, Lightning developed a state-of-the-art shipping pallet and matching business applications for using the innovative pallet.

3.    Lightning's assets were sold at auction, free of any other claim or interest, during the Lightning's bankruptcy case. Plaintiff was the winning bidder at the auction. Defendant was the losing, but backup, bidder.

4.    Rather than try to outbid Plaintiff for Lightning's assets and adequately compensate creditors, Defendant decided to steal key portions of Lightning's assets, including trade secrets, to set up a directly competing business. Recognizing the

Lightning's former business success—and in a brazen and improper attempt to capitalize on that success—Defendant and/or its agents have distributed, offered to sell, imported, manufactured, and/or advertised the assets, infringing on Plaintiff's property rights in violation of the Bankruptcy Court Order, as well as federal, state and common laws.

5. Defendant's conduct is causing, and unless immediately enjoined, will continue to cause, irreparable harm to Plaintiff. Defendant cannot continue to misappropriate Plaintiff's property and receive an unfair competitive advantage by not being required to expend the time and resources to develop the proprietary information as Lightning did. Defendant's conduct should be immediately stopped, and Plaintiff should be compensated for Defendant's willful acts of infringement.

## THE PARTIES

6. Palltronics is a Michigan corporation with its principal place of business at 400 Water Street, Suite 203, in Rochester, Michigan.

7. Upon information and belief, Defendant is a Delaware corporation with an alleged place of business at 41100 Plymouth Road, Suite B1-320, in Plymouth, Michigan.

## JURISDICTION AND VENUE

8. On November 21, 2022, Judge Thomas J. Tucker of the United States Bankruptcy Court for the Eastern District of Michigan Southern Division dismissed

an adversary complaint involving the same subject matter pursuant to the authority

of 28 U.S.C § 1334(c)(1), which permits a bankruptcy court to abstain from hearing

an adversary case even though it has jurisdiction. Case No. 20-04114-tjt, ECF 81.

9.      This Court has subject matter jurisdiction over the claims in this action

pursuant to 15 U.S.C § 1121(a); 28 U.S.C §§ 1331 and 1338 because Plaintiff

includes claims arising under the laws of the United States. This Court has

supplemental jurisdiction over the state law claims under 28 U.S.C § 1367(a) which

are integrally interrelated to Plaintiff's federal claims and arise from a common

nucleus of operative facts, such that the determination of the state law claims with

the federal claims further judicial economy.

10.     Venue in this Court is proper under 28 U.S.C § 1391.

11.     The Court has personal jurisdiction over Defendant because Defendant

advertises in this State, transacts business in this state, and allegedly has a place of

business in this State.

## **FACTS GIVING RISE TO THIS ACTION**

### A.      **The Debtor's Bankruptcy Case and Sale of Assets.**

12.     On February 5, 2021, a Chapter 7 involuntary bankruptcy petition was

filed against Lightning by its creditors in the Bankruptcy Court for the Eastern

District of Michigan, thereby initiating case no. 21-41019-tjt ("BK Case").

13.    PALIoT filed a notice of appearance indicating it was an interested party in the BK Case. **Exhibit 1 – PALIoT Notice of Appearance**.

14.    Lightning ceased operations before the BK Case was initiated.

15.    During the administration of the Debtor's BK Case, the Chapter 7 Trustee ("Trustee") filed a motion for approval of procedures for the sale of Lightning's assets (as the Debtor) via an auction (as supplemented "Sale Motion"). **Exhibit 2 – Sale Motion**.

16.    The Sale Motion provided, among other things, that the Trustee would conduct an auction of "substantially all of the Debtor's assets ('Assets')" under the terms of an asset purchase agreement. **Exhibit 2** - **Sale Motion at** Attachment A.

17.    Palltronics was identified in the Sale Motion as the stalking horse offer for the Assets.

18.    PALIoT was the back-up bidder for the Assets. **Exhibit 2 – Sale Motion**.

19.    Palltronics was the winning bidder and executed an asset purchase agreement ("APA"). **Exhibit 3 - APA**.

20.    On May 13, 2021, the Bankruptcy Court authorized the Sale Motion and the associated APA ("Sale Order"). **Exhibit 4 – Sale Order**.

21.     The Sale Order provides that it expressly includes "all Schedules, as such Schedules may be amended until the Closing Date pursuant to Sections 2.1 and 2.2 [of the APA]." **Exhibit 4 – Sale Order at p. 2 of 44**.

22.     The Sale Order provides that the Assets (as defined in the Sale Motion) are sold free and clear of all Interests. The Sale Order expansively defines "Interests" in recitals R and S to include not only encumbrances, charges, claims and liens but also any claims or other Interests that might impair either the title to or value of the Intellectual Property or the ownership and exclusive use of the Intellectual Property by the Buyer. **Exhibit 4 – Sale Order at ¶¶ R, S, pp. 14-18**.

