UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PALLTRONICS, INC.,                      Case No. 22-12854

                    Plaintiff,          Denise Page Hood
v.                                      United States District Judge

PALIoT SOLUTIONS, INC.,                 Curtis Ivy, Jr.
                                        United States Magistrate Judge
                    Defendant.
_____/

**ORDER GRANTING PLAINTIFF'S MOTION FOR PROTECTIVE
ORDER, (ECF No. 79), AND DENYING AS MOOT DEFENDANT'S
MOTION TO COMPEL DEPOSITIONS (ECF No. 94)**

## I.    PROCEDURAL HISTORY

Plaintiff Palltronics, Inc. sued Defendant PALIoT Solutions, Inc. on

November 23, 2022.  (ECF No. 1).  Plaintiff did so because Defendant, among

other things, allegedly violated the terms of a Sale Order from related bankruptcy

proceedings involving a third company, Lightning Technologies, Inc. ("Lightning"

or "Debtor").  (ECF No. 65, PageID.2520, ¶ 1).  As the winning bidder in the

bankruptcy auction, Plaintiff claims that it purchased all of Lightning's assets set

forth in an asset purchase agreement ("APA") and Sale Motion which the

Bankruptcy Court authorized in March 2021.  Such assets allegedly included

Lightning's intellectual property, namely its trade secrets.  (*Id.* at ¶¶ 1, 4).

Believing that Defendant was illegally using Lightning's trade secrets to develop its own directly competitive product, Plaintiff lodged claims for a declaratory judgment regarding the violation of the Bankruptcy Court's Sale Order, the misappropriation of trade secrets under federal and state law, the violation of the federal Computer Fraud and Abuse Act, and common law claims based on unfair competition and intentional interference with prospective economic advantage.  (ECF No. 1, PageID.18-27).  On July 30, 2024, Plaintiff filed an Amended Complaint.  (ECF No. 65).  There, Plaintiff retained its initial claims, except it removed the intentional interference claim and added a claim for the correction of inventorship as well as a claim for a declaratory judgment regarding the ownership of Defendant's patent.  (*Id.* at PageID.2540-49).

Prior to filing the Amended Complaint, however, the District Court granted Plaintiff a preliminary injunction on its trade secrets misappropriation claims.  (ECF No. 33, PageID.1497-1504).  On October 8, 2024, the District Judge referred all pretrial matters, except dispositive motions, to the undersigned.  (ECF No. 75).  Presently before the Court are several discovery motions.  The Court will resolve Plaintiff's motion for a protective order, (ECF No. 79), and Defendant's motion to compel depositions of certain individuals, (ECF No. 94).

For the following reasons, Plaintiff's motion for a protective order is **GRANTED** and Defendant's motion to compel depositions in **DENIED AS MOOT**.

## II.   BACKGROUND

The parties are direct competitors in the pallet pooling industry.  According to Plaintiff, "[p]allet pooling is a share-and-reuse business model for shipping pallets in which one company, a 'Pallet Pooler,' owns pallets and rents them out to manufacturers to use for shipping through the supply chain."  (ECF No. 8, PageiD.608-09).  Both Plaintiff and Defendant are developing a smart pallet for use in this industry.  Generally speaking, a smart pallet uses a "lightweight polymer coated anti-microbial wood with devices [that] monitor location, temperature, shock, weight, and movement."  (ECF No. 20, PageID.855).

A.   The Lightning Pallet

Lightning was a trailblazer in developing a smart pallet (e.g., the "Lightning Pallet").  Indeed, "Lightning spent its entire 6 year existence and tens of millions of dollars developing a state-of-the-art shipping pallet and implementing matching business applications for using that Pallet . . . ."  (ECF No. 65, PageID.2527, ¶ 33).  Using a combination of interrelated innovations, "the Lightning Pallet was a wood-core shipping pallet sprayed with a proprietary coating, which gave the pallet an improved strength-to-weight ratio and a cost-effective lightweight design."  (ECF

3

No. 8, PageID.608).  As Plaintiff explains it, "these characteristics, combined with embedded customized tracking technology, resulted in a game-changing shipping pallet for use in the highly competitive and lucrative 'pallet-pooling' business." (*Id.* at PageID.608).

Based on the briefing and news articles in the record, the Lightning Pallet was an innovation like no other.  Take, for instance, the following description of the Lightning Pallet from *Forbes*:

> Creating a more durable pallet with tracking technology isn't a new idea.  Lightning's selling proposition is rolling a bunch of innovations into one: a pallet that is lightweight, sustainable, hygienic, easily repaired and skid-free.  It uses active, rather than passive, ID chips, which can beam information to and from the cloud anywhere, anytime.
>
> Lightning's manufacturing process is as innovative as the pallet itself.  In place of traditional hardwood lumber, it uses plywood from fast-growing trees harvested on plantations in Russia and South America.
>
> Inside the company's sparkling factory 45 miles north of Detroit, computerized milling machinery cuts openings for drainage and handholds plus a tiny compartment for the electronic tracking device.  Two platforms, milled from different types of plywood, sandwich stubby legs made from laminated strand lumber, leaving openings for forklift access.  The assembly dances its way through an automated line, twisting and flipping as high-velocity robots spay it.

(ECF No. 20-7, PageID.959-60).  In a separate article, an expert on the pallet industry stated that he was unaware of "any company marrying specific technologies as Lightning is doing—but the hybrid smart pallet concept is on companies' radars."  (ECF No. 20-8, PageID.969).  Another article referred to the

Lightning Pallet as consisting of new technology that made Lightning and its pallet "a game changer for the Logistics Industry." (ECF No. 20-18, PageID.1043). The Lightning Pallet was also apparently one of the first pallets that satisfied regulations under the Food Safety Modernization Act. (ECF No. 20-19, PageID.1046).[1] In short, in Plaintiff's eyes, the Lightning Pallet had "characteristics that no other pallet possessed." (ECF No. 8, PageID.611).

B.    Lightning's Bankruptcy

Despite its revolutionary product, Lightning's creditors filed a Chapter 7 involuntary bankruptcy petition in the Bankruptcy Court for the Eastern District Court of Michigan on February 5, 2021. (ECF No. 65, PageID.2522, ¶ 12). The Chapter 7 Trustee filed a Sale Motion which set forth procedures for the sale of Lightning's assets via an auction. (*Id.* at PageID.2523, ¶ 15). This Sales Motion described how the Trustee would sell Lightning's assets at the auction pursuant to an asset purchase agreement ("APA"). (*Id.* at ¶ 16). Plaintiff was the winning bidder and executed an APA; Defendant was the back-up bidder. (*Id.* at ¶¶ 18-19).