23.     The Sale Order further provides that:

> All of the Trustee's interests in the Assets to be acquired by the Buyer under the Final APA shall be, as of the Closing Date and upon the occurrence of the Closing and payment of the Purchase Price, transferred to and fully and irrevocably vested *exclusively* in the Buyer. Upon the occurrence of the Closing, this Sale Order shall be considered and constitute for any and all purposes a full and complete general assignment, conveyance and transfer of the Assets acquired by the Buyer under the Final APA.

**Exhibit 4 – Sale Order at ¶ 23, p. 35** (emphasis added).

24.     During the bankruptcy proceeding, PALIoT did not seek to have any Assets of Debtor excluded from the Sale Order or assert that the term Assets was too broadly defined relative to the assets of Debtor.

25.     The Trustee closed the sale of the Assets on May 26, 2021, and Palltronics paid the $5 million purchase price. *See* **Exhibit 5 – Report of Sale**.

26.     PALIoT did not object to the Sale Order. Instead, the only change requested by PALIoT was when it asked the Trustee to remove (or substantially modify) the provision in the Sale Order (paragraph 9) that required persons and other entities, including PALIoT, to turn over to Palltronics all the Assets purchased by Palltronics.

**B.     Palltronics Purchased All of the Debtor's Assets Free from Any Encumbrances.**

27.     Palltronics purchased everything belonging to the Debtor that was not explicitly excluded. **Exhibit 3 – APA ¶ 2.1.8.**

28.     The term "Assets" was broadly defined under the APA to mean "all of the Debtor's and its bankruptcy estate's right, title and interest in and to the assets, properties, and other rights used, useful or capable of being used in connection with the Business (exclusive only of the Excluded Assets (as defined in Section 2.4 below))". **Exhibit 3 – APA at ¶ 2**.

29.     Further, Section 2.1.8 of the APA provided that the definition of Assets included "any other property or assets of the Debtor or its bankruptcy estate in existence at the time of the Closing that are not Excluded Assets. . . ." **Exhibit 3 – APA at ¶ 2.1.8**.

30.     The definition of Assets specifically included, but was not limited to, "the Intellectual Property (as defined and identified on Schedule 2.14 hereto)." **Exhibit 3 – APA at ¶ 2.1.4**.

31.     Schedule 2.1.4 includes the following Intellectual Property that is

relevant to this dispute:

> (b)     *Any and all trade secrets or similar protection for confidential information* (including proprietary business processes, knowledge, ideas, research and development, know-how, data or any other information or technique relating to the Business, any and all formula, pattern, device, schematics, technology, technical data, designs, drawings, flowcharts, block diagrams, specifications, whether or not patentable, or compilation of information that is used, usable or capable of being used in the Business; including information relating to the formulation of chemical compounds and their application methods or processes, material handling, coating and spray technology and techniques, pooling, and pallet manufacturing and design (including the track and trace and RFID technology embedded therein and related software)), including without limitation the "Exobond" secret formula and the "Exobond" secret process; and any and all intellectual property rights in computer software and computer software products now or hereafter existing, created, acquired or held.

> (f)     *Any website, domain name* and customer portal.

> (g)     *Any and all claims for damages* by way of past, present and *future infringement and/or misappropriation of any of the rights included above*, with the right, but not the obligation, to sue for and obtain such legal and equitable relief for said use, misappropriation and/or infringement of the intellectual property rights identified above, including in addition to all rights to enforce, but without obligation to do so, any and all confidentiality, non-disclosure and non-compete provisions and/or agreements.

**Exhibit 3 – APA at Schedule 2.1.4, ¶ (b), (f) and (g)** (emphasis added).

32.     Under the Sale Order, Palltronics was given exclusive ownership and

use of the Assets of Lightning. **Exhibit 3 - Sale Order at pp. 16-17.**

**C.      Lightning's Most Valuable Asset is its Pallet.**

33.     Lightning spent its entire 6-year existence and tens of millions of dollars developing a state-of-the-art shipping pallet (the "Lightning Pallet" or the "Pallet") and implementing matching business applications for using that Pallet all of which constituted valuable intellectual property, including but not limited to trade secrets (the "Lightning Inventions" or "Debtor's Inventions").[1]

34.     The Pallet was a multi-component shipping pallet made of an engineered wood core structure coated with a proprietary polymer to give it strength and rigidity.

35.     Debtor's Inventions for the Pallet included identifying and sourcing the engineered wood used in the Pallet. Debtor treated the sources for and the identity of this engineered wood as confidential and proprietary information.

36.     Debtor's Inventions for the Pallet also included the development and sourcing of the proprietary polymer used in the Pallet. Debtor called this polymer Exobond, which was a specifically identified Asset. **Exhibit 3 – APA at Schedule 2.1.4, ¶(b)**.

---

[1] To minimize redactions and under-seal filings in this case, Palltronics has included in this Complaint general descriptions of the confidential Assets it acquired, including the Lightning Inventions. These general descriptions are not intended to and do not waive any claim by Palltronics that the underlying information represented by these descriptions constitutes a trade secret.