---

[1] Defendant noted in its brief in opposition to Plaintiff's motion for a preliminary injunction that smart pallets have been around since 2016, referring to Ahrma Group's pallet. (ECF No. 20, PageID.866). Yet the articles cited here—which were attached to Defendant's opposition brief—were published in 2018 or 2019 (the article cited in ECF No. 20-19 does not have a date). So even two to three years after the Ahrma Group began selling its smart pallet, companies like Forbes were referring to the Lightning Pallet as a revolutionary innovation in the industry.

The Bankruptcy Court authorized the Trustee's Sale Motion and Plaintiff's APA on May 13, 2021.  (*Id.* at ¶ 20).

The Bankruptcy Court's Sale Order awarded Plaintiff the "Assets" as defined in the operative APA; accordingly, "Assets" "expressly include[ed] all Schedules" from Plaintiff's APA.  (ECF No. 65-5, PageID.2926-27).  And Plaintiff purchased those Assets "free and clear of all Interests."[2]  (*Id.* at PageID.2938). "Interests," in turn, referred to things such as "encumbrances, charges, liens, claims, mortgages, leases, subleases, licenses, [etc.]."  (*Id.*).  "Interests" also referred to "Intellectual Property (as defined on Schedule 2.1.4 of [Plaintiff's] APA . . . ."  (*Id.* at PageID.2941).  This meant that Plaintiff took ownership of Lightning's intellectual property free and clear of, among other things:

> any other claim or Interest that might impair either the title to or value of the Intellectual Property or Electronically Stored Property in the name of Buyer or the ownership and exclusive use of the Intellectual Property and Electronically Stored Property by the Buyer, with such Intellectual Property and Electronically Stored Property including, without limitation, any patents, trademarks, trade secrets, the Exobond secret formula, and the Exobond secret process.

(*Id.* at PageID.2941-42).  The condition that Plaintiff own the Assets free and clear of any interests was critical to the sale of Lightning's Assets, otherwise Plaintiff would not have completed the transaction.  (*Id.* at PageID.2942).  As the

---

[2] Except for "Assumed Contracts (and then only to the extent of liabilities that arise, accrue or otherwise are exclusively for periods after Closing)."  (ECF No. 65-5, PageID.2938).

Bankruptcy Court put it, "[a] sale of the Assets other than one free and clear of all Interests would yield substantially less value for the bankruptcy estate. (*Id.*).[3]

The APA defined "Assets" as "all of the Debtor's and its bankruptcy estate's right, title, and interest in and to the assets, properties, and other rights used, useful or capable of being used in connection with the Business (exclusive only of the Excluded Assets . . . .)" (ECF No. 65-4, PageID.2861). The APA added that "[t]he Assets shall include, but shall not be limited to, all of the Debtor's and its bankruptcy estate's right, title, and interest in and to the Assets described in the following clauses of this Section 2.1 . . . ." (*Id.*). This included Intellectual Property. (*Id.* (referring to Schedule 2.1.4)).

Intellectual Property in the APA referred to various items. Plaintiff cited to three specific provisions of the APA that defined Intellectual Property to include the following:

> (b) Any and all trade secrets or similar protection for confidential information (including proprietary business processes, knowledge, ideas, research and development, know-how, data or any other information or technique relating to the Business, any and all formula, pattern, device, schematics, technology, technical data, designs, drawings, flowcharts, block diagrams, specifications, whether or not patentable, or compilation of information that is used, usable or capable of being used in the Business; including information relating to the formulation of chemical compounds and their application methods or processes, material handling, coating and spray technology and techniques, pooling, and pallet manufacturing and

---

[3] The Sale Order also extinguished "[a]ll of the Trustee's interests in the Assets" that Plaintiff acquired through the Sale. (ECF No. 65-5, PageID.2958-59).

design (including the track and trace and RFID technology embedded therein and related software)), including without limitation the "Exobond" secret formula and the "Exobond" secret process; and any and all intellectual property rights in computer software and computer software products now or hereafter existing, created, acquired or held.

(f) Any website, domain name and customer portal.

(g) Any and all claims for damages by way of past, present and future infringement and/or misappropriation of any of the rights included above, with the right, but not the obligation, to sue for and obtain such legal and equitable relief for said use, misappropriation and/or infringement of the intellectual property rights identified above, including in addition to all rights to enforce, but without obligation to do so, any and all confidentiality, non-disclosure and non-compete provisions and/or agreement.

(*Id.* at PageID.2884, 2886).

Plaintiff completed its purchase of Lightning's Assets on May 26, 2021 for a total of five million dollars.  (ECF No. 65, PageID.2524, ¶ 25).

C.     PALIoT's Formation and Pallet

According to Plaintiff, a former Lightning employee incorporated PALIoT Solutions, Inc. in Delaware just two weeks before the initiation of the bankruptcy proceedings.[4]  (*Id.* at PageID.65, PageID.2532, ¶ 56).  At least nine other Lightning employees have also worked for Defendant, including Paul Barry and Richard

---

[4] Defendant denied this allegation as untrue but admitted that it was incorporated in Delaware on the date listed in its articles of incorporation, a public record.  (ECF No. 69, PageID.3455).  Public records reflect that Defendant was incorporated on January 22, 2021. State of Delaware Department of State: Division of Corporations, *Entity Details for Paliot Solutions, Inc.*, (last visited May 13, 2025).  The nature of the website did not allow for use of a Permalink.

MacDonald who are co-founders of the company; the former is Defendant's chief executive officer, and the latter is the chief sustainability and chief commercial officer.  (ECF No. 8, PageID.618; ECF No. 33, PageID.1484).

Since its incorporation, PALIoT has also been working on producing a smart pallet.  According to one of its briefs in this case, it "has spent $32.8 million raised from private investors" in doing so.  (ECF No. 45, PageID.1703-04).  Defendant has also asserted that its pallet "uses a different type of wood, a different polymer, a different RFID and Bluetooth tracking technology, a different manufacturing layout, and a different spray method, all derived independently."  (ECF No. 20, PageID.883; ECF No. 45, PageID.1705 ("[Defendant's] pallet uses and relies upon *its own* design, components, and process."); *see also id.* at PageID.1706-09 (describing the allegedly unique aspects of Defendant's pallet, including the wood its uses, the polymer used to coat the wood, how the pallets are assembled and coated with the polymer, and the type of tracking technology used in the pallet)). In December 2023, the United States Patent and Trade Office ("USPTO") issued a patent for Defendant's pallet.  (*Id.* at PageID.1706 (referring to U.S. Patent No. 11,834,223 B2)).