37.    Debtor's Inventions also included the methods for assembling and manufacturing the Pallet. Those methods included methods for preparing the engineered wood to be assembled by milling it with a CNC machine, a fastener-less assembly method that used a proprietary adhesive to hold Pallet sections in place before being coated with a polymer, and methods and equipment for assembling and spraying the Pallet to encapsule it in the Exobond in an even manner, including assembly machinery and handling and spray robots. Finally, the spraying method developed by Debtor included an innovative method and custom spray booth for spraying the Pallet and recovering excess spray material, called "overspray," for recycling or further use. The assembly process, CNC milling, and Pallet spraying methods required the use of proprietary equipment and coding for CNC machines and for spray and handling robots, and the spraying method required the development of a spray booth and associated recovery methods and chemistry. Debtor treated these methods, the associated coding, and the equipment structure and sourcing as confidential and proprietary information.

38.    Debtor's Inventions further included the development, incorporation and use of a proprietary tracking device in the Pallet. Debtor's tracking device could monitor the physical location of the Pallet, the temperature and humidity, and shock or vibration. The tracking device had a physical feature called a snorkel that allowed the device to be placed inside the Pallet prior to spraying the Pallet so that an aperture

remained into the interior of the tracking device after spraying. Debtor treated the information associated with the development, incorporation, and use of the tracking device into the Pallet as confidential and proprietary information.

39.     Debtor's Inventions included developing business methods to track the movement of the Pallet through the supply chain and earn an accumulation of carbon credits. Debtor treated this business method as confidential and proprietary information.

40.     All the Debtor Inventions (and other Assets) arose from years of development and financial investment and constituted the core valuable intellectual property of Debtor.

41.     The Debtor Inventions are not Excluded Assets (as defined by the APA) and were thus purchased by Palltronics from the Debtor "free and clear of and from any and all Interests…." **Exhibit 4 – Sale Order at ¶ 6, p. 23**.

**D.     Defendant's First Violation of the Sale Order.**

42.     The Sale Order required all persons or entities in possession of Assets to deliver them to Palltronics:

> Except for the Trustee and his professionals to the extent provided in paragraph 34 of this Sale Order, ***all persons or entities which, as of or after the Closing Date, are in possession of some or all of the Assets are hereby ordered and directed to surrender possession of the Assets to the Buyer on the Closing Date*** or at such time thereafter as the Buyer may request and, immediately after delivery of such Assets, to permanently erase or destroy all digital or other electronically stored copies. This directive includes, but is not limited to, the possession of the Assets, including any Intellectual Property

and Electronically Stored Property stored or kept electronically or digitally and all copies of Intellectual Property and Electronically Stored Property. ***Any such person or entity, with notice of this Sale Order, shall be required to certify in writing to the Trustee and Buyer that such party has delivered all Assets and copies to the Buyer, and has permanently erased or destroyed all digital or other electronically stored copies.*** In the event that the Back-Up Buyer becomes the Buyer, the immediately preceding sentence is inapplicable.

**Exhibit 4 – Sale Order at ¶ 9, pp. 25-26** (emphasis added).

43.     In accordance with paragraph 9 of the Sale Order, on June 2, 2021, Palltronics demanded that PALIoT deliver all Assets, including Intellectual Property and Electronically Stored Data, to Palltronics.

44.     Other than two laptops, PALIoT responded that it had none by its letter dated June 8, 2021. This was not true.

45.     As of June 8, 2021, PALIoT was violating the Sale Order by using and controlling the Debtor's LinkedIn Page on LinkedIn ("Debtor's LinkedIn Page").

**Exhibit 6 – LinkedIn Page**.

46.     As of June 8, 2021, the top left portion of the Debtor's LinkedIn Page included the Lightning logo and the webpage stated that it was Lightning.

47.     However, a few lines below the Lightning Technologies' logo was a link which stated "Visit website" in blue lettering. *See* Exhibit 5 – LinkedIn Page. When the "Visit website" linked was clicked, a website for PALIoT (the "PALIoT Website") appeared. **Exhibit 7 – PALIoT Website**.

48.     Further down the Debtor's LinkedIn Page, the PALIoT Website address – http://www.PaliotSolutions.com also appeared.

49.     The first page of the Debtor's LinkedIn Page stated that there are 188 followers ("Followers"). *See* **Exhibit 6 – LinkedIn Page**. Each of these Followers was misled as to the affiliation between PALIoT and the Debtor. Others who are not followers but have viewed the Debtor's LinkedIn Page have also been misled.

50.     The Debtor's LinkedIn Page on LinkedIn was not an Excluded Asset (as defined by the APA) and was thus purchased by Palltronics from the Debtor "free and clear of and from any and all Interests . . . ." **Exhibit 4 – Sale Order at ¶ 6, p. 23; Exhibit 6 – LinkedIn Page**.