D.    The Palltronics-PALIoT Dispute

Though it seems that the parties cooperated throughout the bankruptcy proceedings with little to no disputes, that state of affairs changed shortly after Plaintiff purchased Lightning's Assets.

"The Sale Order required all persons or entities in possession of Assets to deliver them to Plaintiff."  (ECF No. 33, PageID.1485).  Moreover, "[a]ny such person or entity, with notice of th[e] Sale Order" was "required to certify in writing to the Trustee and [Plaintiff] that such party ha[d] delivered all Assets and copies to the Buyer, and ha[d] permanently erased or destroyed all digital or other electronically stored copies."  (ECF No. 65-5, PageID.2949-50).  After Plaintiff demanded in writing that Defendant "deliver all Assets, including Intellectual Property and Electronically Stored Data" to it, Defendant responded that it had none, other than two laptops.  (ECF No. 65, PageID.2530, ¶¶ 43-44).  But this was not the case.

Lightning had its own LinkedIn page.  As of June 2021—that is, after Plaintiff completed its purchase of Lightning's Assets which included Intellectual Property, namely "[a]ny website, domain name and customer portal"—Lightning's LinkedIn page displayed a link that sent the LinkedIn user to Defendant's website. (*Id.* at ¶¶ 45-47).  The LinkedIn page also listed the URL for Defendant's website. (*Id.* at PageID.2531, ¶ 48).  Plaintiff filed a motion to enforce the sale order and for a finding of civil contempt against Defendant.  (*Id.* at ¶ 51).  Discovery on this

10

motion revealed that Richard MacDonald, mentioned above, was the individual who made the changes to Lightning's LinkedIn page.  (*Id.* at PageID.2531-32).  The Bankruptcy Court granted the motion and found Defendant in civil contempt.  (ECF No. 65-10).

Plaintiff also alleged in its initial and Amended Complaints that former Lightning employees who now work for Defendant "downloaded information about the Lightning Pallet assembly and spraying process on their laptops while they were working for Lightning including CAD drawings of the Lightning pallet design, CNC programming for the CNC machines, and coding for the automated robot operations."  (ECF No. 1, PageID.14, ¶ 58; ECF No. 65, PageID.2532, ¶ 58).  Later briefing identified the two employees as Mr. Jim Gruber and Mr. Cody Gehrig.  (ECF No. 8, PageID.618).  At the time of that briefing, Defendant employed Mr. Gruber as a project manager and Mr. Gehrig as a launch operations manager.  (*Id.*).  Defendant denied these allegations and produced declarations from Mr. Gruber and Mr. Gehrig conveying that they "neither used or retained the information from their Lightning laptops, and neither had access to any coding or CAD drawings."  (ECF No. 20, PageID.884-85; ECF No. 69, PageID.3455, ¶ 58).

Whether Defendant had access to such information is directly related to the next chapter in this saga.  In 2022, Plaintiff met with another company FANUC to perform a "reach study" for the spray booth Plaintiff uses to coat its pallet with its

polymer.  (ECF No. 8, PageID.617).  A "reach study" "model[s] and identif[ies] the area within a space that a robot can work."  (*Id.*).  Though Plaintiff had not yet given its code (code which Lightning allegedly developed) to FANUC, the company already had a detailed simulation ready to go that did not need Plaintiff's code.  (*Id.*).  The prepared simulation listed "Paliot" in the corner of the screen.  (*Id.*).  From this, Plaintiff concluded that the "only other possible way FANUC could have received the code was from [Defendant] and [Defendant] could have only gotten that code from individuals who downloaded it when they were at Lightning[.]"  (*Id.* at PageID.618).  Defendant also denied these allegations, asserting that the code was not Lightning's and that FANUC and a separate company, Air and Liquid Systems Inc. ("ALSI"), had jointly developed the code.  (ECF No. 20, PageID.882-883).  Since ALSI apparently applied for a patent using the code, Defendant asserted that the code is not a trade secret.  (*Id.*).

Plaintiff also alleged impropriety regarding Defendant's patent for its own pallet.  Based on the Non-Provisional Patent applications, Mr. Jacob Gabel was a co-inventor of the pallet who subsequently "executed an Assignment for the Provisional Application, Non-Provisional Application, and a yet-to-be published provisional U.S. Pat. Application . . . to [Defendant]."  (ECF No. 65, PageID.2537-39, ¶¶ 84-97).  Lightning allegedly employed Mr. Gabel as a Manager of Product and Process Development where he "gained substantial knowledge of Lightning's

pallet development, designs, material compositions, and manufacturing processes in that role." (*Id.* at PageID.2537, ¶ 84).  Defendant later hired Mr. Gabel as a R&D Manager.  (ECF No. 8, PageID.618).  Plaintiff therefore claimed that Defendant's patent was based on "Lightning's research, development, products, processes, confidential and proprietary information, and inventions"—in short, the intellectual property Plaintiff allegedly bought from Lightning.  (ECF No. 65, PageID.2539, ¶ 98).  Defendant largely denied these allegations as well.  (ECF No. 69, PageID.3463-67, ¶¶ 84-97).

In sum, Plaintiff contends that "just a year after the sale to [Plaintiff] had closed and after [Defendant] certified that it did not have any Debtor's Assets . . . [Defendant] . . . ramp[ed] up its use of those Assets, including the Lightning Inventions, to engage in a directly competitive business with [Plaintiff]."

E.    The Present Litigation and Preliminary Injunction

The above incidents culminated in Plaintiff's lawsuit in this Court and a motion for a preliminary injunction.  (ECF Nos. 1, 8, 65).  In that motion, filed on November 29, 2022, Plaintiff argued that:

> Contrary to the Sale Order and the APA, [Defendant] continues to retain and use Lightning's Assets, including its valuable confidential, proprietary, and trade-secret information about the Lightning Pallet.  [Defendant] improperly acquired Lightning's Assets by taking them from former Lightning personnel.  Unlike Lightning, [Defendant] [did] not ha[ve] years of time and significant funding to develop a pallet product or pallet business.  In fact, [Defendant] was founded just over a year ago.  Thus, rather than spend its own

13

resources to develop its own intellectual property or offer a
competitive price to purchase Assets from Lightning in bankruptcy,
[Defendant] brought on a group of ex-Lightning personnel who were
directly involved in Lightning's pallet business.  Most of these
personnel received letters from [Plaintiff] confirming the Assets were
sold from Lightning to [Plaintiff], and all who received those letters
confirmed they had returned those Assets to Lightning.

(ECF No. 8, PageID.616) (internal citations omitted).