51.     On January 28, 2022, Palltronics filed a *Motion to Enforce the Sale Order and for a Finding of Civil Contempt Against PALIoT Solutions LLC* ("Motion to Enforce") asking the Bankruptcy Court to find, among other things, that PALIoT violated the Sale Order with its conduct regarding Debtor's LinkedIn Page. A copy of the Motion to Enforce is attached as **Exhibit 8 – Motion to Enforce**.

52.     The Bankruptcy Court allowed the parties to take discovery from LinkedIn Corporation ("LinkedIn") to determine who had made changes to the Debtor's LinkedIn Page.

53.     The documents LinkedIn provided in response to Palltronics' subpoena (PALIoT did not issue discovery) show that Richard MacDonald, the Co-Founder,

Chief Technology Officer and Chief Sustainability Officer for PALIoT, was the person who made the changes to the Debtor's LinkedIn Page.

54.     The Bankruptcy Court granted the Motion to Enforce and found that PALIoT violated, and is in civil contempt of, the Sale Order. **Exhibit 9 – Contempt Order**.

**E.     Defendant's Continuing Violation of the Sale Order.**

55.     Defendant could have purchased the Assets from the Trustee, but rather than trying to outbid Palltronics for those Assets (and appropriately compensate Debtor's creditors), Defendant decided to steal key portions of those Assets to set up a directly competing business to Palltronics.

56.     Just two weeks before filing the BK Case, a former employee of the Debtor incorporated PALIoT in Delaware.

57.     Upon information and belief, as of the date of this Complaint, PALIoT is managed and controlled by former employees of the Debtor.

58.     Upon information and belief, employees of Lightning that are now working for PALIoT downloaded information about the Lightning Pallet assembly and spraying process on their laptops while they were working for Lightning including CAD drawings of the Lightning pallet design, CNC programming for the CNC machines, and coding for the automated robot operations.

59.     Defendant is now offering to the public a shipping pallet that is the same

kind of pallet as Debtor's pallet (the "PALIoT Pallet" or "Knockoff Pallet").

60.     The Knockoff Pallet is a multi-component shipping pallet made of an engineered wood core structure coated with a proprietary polymer to give it strength and rigidity.

61.     Upon information and belief, PALIoT used the Assets in selecting the engineered wood used in the Knockoff Pallet.

62.     The Knockoff Pallet uses a polyurea polymer coating. Debtor's Pallet used a polyurea polymer coating.

63.     Upon information and belief, PALIoT has engaged with the same company used by Debtor to build machinery to assemble the Knockoff Pallet.

64.     Upon information and belief, PALIoT has engaged with the same company used by Debtor to source and develop the polymer coating for the Knockoff Pallet.

65.     The PALIoT Pallet is assembled by milling portions of the wood for the pallet using a CNC machine and then assembling those portions using a fastener-less assembly. Debtor's Pallet was assembled by milling portions of the wood for its Pallet using a CNC machine and then assembling those portions using a fastener-less assembly.

66.     Upon information and belief, the Knockoff Pallet is coated with a polymer using the same or similar spraying method as used for Debtor's Pallet.

67.     The Knockoff Pallet incorporates a tracking device that can monitor the physical location of its pallet, the temperature and humidity around the pallet, and shock or vibration to the pallet.

68.     The tracking device used in the Knockoff Pallet includes a snorkel feature just like Debtor's tracking device.

69.     PALIoT advertises that its tracker can be used to track the movement of the Knockoff Pallet through the supply chain and earn an accumulation of Carbon Credits.

70.     Thus, contrary to the Sale Order, the APA, and federal, state, and common law, PALIoT retained and continues to retain and use Debtor's Assets, including its valuable confidential, proprietary, and trade-secret information about Debtor's Inventions.

71.     Unlike Debtor, Defendant has not had years of time and significant funding to develop a pallet product or pallet business. In fact, PALIoT was incorporated less than two years ago.

72.     Instead of spending resources to develop its own intellectual property, or instead of offering a competitive price to purchase Assets from the Debtor in bankruptcy, Defendant brought on a group of ex-Debtor personnel who were directly involved in Debtor's business.

73.     PALIoT admitted that it hired ex-Lightning employees in part because they knew about these developments at Lightning, acknowledging the Assets of Lightning are "things that people who worked at Lightning would have knowledge of . . . ." **Exhibit 10 – Reply Brief at p.3.**

74.     Most of these personnel received letters from Palltronics confirming the Assets were sold from Debtor to Palltronics, and all who received those letters claimed they had returned those Assets to the Debtor.

75.     Nevertheless, Defendant seeks to rent the Knockoff Pallet to the same kinds of customers as the Debtor, namely customers in the fast-moving consumer goods industry, using the same business method as the Debtor, namely pallet pooling.

76.     Thus, just a year after the sale to Palltronics had closed and after PALIoT certified that it did not have any of Debtor's Assets, as required by the Sale Order, PALIoT is now ramping up its use of those Assets, including the Lightning Inventions, to engage in a directly competitive business with Palltronics. PALIoT is thus trying to usurp any benefit Palltronics received in the bankruptcy process by taking the Assets from Debtor instead of fairly bidding on them in the bankruptcy process.