Based on the definition of "Assets" in the Sale Order and the APA, Plaintiff

asserted in its motion for a preliminary injunction that "[t]he intellectual property

Assets related to the Lightning Pallet can be organized into three general categories

of valuable information: Materials and Equipment Selection and Sourcing, Pallet

Assembly and Manufacture, and Pallet Tracking and Use." (*Id.* at PageID.610-11).

The Court elaborates on each in kind.

### *Material & Equipment Selection and Sourcing Assets*

Lightning spent considerable amounts of time and resources determining

which wood would comprise the core structure for the Lightning Pallet. (*Id.* at

PageID.611).  This was critical as the wood used allowed for an "improved

strength-to-weight ratio and [a] cost-effective and lightweight multi-component

design . . . ." (*Id.*).  But to maximize the Lightning Pallet's utility, the wood used

in the Lightning Pallet had to be compatible with Lightning's polymer coating.

(*Id.*).  So each time Lightning considered changing the wood, it also had to

evaluate whether Lightning's polymer was compatible.  "The result of this testing

was a list within Lightning of the acceptable sources and types of wood that were compatible with the polymer coating and that, when coated, could meet [rigorous regulatory] Pallet Requirements." (*Id.* at PageID.611-12).

Similarly integral to the Lightning's Pallet innovations was the sprayable proprietary polymer compound that coated the wood. "To achieve this spray design, Lightning worked to identify chemical manufacturers that could create a high-speed sprayable formula." (*Id.*). Lightning's efforts resulted in agreements with two manufacturers to create the appropriate chemical compound for use with the Lightning Pallet. Given Lightning's efforts in determining the wood and sprayable polymer used for the Lightning Pallet, Plaintiff claims that "Lightning treated the sources, selections, and selection process for these manufacturing materials and third-party partners as confidential information." (*Id.*).

*Pallet Assembly and Manufacture Assets*

Like its development of the wood and sprayable polymer, Lightning likewise developed techniques and mechanisms for spraying the polymer. Such techniques and mechanisms included "spraying techniques and patterns, spray heads and processes for spraying the polymer, and—for high-speed manufacturing— automated processes for applying those spray patterns using the selected spray heads to pallets being automatically through the spraying system." (*Id,* at

PageID.613).  The spraying pattern was especially difficult to determine because of the Lightning's Pallet's design.  (*Id.*).

The Lightning Pallet's assembly process also included "the use of a specialized adhesive material and a fastener-less design unique in the industry" that allowed for the easy removal of damaged supports.  (*Id.* at PageID.614).  With respect to the spraying process, Lightning designed it so that excess polymer coating, e.g., "overspray," could be collected and used for recycling, resale, and other potential uses.  (*Id.*).  The Assembly and Manufacture Assets also included the "suppliers who helped develop a spraying booth and spraying robots, along with related programming, capable of carrying out the sophisticated spray-and-materials-recovery process it developed."  (*Id.*).

*Pallet Tracking and Use Assets*

These assets included Lightning's proprietary tracker and related business methodologies.  (*Id.*).  The tracker itself measured temperature, humidity, and location data.  (*Id.*).  Additionally, this tracker "included special structural features that allowed the tracker to be placed" in a safe location in the Lightning Pallet's structure before the spraying of the polymer.  (*Id.* at PageID.615).  This feature of the tracker allowed for "open apertures for monitoring environmental conditions." (*Id.*).  As far as related business methodologies, Lightning "developed a business method for collecting carbon credits for each mile that the Pallets travel."  (*Id.*).

16

Plaintiff added that "Lightning employees were both bound by confidentiality agreements with Lightning and by obligations arising from their responsibilities to the organization. (*Id.* at PageID.619). "To that end, both employees and management personnel regularly signed Confidentiality and Non-Disclosure Agreements identifying information relating to [Lightning's] Polyurea Hybrid Spray Technology . . . Pallet Designs, Pallet Manufacturing Processes, Materials, Construction, . . . [and] Customers and Suppliers as well as Business Strategies and Information as Confidential Information" (*Id.*) (internal quotations omitted).

Since the above Assets—the Material and Equipment Selection and Sourcing, Pallet Assembly and Manufacture, and Pallet and Use Assets—were allegedly trade secrets, Plaintiff concluded that the only way Defendant could produce a smart pallet in such a short time was by inducing its ex-Lightning employees to reveal those trade secrets. And as far as an irreparable injury, Plaintiff asserted that without an injunction it would suffer "the loss of competitive market positions" and the loss of fair competition in a nascent industry. (*Id.* at PageID.628).

Defendant opposed Plaintiff's motion, arguing many grounds already mentioned, namely that (1) Plaintiff had not established ownership of any intellectual property, (2) all the claimed trade secrets were in the public domain so

they were not trade secrets, and (3) Defendant did not use any of the alleged trade secrets in their own pallet.  (ECF No. 20, PageID.857).  Defendant also contended that Plaintiff's purported irreparable harms were insufficient as a matter of law; and even if that were not the case, Defendant argued, Plaintiff had failed to produce evidence in support of that harm.  (*Id.* at PageID.886).

After a total of 681 pages of briefing with exhibits as well as the 579-page complaint (with exhibits) and a hearing that produced its own 45-page transcript, the Court was satisfied that Plaintiff had met its burden for a preliminary injunction on its trade secrets misappropriation claims.  (ECF No. 33).  First, the Court preliminarily agreed that "the at-issue Assets, including the Material Selection and Sourcing Assets, the Pallet Assembly and Manufacture Assets, and the Pallet Tracking and Use Assets, were confidential trade secret information of Lightning." (*Id.* at PageID.1499).  The Court came to this conclusion based on Plaintiff's showing that "employees and management personnel regularly signed Confidentiality and Non-Disclosure Agreements" to protect Lightning's Assets. (*Id.*).  From there, the Court inferred that Defendant's "dramatic progress" on its own pallet was possible because it relied on "Lightning's former employees' knowledge of the trade secrets, processes and other information they gained from working at Lightning . . . ."  (*Id.* at PageID.1499-1500).  As far as misappropriation, the Court referred to the Bankruptcy Court's civil contempt

order against Defendant regarding Lightning's LinkedIn page as well as other instances in which Plaintiff "show[ed]" Defendant used Lightning's trade secrets without Plaintiff's authorization.[5]  (*Id.* at PageID.1500).  The Court likewise agreed that Plaintiff would suffer irreparable harm without an injunction, specifically the loss of customer goodwill and fair competition.  (*Id.* at PageID.1500-01 (citing *Basicomputer Corp. v. Scott*, 973 F.2d 507, 511-12 (6th Cir. 1992)).