**F.     Defendant Improperly Files For A Patent Incorporating The Assets**

77.     On October 22, 2021, counsel for PALIoT filed U.S. Pat. Application

- 17 -

No. 63/270,702 (the "Provisional Application") identifying Jacob Gabel and Herman Novak as inventors. This filing came five months after the Bankruptcy Court entered the Sale Order. *See* **Exhibit 11 – Provisional Application**.

78.    The Provisional Application discloses a pallet design that was developed at Lightning. The Provisional Application discloses a pallet made of an engineered wood understructure with a sprayed polyurea-based coating. The pallet design at Lightning was also a pallet made of an engineered wood understructure with a sprayed polyurea-based coating.

79.    The Provisional Application discloses that the engineered wood selection is preferably Baltic Birch. The pallet design at Lightning also used Baltic Birch.

80.    The use of Baltic Birch as a preferred engineered wood material was kept confidential and proprietary at Lightning until it was disclosed in the Provisional Application.

81.    The Provisional Application discloses a top plate with apertures in four sets of three apertures. The pallet design at Lightning also included four sets of three apertures on the top, which were placed to accommodate the issues of pallet loads containing food materials. Upon information and belief, the pallet design in the Provisional Application uses apertures for the same purpose as Lightning's pallet.

82.    The Provisional Application discloses a sprayed polyurea material for

its coating material, which preferably includes an antimicrobial and anti-fungal material. The pallet design at Lightning also included a coating that was made from a sprayed polyurea material that included an antimicrobial and anti-fungal material.

83.     These disclosures and others in the Provisional Application constitute Lightning Inventions.

84.     Jacob Gabel was the Manager of Product and Process Development at Lightning. He worked in the engineering department from 2016 through sometime in 2017 and then from 2018 until Lightning ceased operations. Mr. Gabel gained substantial knowledge of Lightning's pallet development, designs, material compositions, and manufacturing processes in that role.

85.     Mr. Gabel directly reported to Roland Heiberger in his role at Lightning. Mr. Heiberger was personally aware of and involved in the pallet development process at Lightning.

86.     At the time Mr. Gabel worked at Lightning, the company had yet to begin renting pallets to customers. As such, the engineering team was focused solely on developing the assembly and coating methods, materials, structure and business use for Lightning's pallet design.

87.     Mr. Gabel was hired for the purpose of and paid to contribute to the inventive process at Lightning.

88.     As a result of his position at Lightning, Mr. Gabel had an express and/or

- 19 -

implied obligation to assign any invention developed as a result of his employment to his employer, Lightning.

89.     On October 21, 2021, Defendant filed non-provisional U.S. Pat. Application No. 17/971,208, titled "Pallet Assembly" (the "Non-Provisional Application") improperly claiming to be a "continuation" of the Provisional Application. *See* **Exhibit 12 – Non-Provisional Application**.

90.     The Non-Provisional Application discloses the identical information as in the Provisional Application.

91.     The Non-Provisional Application names Messrs. Gabel and Novak as inventors.

92.     On or about July 28, 2023, Mr. Novak executed an Assignment for the Provisional Application, Non-Provisional Application, and a yet-to-be-published provisional U.S. Pat. Application No. 63/498,750, titled Pallet Assembly, filed April 27, 2023, to PALIoT Solutions LLC.

93.     Mr. Novak's Assignment was recorded in the USPTO at Reel: 064418, Frame: 0527-0531 on July 28, 2023. *See* **Exhibit 13 – Novak Assignment.**

94.     On or about March 26, 2021, Mr. Gabel executed an Assignment for the Provisional Application, Non-Provisional Application, and a yet-to-be-published provisional U.S. Pat. Application No. 63/498,750, titled Pallet Assembly filed April 27, 2023, to PALIoT Solutions LLC.

95.     Mr. Gabel's Assignment was recorded in the USPTO at Reel: 063686, Frame: 0772-0786 on or about May 18, 2023. *See* **Exhibit 14 – Gabel Assignment.**

96.     On August 22, 2023,  the Applicant of the Non-Provisional Application was changed to Defendant PALIoT Solutions Inc. *See* **Exhibit 15 – PALIoT Assignment.**

97.     On December 5, 2023, the Non-Provisional Application issued as U.S. Pat. No. 11,834,223 ("the '223 Patent").

98.     Upon discovery and review of the '223 Patent, Palltronics learned that Lightning's research, development, products, processes, confidential and proprietary information, and inventions were disclosed and/or claimed in the '223 Patent.

99.     The Non-Provisional Application and '223 Patent do not name Roland Heiberger as an inventor.

100.    The presence of the Lightning Inventions in the '223 Patent, PALIoT's employment of Mr. Gabel and Mr. Novak, and the short time period between the Sale Order and filing of the Provisional Patent Application demonstrates, upon information and belief, that PALIoT improperly relied upon Mr. Gabel to disclose the Lightning Inventions to further development of PALIoT's pallet.