Not taking the matter sitting down, Defendant filed a motion for reconsideration.  (ECF No. 35).  Defendant complained that the Court's Order did not specifically identify what Assets from the Sale Order comprised Lightning's trade secrets or specifically identify how Defendant has purportedly misappropriated those trade secrets in developing its own pallet.[6]  (*Id.* at PageID.1529-33).  Defendant reasoned that because Plaintiff had failed to satisfy its burden, the Court's Order was erroneous or at least required some revision.  (*Id.* at PageID.1530-32).

---

[5] The Court's Order did not specify further but based on the briefing the other possible instance would relate to the FANUC testing incident.  This would not have included Plaintiff's claims related to Defendant's patent as Defendant did not secure a patent until December 2024, and the Court entered its preliminary injunction order on February 27, 2023.

[6] Defendant also took issue with the bond amount the Court set in its Order.  (ECF No. 35, PageID.1533-37).  But this issue is not pertinent here.

The briefing on Defendant's reconsideration motion amounted to another 130 pages.[7]  And the Court remained unpersuaded by Defendant's arguments that Plaintiff did not own any trade secrets or that Plaintiff failed to make the requisite showing of misappropriation.  (ECF No. 46).  In denying the motion for reconsideration, the Court pointed Defendant to the part of the Preliminary Injunction Order that enjoined Defendant from using "Assets" as defined in the APA, specifically Schedule 2.1.4 which defines the scope of "Intellectual Property" to include trade secrets.  (*Id.* at PageID.1751-52).  And as explained in the Preliminary Injunction Order itself, this included the "at-issue Assets, [that is,] the Material Selection and Sourcing Assets, the Pallet Assembly and Manufacture Assets, and the Pallet Tracking and Use Assets."  (ECF No. 33, PageID.1499).

Defendant did not file an appeal to the Sixth Circuit regarding the preliminary injunction.

## III.   ANALYSIS

Since discovery began in October 2024, the parties have engaged in a flurry of related motion practice.  (ECF Nos. 79, 81, 88, 94, 97).  The Court addresses here Plaintiff's motion for a protective order and Defendant's motion to compel depositions of certain individuals.  (ECF Nos. 79, 94).

---

[7] This includes Defendant's reply and supplemental briefs.  (ECF Nos. 38, 45).  Whether Defendant's reply brief was proper yielded its own briefing.  (ECF Nos. 39, 40, 41).  But ultimately, the Court mooted that issue.  (ECF No. 46).

A.    Plaintiff's Motion for a Protective Order (ECF No. 79)

The parties do not dispute that a protective order is needed in this case.
They do, however, disagree on the form of that protective order.  Plaintiff wants
"two-tier[s] [of] protection—a Confidential designation and a Highly Confidential
designation that governs the disclosure of highly confidential, competitive,
proprietary, and trade-secret information."  (ECF No. 79, PageID.3555).
Plaintiff's proposed Highly Confidential classification would come in the form of
an "attorneys' eyes only" ("AEO") designation.  That said, the categories of
individuals who may view Confidential and Highly Confidential information are
identical in all but one respect.  (ECF No. 79-2, PageID.3569-72).  The only
difference is Plaintiff's omission of the following group from those who are able to
receive Highly Confidential information: "the named parties including in-house
counsel, officers, directors, and employees of the Receiving Party to whom
disclosure is reasonably necessary for this Action."  (*Id.* at PageID.3569).

Defendant considered adopting Plaintiff's proposed protective order on the
stipulation that "it include[ ] an exception to allow inside individuals at
[Defendant] to review that information."  (ECF No. 79, PageID.3558).  Defendant
proffered two individuals that would be subject to this exception, but Plaintiff did
not agree with those whom Defendant selected.  (*Id.*).  Defendant offered no other

individuals that may be subject to the exception and did not agree to a two-tier protective order.  (*Id.*).  The disagreement resulted in the filing of this motion.

1.     <u>Governing Standard</u>

Federal Rule of Civil Procedure 26(c) allows the Court to issue protective orders for good cause shown to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including that the disclosure or discovery not be had, or that the disclosure or discovery be limited to certain matters.  Fed. R. Civ. P. 26(c).  On a showing of good cause, Rule 26(c)(1)(G) empowers the Court to grant a protective order "requiring that a trade secret or other confidential research, development, or commercial information not be revealed or be revealed only in a specified way."  Courts have broad discretion to determine whether a protective order is appropriate and what degree of protection is required.  *Seattle Times v. Rhinehart*, 467 U.S. 20, 36 (1984).

Here, Plaintiff seeks an AEO provision.  An AEO designation is a protective order of the most restrictive kind.  "[C]ourts in many circumstances have found that a specific showing of competitive harm justifies a restriction of confidential or trade secret information to 'attorney's eyes only.'"  *Federal-Mogul Motorsports Corp. v. Mevotech L.P.*, No. 15-cv-13205, 2016 WL 47969, at *2 (E.D. Mich, Jan. 5, 2016) (citing *Arvco Container Corp. v. Weyerhauser Co.*, No. 1:08-cv-548, 2009 WL 311125, at *5 (W.D. Mich. Feb. 9, 2009); *see also Westbrook v. Charlie*

*Sciara & Son Produce Co.*, No. 07-2657, 2008 WL 839745, at *4 (W.D. Tenn.

Mar. 27, 2008) ("In general, courts utilize 'attorneys' eyes only' protective orders

when especially sensitive information is at issue or the information is to be

provided to a competitor."), *aff'd*, 2008 WL 11417501 (W.D. Tenn. Dec. 9, 2008).

"The party moving for a restrictive attorneys' eyes only designation must detail the

alleged harm it is likely to suffer without the requested protection 'with a particular

and specific demonstration of fact, as distinguished from stereotyped and

conclusory statements.'" *Jose v. Mueller*, No. 21-12556, 2024 WL 4580394, at *2

(E.D. Mich. Feb. 13, 2024) (quoting *Nemir v. Mitsubishi Motors, Corp.*, 381 F.3d

540, 550 (6th Cir. 2004)).

Because the indiscriminate use of attorneys' eyes only designations can

cause harm, these designations are not used "in the absence of a strong showing of

probable competitive harm." *Arvco Container*, 2009 WL 311125, at *5.

Determining whether good cause exists to allow an AEO designation "requires a

balance of the difficulties imposed" on the opposing party "against the need to

protect information from abuse by competitors." *Id.* at *6 (citation omitted).