101.    Because of the confidential nature of patent prosecution in the United States, it is possible that PALIoT has filed other patent applications, continuation applications, or continuation-in-part applications claiming Lightning Inventions. As

such, Palltronics does not have access to them.

102.   The ability of Palltronics to monetize the patent rights once issued has been permanently decreased, if not eliminated, in that they may be unable to license the patent to others in the industry, or enforce the patent in litigation, given PALIoT's improper actions in filing the application and during patent prosecution, including, but not limited to, the improper claims of patent ownership.

## COUNT I - DECLARATORY JUDGMENT REGARDING VIOLATION OF THE BANKRUPTCY COURT'S SALE ORDER

103.   Palltronics hereby repeats, realleges, and incorporates by reference the allegations in the previous paragraphs as if fully set forth herein.

104.    The Sale Order provided that all interests in the Assets were to be transferred to and fully and irrevocably vested exclusively with Palltronics as the winning bidder.

105.   PALIoT's actions in taking and using the Lightning Inventions and other Debtor Assets in its business therefore violate the terms of the Sale Order.

106.   Enforcement of the Sale Order and its associated APA is essential to providing the requested value to Palltronics that it sought to purchase under the Sale Order.

107.   This Court should enter a declaratory judgment that PALIoT's retention and use of Debtor's Assets, including the Lightning Inventions, constitutes a violation of the Sale Order, and further violates Palltronics' exclusive rights

regarding the Assets purchased under the Sale Order.

## COUNT II – MISAPPROPRIATION OF TRADE SECRETS
### (DEFEND TRADE SECRET ACT, 18 U.S.C § 1836, ET SEQ.)

108.   Palltronics hereby repeats, realleges, and incorporates by reference the allegations in the previous paragraphs as if fully set forth herein.

109.   The Lightning Inventions of the Debtor that were purchased by Palltronics under the Sale Order constitute trade secrets pursuant to the Defend Trade Secrets Act, 18 U.S.C § 1836, et seq., because Palltronics derives independent economic value from this information not being generally known to the public and not being readily ascertainable by proper means by other persons who could obtain economic value from its disclosure or use, and because the information is the subject of reasonable efforts to maintain its secrecy.

110.   The Lightning Inventions are related to products and services used in, or intended for use in, interstate or foreign commerce.

111.   The Lightning Inventions include among other things: know-how, trade secrets, technical information, business information, financial information, and other non-public information.

112.   PALIoT actually misappropriated and/or threatened to misappropriate the Lightning Inventions without Palltronics' or Lightning's consent, in violation of federal law. Among other things, PALIoT has usurped Palltronics' confidential and proprietary information and trade secrets by continuing to retain and use Debtor's

- 23 -

Assets, including its valuable confidential, proprietary, and trade-secret information about the Lightning Inventions.

113.   Debtor's Assets, including its trade secrets and confidential and proprietary information, are of great value to Palltronics and would give any competitor of Palltronics—including Defendant —an unfair competitive advantage by Defendant not being required to expend the time and resources to develop the trade secret and confidential and proprietary information as the Debtor did; quickly developing products and technologies to compete with Palltronics to diminish Palltronics' rightfully-earned head start unfairly; improperly filing for patent protection on said products and technologies and other improper advantages.

114.   PALIoT's actual or threatened misappropriation has been willful and malicious.

115.   Palltronics has been damaged because of PALIoT's actual or threatened misappropriation.

116.   As a result of threatened or actual misappropriation of the Lightning Inventions, in addition to actual compensatory damages, attorney fees under 18 U.S.C § 1836(3)(D), and costs Palltronics has been injured and faces irreparable injury, Palltronics is threatened and losing valuable business opportunities, its trade secrets, goodwill in amounts which may be impossible to determine, unless PALIoT is enjoined and restrained by order of this Court.

## COUNT III - MISAPPROPRIATION
### (MCL 445.1901 ET SEQ.)

117.   Palltronics hereby repeats, realleges, and incorporates by reference the allegations in the previous paragraphs as if fully set forth herein

118.   Debtor and now Palltronics rigorously maintain the confidentiality of the Lightning Inventions because the information provided the Debtor, and now provides Palltronics, with a competitive advantage in the marketplace from which Palltronics derives economic value.

119.   The Lightning Inventions are of great value to Palltronics and would give any competitor of Palltronics—including PALIoT—an unfair competitive advantage because a competitor would not be required to expend the time and resources to develop the trade secret and confidential and proprietary information as Debtor did. By quickly developing products and technologies to unfairly compete with Palltronics and improperly filing for patent protection on said products and technologies, PALIoT would diminish Palltronics rightfully earned head start.