    2.    <u>The Parties' Arguments</u>

Plaintiff argues that its proposed AEO designation is a standard feature of

civil litigation involving trade secrets, especially when discovery involves the

exchange of confidential information between competitors.  (ECF No. 79,

PageID.3560).  Thus, Plaintiff reasons, there is good cause for an AEO designation in this case because both it and Defendant are competitors in the pallet pooling industry who are each developing smart pallets.  (ECF No. 79, PageID.3561).  As for its "showing of probable competitive harm," Plaintiff points back to this Court's preliminary finding that Defendant is likely misappropriating trade secrets Plaintiff acquired from Lightning and that, absent an injunction, the continued misappropriation would result in immediate and irreparable harm.  (*Id.* at PageID.3561; ECF No. 83, PageID.3942-43).  Plaintiff also refers to the civil contempt order the Bankruptcy Court entered against Defendant regarding Lightning's LinkedIn page.  (ECF No. 83, PageID.3942).

Defendant offers three arguments in opposition to Plaintiff's proposed two-tiered protective order, all of which focus on the proposed AEO provision.[8]  First, Defendant reiterates its contention that Plaintiff did not acquire any trade secrets from Lightning and, even if Plaintiff had, it has not identified them.  (ECF No. 82, PageID.3931-32).  Second, Defendant argues that Plaintiff has offered the type of "stereotyped and conclusory statements" that are insufficient to warrant an AEO designation.  (*Id.* at PageID.3932-33).  And lastly, Defendant asserts that AEO designations are both "costly, cumbersome, and burdensome" because they place

---

[8] Defendant's brief in opposition does not oppose the specific provisions in the proposed protective order, just the general notion that an AEO is proper in this case.

the burden on the non-producing party to "police use of the AEO designation" while simultaneously "increasing the likelihood of additional court intervention in the discovery process."  (*Id.* at PageID.3933).

As far as Defendant's concerns over the costs of an AEO provision, Plaintiff cites, in part, case law from this Court for the proposition that such concerns can be assuaged by "an appropriate provision of the protective order allowing a party to challenge a designation . . . .  (ECF No. 79, PageID.3562 (quoting *Knight Cap. Partners Corp. v. Henkel Ag & Co. KGaA*, 290 F. Supp. 3d 681, 686 (E.D. Mich. 2017)); ECF No. 83, PageID.3944-45).  Since the proposed protective order includes a mechanism for challenging Confidential or Highly Confidential designations, Plaintiff concludes that the AEO mechanism is appropriate and necessary to conduct discovery in this case.  (ECF No. 79, PageID.3562-63).  Plaintiff contends that a two-tiered protective order would also protect Defendant's proprietary intellectual property.  (ECF No. 83, PageID.3945 n.1).

    3.   <u>Discussion</u>

        a.   <u>Plaintiff's Alleged Trade Secrets</u>

The Court is persuaded that there is good cause for a two-tier protective order that allows for AEO designations.  As Plaintiff points out, "[t]he disclosure of confidential information on an 'attorneys eyes only' basis is a routine feature of civil litigation involving trade secrets."  *Knight Cap. Partners Corp.*, 290 F. Supp.

3d at 685.  This is especially true in cases involving the exchange of confidential

information between direct competitors.  *See Green Empire Farms, Inc. v. Plant*

*Prods. USA, Inc.*, No. 2:23-cv-10737, 2024 U.S. Dist. LEXIS 167463, at *6 (E.D.

Mich. Sept. 17, 2024) (collecting cases in which discovery of confidential and

proprietary information between direct competitors warranted AEO designations);

*Sawicki v. Resolute Indus., LLC*, No. 22-10648, 2022 WL 16925957, at *2 (E.D.

Mich. Nov. 14, 2022) (same); *Arvco Container Corp.*, 2009 WL 311125, at *6

(requiring the Court to balance the interests between *competitors*) (emphasis

added).

Defendant does not contest that an AEO is proper when direct competitors

exchange discovery about their proprietary, confidential information like trade

secrets.  Defendant's contention is simply that Plaintiff does not have any trade

secrets to begin with.  In other words, Defendant posits that an AEO designation is

unnecessary because Plaintiff's trade misappropriation claims are baseless.  This

argument on the merits is more appropriate for a dispositive motion and is not

well-taken as the parties engage in discovery.  *See Knox Trailers, Inc. v. Clark*, No.

20-CV-137, 2022 WL 163696, at *5 (E.D. Tenn. Jan. 18, 2022) (concluding that

defendant's argument that plaintiff lacked "legal protection for their confidential

information"—after the court granted a preliminary injunction finding otherwise—

was a merits argument ill-suited for discovery motion practice).

26

Defendant's argument that Plaintiff has failed to identify its alleged trade secrets is just the opposite side of the same coin.  Defendant is aware what Plaintiff believes to be its trade secrets.  In its motion for a preliminary injunction, Plaintiff argued that the trade secrets it bought from Lightning included the Material Selection and Sourcing Assets, the Pallet Assembly and Manufacture Assets, and the Pallet Tracking and Use Assets.  The Court agreed, concluding that these assets "were confidential trade secret information of Lightning."  (ECF No. 33, PageID.1499).  Indeed, it would appear that Defendant understands this to be the case considering that it referred to these same assets in its motion for reconsideration.  (ECF No. 35, PageID.1531 ("Specifically, the Court identified the following practices and methods as being 'Lightning's Inventions'[:] "Identification and sourcing of engineered wood"; "Development and sourcing of a proprietary polymer used for coating the wood"; "Use of Spray Technology"; "Methods for assembling and manufacturing the pallet"; [and] "Use of a proprietary tracking device.").  Defendant's position here is essentially that these cannot be the alleged trade secrets because they are not trade secrets in the first place.  But again, that is an argument that is more appropriate for a dispositive motion and improper for discovery motion practice.  *See Knox Trailers, Inc.*, 2022WL 163696, at *5.

Defendant could have appealed the Court's preliminary injunction order to the Sixth Circuit.  *See, e.g.*, *Mallet & Co. Inc. v. Lacayo*, 16 F.4th 364 (3d Cir. 2021) (vacating district court's preliminary injunction for lack of specificity under Federal Rule of Civil Procedure 65(d)).  Though Defendant lost its first battle, it has not lost the war.  Defendant contends that Plaintiff did not purchase any trade secrets from Lightning—now is the time to conduct discovery to prove that assertion.

### b.   Likelihood that Plaintiff will be Harmed

Plaintiff has adequately shown that a two-tiered protective order is warranted.  As the facts here demonstrate, Defendant is not necessarily litigating on a clean slate.  Defendant was the subject of the Bankruptcy Court's civil contempt order regarding Lightning's LinkedIn page.  Because the Sale Order referred to the APA and the APA defined "Intellectual Property" to include websites and domain names, there is a foundation for Plaintiff's assertion that Defendant has misused Plaintiff's intellectual property.  Even so, discovery on Plaintiff's trade secrets misappropriation claims will involve the alleged trade secrets, and those trade secrets do not consist of Lightning's LinkedIn page.