120.   The Lightning Inventions include, among other things: know-how, trade secrets, and technical, business, and financial information, and other non-public information. This information constitutes trade secrets, pursuant to the Michigan Uniform Trade Secrets Act, MCL 445.1901, *et seq.,* because Palltronics derives independent economic value from this information not being generally known to the public and not being readily ascertainable by proper means by other

persons who could obtain economic value from its disclosure or use, and because the information is the subject of reasonable efforts to maintain its secrecy.

121.   PALIoT actually misappropriated and/or threatened to misappropriate the Lightning Inventions without its consent, in violation of Michigan law.

122.   PALIoT will be or is being unjustly enriched by the misappropriation of the Lightning Inventions, and, unless restrained, will continue to threaten to use, actually use, divulge, acquire, and/or otherwise misappropriate the trade secrets and confidential information.

123.   PALIoT's actual misappropriation has been willful and malicious.

124.   As a result of the actual misappropriation of the Lightning Inventions, it has been injured and faces irreparable injury. In addition to actual compensatory damages, attorney fees, and costs, Palltronics is threatened with losing its trade secrets and goodwill in amounts that may be impossible to determine, unless PALIoT is enjoined and restrained by order of this Court.

## COUNT IV - COMPUTER FRAUD AND ABUSE ACT
### (18 U.S.C § 1030)

125.   Palltronics hereby repeats, realleges, and incorporates by reference the allegations in the previous paragraphs as if fully set forth herein.

126.   PALIoT, and/or representatives of PALIoT, accessed a protected computer belonging to Palltronics and exceeded its authorization. PALIoT had no authorization to modify the Debtor's LinkedIn Page or to access other Assets of

Debtor, which Palltronics owned pursuant to the Order of Sale.

127.   As a result of PALIoT's actions, Palltronics faces irreparable harm in the diversion of business opportunities because of PALIoT's unlawful changes. This loss is not adequately compensable by money damages.

128.   In addition, PALIoT knowingly and with the intent to defraud Palltronics accessed a protected computed, exceeding its authority, and by means of such conduct furthered the intended fraud and obtained valuable information, namely the Debtor's LinkedIn passwords and information. Such information is valued above $5,000.

129.   Moreover, Palltronics has incurred costs above $5,000 in its attempt to investigate who made the changes to the LinkedIn page.

130.   Such investigations ultimately confirmed these changes were made by PALIoT's Co-Founder, Chief Technology Officer, and Chief Sustainability Officer—Richard MacDonald.

131.   PALIoT violated 18 U.S.C. §§ 1030(a)(5)(B) and 1030(a)(5)(C), because they intentionally, and with disregard for the law and the rights of Palltronics, accessed Palltronics or Debtor's protected computers without authorization and caused resultant: (a) damage, such damage including the unavailability to public viewers of Debtor's LinkedIn Page of a button leading to the correct web address and the impairment of the integrity and availability of

information about Debtor that are available on its LinkedIn profile, and (b) loss, including, without limitation, the reasonable cost to Palltronics incurred in investigating and responding to the unlawful action, including at least $5,000 in reasonable attorney fees, expenses, and lost time.

132.   Further, Palltronics' inability to accurately communicate through the Debtor's LinkedIn Page, as well as the confusion created by, and potential lost business opportunities attributable to, the button directing internet users PALIoT's website damages Debtor's and/or Palltronics' reputation and goodwill, such loss equaling at least $5,000.

## COUNT V - UNFAIR COMPETITION
### (COMMON LAW)

133.   Palltronics hereby repeats, realleges, and incorporates by reference the allegations in the previous paragraphs as if fully set forth herein.

134.   In diverting the Debtor's LinkedIn Page to PALIoT's website, PALIoT unfairly simulated Palltronics (owner of Debtor's Assets, including the Debtor's LinkedIn Page under the Sale Order) to deceive the public thereby obtaining for itself the benefits properly belonging to Palltronics.

135.   Through its misappropriation of the Lightning Inventions, PALIoT has unfairly gained a competitive advantage in the pallet market.

136.   As a result of PALIoT's unfair competition, Palltronics has been injured and faces irreparable injury. In addition to actual compensatory damages, attorney

fees, and costs, Palltronics is threatened with losing its trade secrets and goodwill in amounts that may be impossible to determine, unless PALIoT is enjoined and restrained by order of this Court.

137.   As a result of PALIoT's unlawful actions, Palltronics has been injured and faces irreparable injury. In addition to actual compensatory damages, attorney fees, and costs, Palltronics is threatened with losses, which may be impossible to determine, unless PALIoT is enjoined and restrained by order of this Court.

## <u>COUNT VI – CORRECTION OF INVENTORSHIP</u>
### (35 U.S.C § 256)

138.   Palltronics hereby repeats, realleges, and incorporates by reference the allegations in the previous paragraphs as if fully set forth herein.

139.   The failure to recognize the proper inventive contributions of individuals to any inventions in the '223 Patent has resulted in the misjoinder or non-joinder of the proper and complete named inventors.

140.   Upon information and belief, the '223 Patent discloses and claims one or more inventions for which Mr. Novak is not a properly named inventor.