This leaves Plaintiff's argument that it has satisfied its burden given that the Court concluded that Plaintiff would suffer immediate and irreparable harm absent an injunction.  In rebutting this argument, Defendant cites primarily to this Court's

decision in *Fortech S.R.L. v. Motor Consultants of Am., Inc.*, No. 22-11648, 2024 WL 4580799 (E.D. Mich. May 9, 2024) and posits that Plaintiff relies solely on "stereotyped and conclusory statements."  (ECF No.82, PageID.3931-32).  But *Fortech* is more supportive of Plaintiff's position than Defendant's.

When evaluating the harm the movant would suffer absent an AEO designation, the *Fortech* Court relied, in part, on *Stout v. Remetronix, Inc.*, 298 F.R.D. 531 (S.D. Ohio Jan. 17, 2014).  *See Fortech*, 2024 WL 4580799, at *4.  In *Stout*, the court granted a motion for an AEO designation because it had "demonstrated that the information was 'maintain[ed] on [a] password-protected computer' and was shown 'only on rare occasions' to 'other employees or businesses' while instructing the other parties 'not to otherwise disseminate the information,' . . . ."  *Id.* (quoting *Stout*, 298 F.R.D. at 535).  Based on this reasoning, the *Fortech* Court concluded that the movant in its case had satisfied its burden.  In particular, the movant had stated that its "proprietary and unique ideas" were subject to confidentiality agreements to protect them from the threat of competition.  *Id.*  Moreover, the movant there asserted that there was nothing like its software on the market and that its product was still in development and not yet available on the open market.  *Id.*

Plaintiff has made the same arguments as the movant in *Fortech* throughout this case.  Plaintiff claims that it purchased trade secrets from Lightning and that

those trade secrets were subject to confidentiality agreements among its own
employees.  (ECF No. 8, PageID.619).  Likewise, Plaintiff stated that Lightning's
"sources, selections, and selection process for . . . manufacturing materials and
third-party partners" were treated as confidential information.  (*Id.* at PageID.612).
Plaintiff has also argued that the Lightning Pallet—and therefore its pallet—is a
revolutionary and unique smart pallet unlike any other on the open market, just like
in *Fortech*.  (*Id.* at PageID.610 ("The investment of years of time and millions of
dollars thus created a Pallet with characteristics that no other pallet possessed.")).
And like in *Fortech* (and as Defendant itself pointed out in its response brief),
Plaintiff has not yet brought its smart pallet to market.  (ECF No. 82,
PageID.3933).

Additionally, the *Stout* case on which *Fortech* relied found additional
support for the claim of competitive harm because one of the movants' former
employees worked for a direct competitor.  *Stout*, 298 F.R.D. at 535-36 (citing
*United States ex rel. Daugherty v. Boswick Lab'ys*, No. 1:08-cv-354, 2013 WL
3270355, at *4, *6 (S.D. Ohio June 26, 2013)) ("If [movants'] competitors had
access to the [confidential information], [movants] could suffer harm in the
market.").  As Plaintiff has shown in this case, Defendant, who is a direct
competitor, employed at least nine former Lightning employees, including some in
high level executive positions.  (ECF No. 8, PageID.618).  Thus, *Stout* offers

another basis for Plaintiff's contention that it will suffer competitive harm absent an AEO designation.

Furthermore, as the Court concluded in its preliminary injunction order, the likelihood of Defendant's misappropriation of Plaintiff's trade secrets resulted in immediate and irreparable harm in the form of unfair competition.  (ECF No. 33, PageID.1501).  At the very least, it follows that Plaintiff faces the risk of competitive harm should it be forced to produce discovery on the alleged trade secrets without the protection of an AEO designation.[9]

Based on reasoning in *Fortech*, *Stout*, and the fact Plaintiff has received a preliminary injunction regarding its trade secrets misappropriation claims, Plaintiff has satisfied its burden.[10]

    c.    <u>Balance of Difficulties</u>

Defendant opposes Plaintiff's proposed protective order because AEO designations are "costly, cumbersome, and burdensome" and "increase the

---

[9] Plaintiff suggests that it showed the threat of immediate and irreparable harm by clear and convincing evidence.  (ECF No. 83, PageID.3943 (citing *Patio Enclosures, Inc. v. Herbst*, 39 F. App'x 964, 969 (6th Cir. 2002)).  But *Herbst* applied a clear and convincing standard because that was the burden of persuasion needed to prevail on a breach-of-noncompete covenant claim under Ohio law.  *See Handel's Enterprises, Inc. v, Schulenburg*, 765 F. App'x 117, 123-24 (quoting *Herbst*, 39 F. App'x at 968)).  Plaintiff's motion for a preliminary injunction was granted on its federal and state trade secrets claims, not a breach-of-noncompete claim.

[10] It should be noted that Plaintiff has moved for an order to show cause why Defendant should not be held in civil contempt for violating the preliminary injunction order.  (ECF No. 47).  This motion is before the District Judge and has not been decided.  Accordingly, the undersigned did not consider Plaintiff's arguments there in coming to this conclusion.

likelihood of additional court intervention in the discovery process." (ECF No. 82, PageID.3933).  But Plaintiff has shown that those concerns can be ameliorated with a provision in the protective order that allows for the requesting party to challenge the AEO designation.  Plaintiff cites two published decisions, including one from this Court, in support of that proposition.  *See Knight Capital Partners Corp.*, 290 F. Supp. 3d at 686; *S2 Automation LLC v. Micron Tech., Inc.*, 283 F.R.D. 671, 685 (D.N.M. 2012).  Such a challenge provision was found to address the non-movants' concerns regarding the possibility of abuse and increased costs in those cases.  As the *S2 Automation* Court explained it, "[s]uch a [challenge] mechanism highlights for everyone the most sensitive documents[ ] and assures that leaks by the receiving sides are rare and, if they occur, can be more easily traced to the source."  *S2 Automation LLC*, 283 F.R.D. at 685.  Moreover, such provisions "can prevent litigation over improper use of information disclosed under a protective order by clarifying the most sensitive information that the parties disclose."  *Id.*  This not only protects the disclosure of this information but permits "the party's lawyers to litigate on the basis of that information . . . ."  *Knight Capital Partners Corp.*, 290 F. Supp. 3d at 686.  Such protections would also safeguard *each* party's most sensitive information during discovery.  (*See, e.g.*, ECF No. 81-3 (showing that Defendant's objections to Plaintiff's discovery

requests rest, in part, on Defendant's concern that Plaintiff is attempting to access Defendant's own proprietary information)).