141.   The '223 Patent discloses and claims an invention incorporating technology developed by others at Lightning, including at least Roland Heiberger.

142.   Roland Heiberger contributed to the invention(s) claimed in the '223 Patent that were developed while he was working with Lightning.

143.   Roland Heiberger made individual, conceptual contributions to novel

and nonobvious elements of the invention(s) claimed in the '223 Patent during their employment with Lightning.

144.    Roland Heiberger is thus at least a joint inventor of the invention(s) claimed in the '223 Patent.

145.    The exclusion of Roland Heiberger as an inventor of the '223 Patent occurred without any deceptive intent on his part.

146.    Palltronics has expectant ownership rights in the patent at issue and/or a concrete financial interest in the patent, albeit an interest less than ownership.

147.    By virtue of its ownership of the Assets pursuant to the Sale Order, Palltronics would be the proper assignee of the '223 Patent.

148.    Pursuant to 35 U.S.C § 256, Palltronics seeks a certificate of correction correcting any misjoinder or non-joinder of inventors of the '223 Patent, including the non-joinder of Roland Heiberger as a named inventor.

### COUNT VII – DECLARATORY JUDGMENT
**(Plaintiff's Ownership of the '223 Patent)**

149.    Palltronics hereby repeats, realleges, and incorporates by reference the allegations in the previous paragraphs as if fully set forth herein.

150.    As set forth above, an actual controversy exists among the parties as to Palltronics' right, title, and interest in the '223 Patent.

151.    Mr. Gabel was employed by Lightning in the engineering department for the purpose of developing and inventing improvements to the assembly and

- 30 -

coating methods, materials, structure, and business use for Lightning's pallet design.

152.   Neither Mr. Gabel nor Mr. Novak, nor any individual or company working on their behalf, was permitted by Lightning to file patent applications and assign away interests in the patent applications because the right to the legal title to those inventions, including in the '223 Patent, was already owed to Palltronics.

153.   The assignment to PALIoT by Mr. Novak and Mr. Gabel for the invention embodied in the '223 Patent is willful, improper, null, and void.

154.   There exists an actual, immediate, real, and substantial controversy between the parties having adverse legal interests regarding the ownership of all rights, title, and interest to the '223 Patent and claims on similar subject matter in any divisional, renewal, substitute, continuation, continuation-in-part, reissue, and reexamination applications that have or will be filed.

155.   For the reasons set forth, Palltronics is entitled to a declaratory judgment that Palltronics is a sole or joint owner of the '223 Patent and any patent application that has or will be filed that claims priority thereto.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief against Defendant as follows:

A.    Enter Judgment against PALIoT on all counts;

B.    Preliminarily and permanently enjoin PALIoT from obtaining, using, or disclosing any portion of the Lightning Inventions;

C.   Order PALIoT to turn over to Palltronics any documentation or information in any tangible or intangible form in their possession, custody, or control that contains the Lightning Inventions or any other of Debtor's Assets;

D.   Order that the misjoinder or non-joinder of the proper inventors of the '223 Patent be corrected, including the addition of Roland Heiberger as at least a joint inventor, and ordering the Director of the United States Patent and Trademark Office to correct the inventorship of the '223 Patent;

E.   A declaration that Palltronics is an owner of right, title, and interest in the '223 Patent;

F.   Enter judgment against PALIoT for all sums that may be adjudged against PALIoT in Palltronics' favor, including all monies referred to above, as well as costs and pre- and post-judgment interest, and attorney fees pursuant to 18 U.S.C § 1836(3)(D); and

G. Award any other relief deemed just and appropriate.

## <u>DEMAND FOR JURY TRIAL</u>

Pursuant to Fed. R. Civ. Pro. 38(B) and 5(D), Plaintiff demands a jury trial of all issues triable by jury.

Respectfully submitted,


By:___/s/ Jacob D. Koering_____
Steven A. Roach (P39555)
Marc N. Swanson (P71149)
Joel C. Bryant (P79506)
Anita C. Marinelli (P81986)
MILLER, CANFIELD, PADDOCK AND STONE,
P.L.C.
150 West Jefferson, Suite 2500
Detroit, MI 48226
Phone: (313) 496-7591
roach@millercanfield.com
swansonm@millercanfield.com
marinelli@millercanfield.com

Jacob D. Koering
MILLER, CANFIELD, PADDOCK AND STONE,
P.L.C.
225 W. Washington Street, Suite 2600
Chicago, IL 60606
Phone: (312) 460-4200
koering@millercanfield.com

Dated: 7/30/2024

## CERTIFICATE OF SERVICE

I hereby certify that on July 30, 2024, I filed the foregoing via the Court's CM/ECF System, which will automatically provide notice of the filing to all registered participants in this matter.

By: /s/ *Jacob D. Koering*
Jacob D. Koering
MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.
227 W. Monroe Street, Suite 3600
Chicago, IL 60606
(312) 460-4200
koering@millercanfield.com