Defendant cites one case in support of its argument that a challenge provision does not adequately address its concerns.  (ECF No. 82, PageID.3933 (citing *Glob. Materials Techs., Inc. v. Dazheng Metal Fibre Co.*, 133 F. Supp. 3d 1079, 1084 (N.D. Ill. 2015)).  But the Court finds that *Global Materials* illustrates how a challenge mechanism works in action.  Yes, the court there recognized that an AEO designation comes with certain costs—but most of the cases cited above do as well.  *See, e.g.*, *Fortech*, 2024 WL 4580799, at *2-3.  This does not change the fact that a two-tiered protective order "is not an uncommon feature in protective orders in modern complex commercial litigation."  *S2 Automation LLC*, 283 F.R.D. at 685; *Knight Capital Partners Corp.*, 290 F. Supp. 3d at 685-86 (calling AEO designations "a routine feature of civil litigation involving trade secrets").  Furthermore, the court in *Global Materials* did not wholly remove the AEO provision from the protective order as Defendant suggests, (ECF No. 82, PageID.3933); rather, the court only removed the AEO designation from certain documents while leaving it in place for others.  133 F. Supp. 3d at 1092.  If anything, *Global Materials* shows the effectiveness of a challenge provision in a two-tiered protective order.

Since Plaintiff's proposed protective order contains a challenge provision and Plaintiff has show good cause for a two-tiered protective order, Plaintiff's motion is **GRANTED**.

Accordingly, the Court adopts the proposed protective order attached to Plaintiff's motion, (ECF No. 79-2), with one substantive revision.[11]  Currently, the protective order's challenge provision allows for the Disclosing Party and objecting party to submit a letter to the Court detailing the objecting party's position.  (*Id.* at PageID.3580, ¶ 15(a)-(d)).  Rather than a letter, the Court will require full briefing on the objecting party's position.  After the parties have conducted a meet and confer to address the objecting party's concerns, (*See id.* at PageID.3579, ¶ 15), the objecting party is directed to file a motion with the Court seeking to remove the Confidential or Highly Confidential designation from the specified discovery material should the meet and confer be unsuccessful.  The objecting party's motion should be filed with the Court within fourteen (14) calendar days of the meet and confer.  The Disclosing Party's response brief will be due fourteen (14) calendar days after the objecting party has filed its motion.  The objecting party's reply brief will be due fourteen (14) calendar days after the Disclosing Party has filed its response brief.  The briefing should be filed in

---

[11] The Court has made minor formatting edits as well.

accordance with the Federal Rules of Civil Procedure and this Court's Local Rules.[12]

One final note.  The Court understands that Defendant's position is that Plaintiff did not acquire any trade secrets from Lightning.  The Court also understands that Plaintiff intends to supplement its discovery responses after the disposition of this motion.  (*See, e.g.*, ECF No. 92, PageID.4477 (responding to Defendant's motion to compel, (ECF No. 88), and indicating that Plaintiff "agreed it will supplement many of [the at-issue discovery] requests upon entry of a protective order").  Presumably, Plaintiff may designate some of that material Confidential or Highly Confidential.  Nothing in the protective order prevents Defendant from challenging those designations.  But should Defendant do so, its arguments should focus on why, for instance, there is not good cause for an AEO designation of certain material.  *See, e.g.*, *Brown v. Tellermate Holdings Ltd.*, No. 2:11-cv-1122, 2014 WL 2987051, at *22-23 (S.D. Ohio July 1, 2014) (applying *Penn, LLC v. Prosper Business Dev. Corp.*, No. 2:10-cv-0993, 2012 WL 5948363, at *4 (S.D. Ohio Nov. 28, 2012)); *Glob. Materials Techs., Inc.*, 133 F. Supp. 3d at 1084 ("Once a protective order has been entered, the party seeking to protect documents under its shield must continue to show good cause for confidentiality

---

[12] Concurrently with this Order, the Court will file a copy of the protective order that reflects these changes.

when challenged.") (internal quotations omitted).  The challenge provision should not be used as a vehicle for a merits-based argument.

B.    <u>Defendant's Motion to Compel Depositions (ECF No. 94)</u>

On February 26, 2025, Defendant filed a motion to compel the depositions of Mr. Roland Heiberger and Mr. Richard Crow.  (ECF No. 94).  Because "Plaintiff has repeatedly demonstrated the relevance of Heiberger and Crow's testimony" in support of its motion for a preliminary injunction and a declaration from Heiberger in support of Plaintiff's pending civil contempt motion, Defendant wants to depose them both.  (*Id.* at PageID.4517).  Plaintiff has not produced these witnesses because of its "concerns about the confidentiality protections" for depositions absent a protective order.  (*Id.* at PageID.4520).  Plaintiff says as much in its response brief.  (ECF No. 95, PageID.4543 ("[Plaintiff] agreed it would produce Mr. Heiberger and Crow once such a protective order has been tentered.").  Though Defendant offered to conduct the depositions under an AEO designation, "subject to the Court's ultimate decision on the motion for a protective order," Plaintiff refused.  (ECF No. 94, PageID.4520; ECF No. 95, PageID.4544-47).

The parties agree that the only obstacle preventing Defendant's desired depositions is the absence of a protective order.  The Court has now granted Plaintiff's motion for a protective order.  Accordingly, Defendant's motion to compel is **DENIED AS MOOT**.  The depositions can now take place subject to

the appropriate provisions in the protective order. The parties should confer

further on the timing for these depositions.

## IV. CONCLUSION

For the reasons discussed above, Plaintiff's motion for a protective order is

**GRANTED** and Defendant's motion to compel deposition is **DENIED AS**

**MOOT**.

**IT IS SO ORDERED**.

The parties here may object to and seek review of this Order, but are

required to file any objections within 14 days of service as provided for in Federal

Rule of Civil Procedure 72(a) and Local Rule 72.1(d). A party may not assign as

error any defect in this Order to which timely objection was not made. Fed. R.

Civ. P. 72(a). Any objections are required to specify the part of the Order to which

the party objects and state the basis of the objection. When an objection is filed to

a magistrate judge's ruling on a non-dispositive motion, the ruling remains in

effect unless it is stayed by the magistrate judge or a district judge. E.D. Mich.

Local Rule 72.2.


Date: May 20, 2025                        s/Curtis Ivy, Jr.
                                          Curtis Ivy, Jr.
                                          United States Magistrate Judge